## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | |
|---|---|
| In re:<br><br>**GEMCRAFT HOMES, INC., et al.**[1]<br><br>**Debtors.** | **(CHAPTER 11)**<br><br>**CASE NO. 09-_____ (_____)**<br><br>**(Joint Administration Requested)** |

### AFFIDAVIT OF WILLIAM R. LUTHER, JR., IN SUPPORT OF FIRST-DAY MOTIONS

I, William R. Luther, Jr., being duly sworn, deposes and states, under penalty of perjury,

that the following information is true to the best of my knowledge, information and belief.

### I.    Background

#### A.    Introduction

1.    I am the President of Gemcraft Homes, Inc. ("Gemcraft") and Gemcraft Homes

Group, Inc. ("GHG"), and am the Managing Member of DLM, LLC ("DLM"), Gemcraft Homes

Forest Hill, LLC ("Gemcraft Forest Hill"), Gemcraft Chesapeake, LLC ("Gemcraft

Chesapeake"), and The Preserves at Jefferson Creek, LLC ("Preserves"). I am also the Manager

of Harkins Property, LLC ("Harkins"), and the Managing Member of Gemcraft Homes Autumn

Run, LLC, which is the Managing Member of S & M Properties, LLC ("S & M"). In these

capacities, I am familiar with the day-to-day operations, financial condition, books and records,

and business affairs of the Debtors. I submit this Affidavit in support of the Companies'

---

[1]    The Debtors in these chapter 11 bankruptcy cases are (i) Gemcraft Homes, Inc., (ii) DLM, LLC, (iii) Gemcraft Homes Group, Inc., (iv) Gemcraft Homes Forest Hill, LLC, (v) Gemcraft Chesapeake, LLC, (vi) Harkins Property, LLC, (vii) The Preserves at Jefferson Creek, LLC, and (viii) S & M Properties, LLC (collectively, the "Debtors" or the "Companies").

chapter 11 petitions, first-day applications, and motions listed on <u>Exhibit A</u> hereto (the "First-Day Motions").

2.      Except as otherwise indicated, all facts set forth in this Affidavit are offered to the best of my knowledge, information and belief and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Companies' management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Companies' industry, operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Affidavit on behalf of the Companies.

3.      To minimize any adverse effects on our businesses as a result of the commencement of the Companies' chapter 11 cases, the Companies have requested various types of relief in the First-Day Motions.  The First-Day Motions seek relief, among other things, to:  (a) approve, on an interim basis and final basis, an unsecured debtor-in-possession credit facility proposed by Gemcraft Capital, LLC, an affiliate of the Debtors, which is needed to cover payroll expenses at the ontset of these cases; (b) permit the continuation of the Companies' cash management system and other business operations without interruption; (c) continue to honor prepetition contracts for the sale of homes and to sell homes postpetition in the ordinary course; (d) maintain employee morale and confidence; and (e) establish certain other administrative procedures to promote a smooth transition into chapter 11.  Gaining and maintaining the support of the Companies' employees, home buyers, vendors and other key constituents as well as maintaining the day-to-day operations of the Companies' businesses with minimal disruption, will be critical to the Companies' reorganization efforts and their ability to maximize the recovery prospects for all interested parties.  The relief requested in the First-Day Motions is in

the best interest of the Companies, their creditors and estates, and is necessary to avoid immediate and irreparable harm.

### B.  Overview of the Debtors' Business

4.    Gemcraft is a corporation formed under the laws of the State of Maryland with its principal place of business located in Harford County, Maryland.  Gemcraft was founded in 1993 with a single sales trailer in Abingdon, Maryland, from which six residential homes were sold. Since that time, Gemcraft has grown to become one of the largest independent homebuilders in the Mid-Atlantic region, and one of the fastest growing builders in the entire country.  Gemcraft is a production builder which targets first-time homebuyers and first-time "move up" buyers.  It also targets retired, and soon to retire, buyers for its retirement communities.

5.    Gemcraft was named the Maryland Builder of the Year by the Maryland Homebuilders' Association in 2001.  In 2007, Gemcraft was the recipient of three Parade of Homes awards for Best Home and Best Bath & Kitchen, and two Pyramid awards for Best Single Family Home and Best Multi-Family Home.  Gemcraft followed that success in 2008 by winning four more Parade of Homes awards, including awards for Best Bath and Best Kitchen. Builder Magazine's May 2009 issue recognized Gemcraft as the 61st largest builder in the country.  Gemcraft's historical success can be attributed to its dedication to buyer satisfaction, and ability to deliver quality amenities at affordable prices.   As of the Petition Date, Gemcraft has built residential homes in over forty communities spread across five states.

6.    DLM is an affiliate of Gemcraft, with common ownership, which serves as the land development company for the enterprise.  First organized in 2000 as a Maryland limited liability company known as Forest Hill Land Development, LLC, DLM has grown from managing one development job to one of the largest residential developers on the East Coast,

controlling over 20,000 lots. DLM historically focused on raw ground in growth areas that were acquired to be taken through the entire development process. DLM produces finished lots ready for the homebuilder to sell, build and deliver to new homebuyers. DLM has sold lots to Gemcraft and national and local builders including Lennar, Ryan, and K-Hovnanian.

7.    Prior to 2000, Gemcraft Forest Hill served as the land acquisition company for the enterprise. Gemcraft Forest Hill currently holds land that was acquired (or contracted to be acquired) prior to DLM's formation.

8.    GHG maintains systems that allow Gemcraft's homebuilding divisions to sell homes. GHG also maintains the payroll account to pay Gemcraft's employees (except employees in West Virginia).

9.    Harkins, which is wholly owned by Gemcraft Forest Hill, owns several land development projects in Delaware and Pennsylvania. Gemcraft Chesapeake and Preserves at each purchase and sell finished lots in separate condominium projects located in Delaware.

10.    S & M Properties is an affiliate of Gemcraft and owns finished lots in a community in Abington, Maryland known as Autumn Run.

**C.    Prepetition Capital Structure**

11.    The Debtors' growth has been very dependent on loans from banks to finance the acquisition of land as well as the construction of homes. In 2005, the Debtors relied on approximately 24 different lenders, including Regions Bank ("Regions"), M&T Bank ("M&T"), PNC Bank, BB&T Bank, Wachovia Bank, and Columbia Bank (collectively, with all of the Debtors' other lenders, the "Lenders"), and they had the ability to borrow up to $400 million in the aggregate. The overwhelming majority of the Debtors' loans were guaranteed by the owners of Gemcraft.

12.     As of November 1, 2009, Gemcraft and other Debtors (except for DLM) owe their Lenders a total of approximately $99,000,000 under the various loan agreements, DLM owed its Lenders a total of approximately $32,000,000, and other affiliated non-Debtors owe approximately $32,0000,000.

**D.**     **Events Leading to Bankruptcy**

13.     As is now well documented, after the U.S. housing market peaked in 2005, the market collapsed at the end of 2006.  Home foreclosures skyrocketed in 2006-2007, further contributing to the crisis in the subprime, mortgage, and credit markets.  The downturn worsened in 2008.

14.     Homebuilders all over the country suffered major losses.  A number of them filed for relief in bankruptcy, and many others ceased operating and closed their doors.

15.      According to the National Association of Homebuilders (the "NAH"), single-family home starts fell by 3.3% in October 2008 to a level that was down by 71% from its peak in January 2006.  The NAH also reported that sales of new homes continued to trend downward falling by 40% on a year-over-year basis.  New-home sales were down by 69% in 2008 from their cyclical peak in July 2005.  On December 30, 2008, the Case-Shiller home price index reported its largest price drop in its history.

16.     The Debtors were not immune to these adverse market forces.  Beginning in 2006, as home values declined, interest rates rose, and defaults on home loans increased dramatically, Gemcraft's annual home sales decreased from 770 in 2006, to 501 in 2008.  Gemcraft's gross profits on home sales decreased concurrently from the high 20% range to the single digits.  The value of DLM's land holdings plummeted, in the Debtors' estimate, by hundreds of millions of dollars.  With decreasing sales and profitability, Gemcraft's ability to

meet its obligations to its subcontractors suffered, and its Lenders continued to demand interest and paydowns on outstanding loans.

17.    To address their liquidity crisis, the Debtors reduced their staff from over 400 employees to approximately 81 as of the Petition Date, closed six of their seven offices, cut salaries and benefits, and reduced overhead and direct costs.

18.    The Companies' reduced sales, projected to be 350 this year, coupled with the decreased value of land holdings, rendered the Companies' unable to service their debts to its Lenders and remain profitable companies under their current financial structure.   In these circumstances, the Debtors had no choice but to seek relief under chapter 11 of the United States Bankruptcy Code to restructure their business and financial affairs and to continue as going concerns.

### E.    The Need for Financing

19.    As reflected in the Debtors' cash flow forecast for the first 30 days of these cases (a copy of which is attached as Exhibit B), the Debtors require authority to borrow up to $250,000.00 to fund their payroll.  Without this immediate postpetition financing, the Debtors would be unable to pay their payroll and other operating expenses and would be prevented from reorganizing their businesses, thus impairing the Debtors' ability to preserve the value of their estates.  As of the Petition Date, the Debtors have approximately 150 contracts with purchasers to build homes which are in various stages of construction, ranging from not-yet-started to almost completed.

20.    The Debtors intend to complete the construction of these homes and to fulfill their contract obligations to their customers. To do so will require funding from the Gemcraft Capital, LLC, a non-Debtor affiliate.   The Debtors also anticipate obtaining additional postpetition

financing from its two primary lenders, Regions Bank and Manufacturers and Traders Trust Company, under separate secured credit facilities which we expect to be the subject of separate motions for Court approval in the very near future.  Together, these three facilities will provide the funding necessary for the Debtors to pursue what they believe should be a successful reorganization.

## II.    First-Day Motions[2]

21.    Concurrently with the filing of these chapter 11 cases, the Companies filed a number of First-Day Motions.  The Companies anticipate that the Court will conduct a hearing soon after the commencement of these cases (the "First-Day Hearing"), at which the Court will hear the First-Day Motions.

22.    An important and critical element of the success of these chapter 11 cases will be the entry of orders granting the relief requested in each of the First-Day Motions.  Generally the First-Day Motions are designed to facilitate:  (a) the continuation of the Companies' existing cash management systems and other business operations without interruption, and to approve on an interim basis the postpetition financing agreements negotiated between the Companies and their lenders, (b) preservation of customer and vendor relationships, (c) maintenance of employee morale and confidence, and (d) establishment of certain other administrative procedures to promote a smooth transition into chapter 11.  The factual background in support of each First-Day Motion is provided below:

---

[2]    Capitalized terms not defined herein have the meanings ascribed to them in the respective First-Day Motions.

A. **Debtors' Motion for Order Under 11 U.S.C. § 364(b)(A) Authorizing Debtors to Obtain Unsecured Postpetition Financing from Gemcraft Capital, LLC (B) Scheduling Hearings for Interim and Final Approval, and (C) Granting Related Relief**

23.     Gemcraft Capital has agreed to make a loan to the Debtors under the terms of the GC Credit Facility.  Pursuant to the GC Credit Facility, and upon entry of an interim Order, Gemcraft Capital will make available to the Debtors, from time to time, in amounts determined by Gemcraft Capital in its discretion, funds in an aggregate principal amount not to exceed $5 million.

24.     The main elements of the unsecured GC Credit Facility are summarized as follows:

(a)     <u>Amount of Loan</u>:  The GC Credit Facility provides for a total commitment in an aggregate principal amount not to exceed $5 million.

(b)     <u>Use of Financing</u>:  The GC Credit Facility will be used to fund normal and customary operating expenses related to the Debtors' businesses, amounts authorized to be paid by the Court, and bankruptcy related fees and expenses incurred by the Debtors.

(c)     <u>Borrowers</u>:  Gemcraft and DLM.

(d)     <u>Interest Rates, Fees and Expenses</u>:

(i)     <u>Interest</u>.  The interest rate on advances is 8 % per annum.

(ii)     <u>Fees</u>.  There are no fees being charged.

(iii)     <u>Default Rate</u>.  The default rate of interest is 10% per annum.

(e)     <u>Term</u>:  The maturity date will be July 1, 2010 unless otherwise, extended by Gemcraft Capital, or a plan is confirmed.

(f)     <u>Lien Status and Priority</u>:  The loan is unsecured.  Gemcraft Capital will have an allowed administrative expense claim, pursuant to 11 U.S.C. § 503(b).

(g)     <u>Default Rights</u>:  Gemcraft Capital may pursue remedies subject to the automatic stay of Section 362 of the Bankruptcy Code, and may refuse

> to make further advances. Upon the occurrence of an Event of Default under the Agreement and subject to obtaining relief from the stay, Gemcraft Capital shall have customary remedies including, but not limited to, the right to terminate the Agreement and declare the outstanding balance immediately due and payable.

25.     I believe that the circumstances require the Debtors to obtain debtor in possession financing to pay for operating expenses.  Specifically, the Debtors require $250,000.00 immediately to fund payroll.  They will not draw more than $250,000.00 under GC Credit Facility prior to the entry of a Final Order.  Without the GC Credit Facility, the Debtors would be unable to pay necessary and ordinary expenses during the period prior to final approval of this Motion.  Gemcraft Capital has agreed to lend the Debtors funds on an unsecured basis at a rate of interest of 8 %.

26.     The GC Credit Facility is the only unsecured financing available. The terms and conditions of the GC Credit Facility are clearly fair and reasonable.  The GC Credit Facility provides for a modest interest rate, and GC Capital will not receive a lien on the Debtors' assets. These terms are far more favorable than any possible terms that may be obtained from other lenders unrelated to the Debtors. I believe that the terms of the GC Credit Facility were negotiated in good faith and at arm's-length, and are in the best interest of creditors and the Debtors' estates.

**B.     Motion for Interim and Final Orders Pursuant to Section 366 of the Bankruptcy Code (i) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (ii) Deeming Utility Providers Adequately Assured of Payment for Future Utility Services, and (iii) Establishing <u>Procedures for Determining the Adequate Assurance of Payment</u>**

27.     The Companies seek the entry of an Interim Order and a Final Order, (i) prohibiting utility providers from altering, refusing or discontinuing utility services, (ii) deeming that the Companies' utility providers have been provided with adequate assurance of payment for future services, (iii) establishing procedures for determining the adequate assurance of payment

for future services, (iv) authorizing the Debtors' banks to honor any checks received by the Utility Providers prepetition for services which were not cashed as of the Petition Date, or replacement checks for any checks that were dishonored.

28.     In connection with the operation of their businesses in the ordinary course, the Companies obtain Utility Services from a number of Utility Providers, and incur expenses for such services.  Uninterrupted utility services are critical to the Companies' ongoing ability to maintain their offices and model homes, and to construct new homes, and therefore, to the success of these chapter 11 cases.

29.     Generally, the Companies have established a good and consistent payment history with the Utility Providers making regular, timely payments for expenses incurred.  As of October 31, 2009, the Debtors are current with its Utility Providers.

30.     The Companies propose to deposit a sum equal to approximately fifty percent (50%) of their average aggregate monthly payment of Utility Services, into an interest bearing segregated account maintained by the Companies to provide adequate assurance of future performance to the Utility Providers.

**C.     Debtors' Motion for an Order Authorizing Payment of Prepetition Wages, Compensation, Employee Benefits, Expenses Reimbursements and Related Items, and the Continuation of Certain Employment Policies in the Ordinary Course**

31.     As of the Petition Date, Gemcraft has approximately 81 Employees, consisting of corporate office Employees and salespeople.  None of the other Debtors have Employees.  To minimize the personal hardships Employees will suffer if prepetition employee-related obligations are not paid, and to maintain Employees' morale at this critical time, the Companies seek the authority to pay the Employee Obligations, as well as reimbursement of certain customary reimbursable expenses.

**Wages, Salaries and Bonuses**

32.     In the ordinary course of business, Gemcraft incurs payroll obligations to employees for the performance of services.  Gemcraft has salaried and hourly employees.  In addition to salary and hourly wage, some Gemcraft employees receive production and sales bonuses.

33.     Production bonuses are given to sales representatives based on: (i) quality control reviews received by supervisors; (ii) the time a home is under construction; and (iii) obtaining customer signoff on pre-settlement items.  Production bonuses vary depending on level of seniority and type of home, and range from $25 to $100 per bonus per home sold.

34.     In addition to the production bonuses, the community sales manager, assistant sales manager, and sales assistants may receive a bonus when a house is sold.  The community sales managers typically receive one percent (1%) of the sale price, the assistant sales managers typically receive one percent (1%) or less of the sale price, and sales assistants typically receive a bonus of $25 to $50 per home sold.

35.     Since 1995, Gemcraft has used the services of an entity known as "Selective HR Solutions" to outsource the company's benefits administration, human relations, payroll processing, and workers' compensation.  Gemcraft uses Selective HR Solutions largely to enable Gemcraft to offer more competitive health insurance rates and other benefits that would be more costly or simply unavailable to a company that is not a large company.

36.     Gemcraft enters payroll information online through a website managed by Selective HR Solutions, and Selective HR Solutions calculates the payroll obligations, prints the checks for employees who elect to receive paychecks (which are issued from a Selective HR Solutions account), overnights the checks to Gemcraft for distribution to employees and pays payroll taxes and other applicable deductions required by law.  Selective HR Solutions also

handles automatic deposits into employee bank accounts, and the funds for such payments are also drawn from a Selective HR Solutions account.[3]

37.    Employees are paid (and payroll is funded) bimonthly, on the first and sixteenth days of each month.  Selective HR Solutions electronically transfers the amount necessary to fund payroll (plus a fee for its services), on the first and sixteenth days of each month, from a Gemcraft bank account, to cover payroll, taxes, benefits and Selective HR Solutions' service fee.

### Employee Benefits

38.    In the ordinary course of business, Gemcraft maintains Employee Benefits.  Full-time employees become eligible for Employee Benefits on the first day of the month following sixty days of full-time employment.  Part-time employees are immediately eligible to receive health insurance and other benefits, at their own expense.

39.    Gemcraft maintains an employee benefits policy pursuant to which employees are provided with certain sick time, paid holidays, and vacation pay.  Many employees have accrued paid time off as of the Petition Date, consistent with Gemcraft's current policy for paid time off.

40.    Gemcraft also offers medical, dental, and vision coverage to its employees. Gemcraft offers two health plans (which include dental and vision coverage), which are administered by United Health Care.  The premiums under these plans are paid partially by Gemcraft and partially by the employees.  The percentage of Gemcraft's contribution depends on the type of coverage chosen by the employee and the number of dependents covered by the selected plan.  These amounts are all funded as part of payroll in the manner described above. The health insurance plan also includes life insurance.

---

[3]      If commissions are earned in West Virginia, Selective HR Solutions transfers money from a separate Gemcraft account to pay such commissions.

41.     In addition to healthcare and related benefits paid in part by Gemcraft, employees may choose to pay for supplemental insurance (at their sole expense), including long-term disability, accidental death and dismemberment, and supplemental life insurance.

42.     Gemcraft estimates that, as of the Petition Date, Prepetition Payroll Obligations and Employee Benefits total approximately $180,000.  This represents the amount Gemcraft estimates it will pay to Selective HR Solutions for the period from November 1, 2009 through November 7, 2009 (exclusive of Selective HR Solutions' fee, which is expected to be 1.75% of the payroll amount).

**Reimbursable Business Expenses**

43.     In the ordinary course of business, Gemcraft reimburses employees for actual, reasonable and proper business and travel expenditure incurred in the normal course of their employment ("Reimbursable Expenses").  Employees typically incur Reimbursable Expenses through the use of their personal credit cards or own cash.  A few employees also have access to a company credit card used primarily to pay for E-Z Pass tolls.  As of the Petition Date, Gemcraft estimates that unpaid Reimbursable Expenses total approximately $20,000.

44.     I believe that the successful reorganization of the Debtors' businesses, to be accomplished in large part by the continuing sales of homes by current employees, depends on the retention and motivation of the employees during these chapter 11 cases.  Most of the Debtors' employees (and their families) are dependent upon the wages, salaries, reimbursements and other benefits they receive from the Debtors.

45.     If amounts owed are not paid, insurance reimbursements not made, or other benefits delayed, employees may suffer extensive personal hardship and in some cases will be unable to meet the "basic living" needs.  This could cause significant harm to Employees and

their families and potentially make it difficult or impossible for them to continue working for Gemcraft.

46.    I believe that, to avoid the risk of such employee resignations and to maintain employee morale, it is critical that Gemcraft be authorized to pay each of the Employees all compensation amounts (subject to the statutory cap described below) that have been earned under Gemcraft's prepetition contractual obligations or practices.  It is also essential that Gemcraft continues the employee plans and policies discussed in the Motion in the ordinary course of business and on an uninterrupted basis.

**D.    Debtors' Motion for an Order (i) Authorizing Debtors to Continue Use of Their Centralized Cash Management System, Existing Bank Accounts and Business Forms, and (ii) Waiving Temporarily, the Deposit and Investment Requirements of Section 345 of the Bankruptcy Code**

47.    In the ordinary course of business, the Debtors and certain non-Debtors maintain approximately 25 Bank Accounts that operate as part of a centralized Cash Management System. Through the Bank Accounts, the Debtors efficiently collect, transfer, and disburse funds generated from home sales and lender draws.  The Debtors routinely deposit, withdraw, and otherwise transfers funds to, from, and between the Bank Accounts by various methods including check and wire transfer.

48.    The Debtors maintain several bank accounts at Harford Bank, including the following: (i) the operating account for Gemcraft, which is also used as an account for Gemcraft's northern homebuilding division (the "Gemcraft Operating Account"); (ii) an account held by GHG used to fund payroll ("GHG Account"); (iii) six accounts for Gemcraft's other homebuilding divisions (the "Primary Division Accounts"), as well as accounts held by Harkins, Gemcraft Chesapeake and Preserves with similar funcitons; (iv) four local accounts for certain Gemcraft homebuilding divisions (the "Local Division Accounts", and together with the Primary

Division Accounts, the "Division Accounts"); (v) a general escrow account (the "Harford Escrow Account"); (vi) accounts with outstanding letters of credit (the "Harford LOC Accounts"); and (viii) the operating account for DLM (the "DLM Operating Account").

49.     Although most of the Debtors' accounts are maintained at Harford Bank, there are a few accounts maintained at other banks, including: (i) a general escrow account held by Gemcraft at M&T Bank and an escrow account held by Gemcraft at M&T Bank for West Virginia customer deposits (together with the Harford Escrow Account, the "Escrow Accounts"); (ii); interest reserve accounts held by Gemcraft or DLM at M&T Bank, Wachovia, Regions Bank, and People's Bank (the "Interest Reserve Accounts"); (iii) loan advance accounts held by Gemcraft at Columbia Bank and M&T Bank, and a loan advance account held by DLM at Stonebridge bank (the "Draw Accounts"); and (iv) accounts with outstanding letters of credit held by DLM at Bay First Bank and PNC Bank (together with the Harford LOC Accounts, the "LOC Accounts").

50.     The following is a summary of how the Bank Account and Cash Management System operate:

- Gemcraft Operating Account. This account is funded by draws from lenders for building finished lots, and is also funded by settlements from homes sold in Gemcraft's northern division. This account is used to fund the Division Accounts with a short term loan, if necessary to cover expenses, to pay rent to the Office Building Account, and to fund payroll accounts on the first and sixteenth days of each month to cover payroll expenses.

- GHG Account. This account is funded by service fees paid by Gemcraft homebuilding divisions. This account also is the account into which payroll is funded by Gemcraft operating account (with the exception of West Virginia payroll).

- Primary Division Accounts (including the Gemcraft Operating Account, to the extent used for northern division operations). These accounts are funded by settlements on homes sold in the various divisions. These accounts are used to pay expenses (such as model home costs) associated with homebuilding in the division and overhead expenses. Harkins, Gemcraft Chesapeake and Preserves also each maintain an account which serves a similar function with respect to their projects.

- Local Division Accounts.  These accounts are funded to maintain a nominal balance by Gemcraft to cover certain expenses (such as use and occupancy and tap fees) that must be paid promptly.  These accounts absolve the need for local division employees to request a check from Gemcraft's corporate offices drawn on a Primary Division Account or the Gemcraft Operating Account.

- DLM Operating Account.  This account is funded by lender draws for land development costs and expenses.

- Interest Reserve Accounts.  These accounts are restricted accounts that contained interest reserves required by lenders.

- Draw Accounts.  These accounts funded by draws directly from lenders that require draws to be funded to their own accounts.  After draws are funded to these accounts, Gemcraft or DLM, as applicable, transfer the funds to their respective operating accounts.

- LOC Accounts.  These accounts are restricted accounts that contain funds securing the completion of certain land development projects.

## The Debtors' Business Forms

51.    In the ordinary course of business, the Debtors use numerous varieties of business forms.  To minimize the expense to the estates and to avoid any confusion with suppliers, customers, and employees, the Debtors respectfully request that the Court authorize the Debtors to continue to use all business forms, including without limitation, checks, letterhead, customer program forms, purchase orders, contracts, and invoices, as such forms were used by the Debtors immediately prior to the Petition Date, without reference to the Debtors' status as a debtor in possession.  Granting this relief will allow the Debtors to avoid the cost and delay of ordering new business forms.  Upon depletion of the current stock of forms and checks, the Debtors will obtain new checks and forms that indicate the debtor in possession status.

## Continued Use of a Cash Management System Is Warranted

52.    The Companies hereby seek authority to maintain the Cash Management System.  The Cash Management System constitutes a customary and essential business practice.  The Companies' Cash Management System is similar to those commonly employed by corporate

enterprises comparable to the Companies in size and complexity.  The widespread use of such systems, moreover, is attributable to the numerous benefits they provide, including the ability to (a) control and monitor corporate funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the movement of funds.

53.     In light of the substantial size and complexity of the Companies' operations, the Companies' efforts to preserve and enhance the value of their estates will be hampered if their cash management procedures are disrupted.

54.     For much the same reasons, the Companies further seek the authority to implement ordinary course changes to their Cash Management System, without further order of the Court, in the event that the Companies conclude that changes in the Cash Management System are beneficial to the estates.  In addition, the Companies request authority to open and close bank accounts.  The Companies request that the banks be authorized to honor the Companies' requests to open or close any bank accounts.

55.     As set forth above, within their Cash Management System, the Companies maintain numerous Bank Accounts.  To avoid substantial disruption to the normal operation of their businesses and to preserve a "business as usual" atmosphere with respect to cash management function, as part of their request to maintain their Cash Management System, the Companies hereby also request permission to continue to use their Bank Accounts.  The Companies request further that the Banks be authorized to continue to follow the instructions of all parties authorized to issue instructions with respect to the Bank Accounts.  Allowing these accounts to be maintained with the same account numbers will assist the Companies in accomplishing a smooth transition to operating in chapter 11.

56.     To protect against the possible inadvertent payment of prepetition claims, the Companies will immediately advise their banks not to honor checks issued prior to the Petition Date, except as otherwise expressly permitted by an order of the Court and directed by the Companies.

57.     The Companies also seek a waiver of the requirement to establish specific bank accounts for tax payments.  The Companies believe that tax obligations can be paid most efficiently out of the existing Bank Accounts, that the U.S. Trustee can adequately monitor the flow of funds into, among and out of the Bank Accounts, and that the creation of new debtor in possession accounts designated solely for tax obligations would be unnecessary and inefficient.

## Waiver of Section 345 Requirements

58.     The Companies seek a waiver of section 345(b) of the Bankruptcy Code permitting the Companies to maintain their Bank Accounts without the need to post a bond or other security if the funds deposited in their Bank Accounts exceed the limits of section 345.

59.     The Companies do not maintain any investment accounts of significance.  In light of the amount of funds that will flow through the estates, the regular deposits and sweeps, and the minimal or zero balances in certain of the Bank Accounts, it would be unnecessary and inefficient for the Companies to be forced to incur the expense of obtaining a bond given the safeguards embedded in the Companies' Cash Management System for the preservation of the funds therein.  The Companies submit that their current practices provide sufficient protection for their cash and that it would be in the estates' best interests for the Companies to continue to follow these practices.  Moreover, the banks where the Companies maintain their accounts are well-known and fiscally strong institutions, which provide services critical to the Companies operations.

**E.    Motion for Order Authorizing the Debtors to (A) Honor Existing Prepetition Contracts for the Sale of Homes and to Apply Purchaser Deposits and Pay Expenses Incurred at Closing, and (B) Enter into Sale Contracts for Homes and Close on Sales of Homes Postpetition  in the Ordinary Course of <u>Business</u>**

60.    By this motion, the Debtors seek authority to (i) close upon the sale of homes, free and clear of all liens, claims and encumbrances with the consent of the appropriate lenders, (ii) honor existing prepetition contract obligations to homebuyers and others including the application of deposits and the payment of related closing costs such as taxes, (iii) provide a mechanism for the resolution of certain disputed lien claims, such as those which may be asserted for mechanic liens claims and (iv) sell homes postpetition in the ordinary course of business.

61.    Gemcraft currently has approximately 150 residential homes under contract to be constructed (or completed) and sold in Maryland, Delaware, Pennsylvania, West Virginia and Virginia.  Over the next 90 days, Gemcraft expects to close on many of those sales.  The purchasers of these homes have each paid a significant deposit to be credited to the sale price of the home at closing, and their families are depending on Gemcraft to finish the construction and deliver the home they purchased.

62.    Given that the Debtors' core business is the sale of residential homes, the Debtors believe that it is within their ordinary course of business to proceed with the closing of the sales for homes that are under contracts entered into prepetition, and to continue to build and sell residential homes postpetition, without further Order from the Court.  To satisfy the needs of purchasers, title companies, title insurers and others involved in the home sale process, however, the Debtors seek the entry of an Order authorizing them to (i) close on the prepetition residential home sale contracts, apply the respective purchaser deposits as contractually required and pay

related expenses at closing, and (ii) continue to enter into postpetition sales contracts and to close such sales in the ordinary course.

63.     The Debtors believe that the relief requested in the motion is critical to maximizing recoveries for creditors in these cases.  Continuing to sell homes in their discretion preserves the value of the of the Debtors' businesses while generating revenue for the estates.

64.     As part of the motion, the Debtors also seek to sell the homes free and clear of all liens and other interests.  The liens on the properties are comprised of liens from the Debtors' lenders, and any mechanic's liens that have attached to the properties.  The Debtors expect to obtain the consent of the Lenders for the sales to satisfy § 363(f) to the extent required.

65.     Recognizing that some holders of unpaid claims for goods and service may try to enforce, mechanic's lien claims, the Debtors propose the following procedure to resolve those claims:

(i)     If prior to the sale of a home any person or entity has filed a memorandum of mechanic's lien claim or has perfected such lien under applicable nonbankruptcy state law for goods, services or material provided, that encumbers a home that is to be sold, and if the Debtors and the Lender with a lien upon such home agree as to the amount, validity and priority of such mechanic's lien claim, such undisputed claim (or undisputed portion thereof) may be paid at closing from the proceeds of the sale of the home, and the sale of such home shall be authorized free and clear of such mechanics lien claim;

66.     If prior to the sale of a home any person or entity has perfected such lien under applicable nonbankruptcy state law for goods, services or material provided, that encumbers a home that is to be sold, and if the Debtors or Lender with a lien upon said home determines that the amount (or any portion thereof),validity and priority of such mechanic's lien claim is in

dispute (i) the disputed amount of such mechanic's lien claim shall be escrowed and the sale of such home shall be authorized free and clear of such disputed mechanic's lien claim and (ii) the Debtors shall within ten days of closing file a report of sale with the Court setting forth in general terms the nature of the dispute;

67.     In the event the Debtors, lender and holder of a disputed mechanic's lien claim do not consensually resolve the amount or validity of such claim, any such party may file a request with the Court to resolve the dispute and any and all disputes shall be resolved only by the Court.

68.     At closing upon a sale of a home the Debtors are also generally required to execute an owner's affidavit that certifies, among other things, that the Debtors are not the subject of a bankruptcy proceeding.  Since that representation, among others, cannot be made, the Debtors believe that title companies will want the comfort that they may close upon a sale of a home based upon an order of this Court, without the further need for the execution of an owner's affidavit.

69.     The relief sought is necessary for the Debtors to maximize the value of their assets for their creditors and to continue the operation of their business in the ordinary course.

**F.     Motion for Authority to Honor Claims Under Existing Home Warranties**

70.     When Gemcraft or an affiliated entity (including non-debtor entities) sells a home, Gemcraft typically provides a Warranty to the homeowner.  A general summary of the terms of a the Warranty is as follows:

- Year 1.  All components of the home are covered.

- Year 2.  "Systems" of the home are covered.  "Systems" include piping, fitting, ductwork, and electrical wiring, but do not include fixtures.

- <u>Years 3 through 10</u>. "Structural Elements" of the home are covered. "Structural Elements" include masonry, floor systems, foundation, lintels and headers, roof framing, structural beams and girders, structural columns, and load bearing walls and partitions.

- The Warranty contains certain exclusions, such as: (i) acts of God; (ii) floods; (iii) wind driven water; (iv) wind; and (v) insects, animals and vermin.

71.     Allowing Gemcraft to honor claims under Warranties is critical to the Debtors' continued viability.  The success of the Debtors' businesses are based, in large part, on their reputation for high-quality workmanship, customer service, and reliability.  If the Debtors are not authorized to honor claims under Warranties, their reputation in the community would be severely damaged, which will negatively impact the Debtors' ability to sell homes in the future and to continue to stay in business.  Moreover, the benefits of honoring the Warranties and keeping customers satisfied far exceed the costs to the estates.

**G.     Motion of the Debtors for an Order Directing Joint Administration of their Related Chapter 11 Cases**

72.     Given the affiliation between the Debtors and the integration of the Debtors' operations, joint administration of the chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will arise in the chapter 11 cases will affect both Debtors.  The entry of an Order approving joint administration will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the Office of the United States Trustee for the District of Maryland and all parties in interest to monitor the chapter 11 cases with greater ease and efficiency.

73.     Moreover, joint administration will not adversely affect the Debtors' respective

constituencies because the motion requests only administrative, not substantive, consolidation of the estates. Thus parties in interest will not be harmed by the relief requested, but instead will benefit from the cost reductions associated with the joint administration of the chapter 11 cases. Accordingly, the Debtors submit that the joint administration of the chapter 11 cases is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

### H.    Debtors' Motion for an Order Extending the Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs

74.    Pursuant to Bankruptcy Rule 1007(c), the Debtors' Schedules and SOFA must be filed with its voluntary petition, or within fifteen (15) days after the Petition Date if the petition is accompanied by a Creditor List.

75.    Here, the Debtors have approximately 1000 creditors.  The conduct and operation of the Debtors' businesses require the Debtors to maintain extensive books and records.  As a result of the size and complexity of their business operations, as well as the demand on the Debtors to communicate and work with their lenders and contract purchasers to ensure a smooth transition in the initial stages of the Chapter 11 cases, the Debtors and their professionals have yet to complete the Schedules and SOFA, and anticipate that such documents cannot reasonably be completed by the deadline established by Bankruptcy Rule 1007(c).  Rather than filing incomplete documents that would require amendments at a later date, the Debtors seek an extension of time to complete this task.

76.    The Debtors believe cause exists to grant the Debtors a forty-five (45) day extension of the fifteen-day deadline provided by Bankruptcy Rule 1007(c), which will provide the Debtors with a total of sixty (60) days after the Petition Date to file the Schedules and SOFA.

77.    The complexity of the Debtors' organization, the substantial amount of information that the Debtors must assemble and compile, and the number of employee and

professional hours required to complete the Schedules and SOFA while managing the operations of the Debtors' ongoing business, all constitute good and sufficient cause for granting the requested extension of time.

**I.      Debtors' Motion for Order Authorizing Debtors to File Consolidated Mailing Matrix and Consolidated List of 30 Largest Unsecured Creditors**

78.    There are eight (8) affiliated Debtors and between 800 and 1,000 creditors and other parties in interest in these cases.  Given the potential confusion and overlap regarding creditor obligations, combined with the fact that the Debtors are related affiliates, the Debtors submit that it is appropriate for them to file a consolidated mailing matrix and consolidated list of their 30 largest unsecured creditors.  The consolidated mailing matrix and the consolidated list of creditors will provide good and sufficient notice to all creditors and parties in interest in an efficient manner.

**J.      Application for Authority to Employ Cole, Schotz, Meisel, Forman & Leonard, P.A. as Counsel to the Debtors and Debtors in Possession**

79.    The Debtors seek to retain Cole Schotz as their counsel because of the firm's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code.

80.    The professional services that Cole Schotz will render to the Debtors include, but shall not be limited to, the following:

(i)      advising the Debtors of their rights, powers and duties as a debtors and debtors-in-possession;

(ii)      advising the Debtors concerning, and assisting in the negotiation and documentation of a Chapter 11 plan and related transactions;

(iii)      reviewing the nature and validity of liens asserted against the property of the Debtors and advising the Debtors concerning the enforceability of such liens;

(iv)    preparing on behalf of the Debtors all necessary and appropriate applications, motions, pleadings, draft orders, notices, schedules, and other documents, and reviewing all financial and other reports to be filed in these Chapter 11 cases;

(v)    advising the Debtors concerning, and preparing responses to, applications, motions, pleadings, notices and other papers that may be filed and served in this Chapter 11 case; and

(vi)    performing all other legal services for and on behalf of the Debtors that may be necessary or appropriate in the administration of these Chapter 11 cases.

81.    Subject to Court approval, compensation will be payable to Cole Schotz on an hourly basis, plus reimbursement of actual, necessary expenses incurred by the law firm.

82.    I have been advised that Cole Schotz has not represented the lenders, creditors, or any other parties-in-interest in any matters relating to the Debtors or their estates.

83.    To the best of the Debtors' knowledge, based upon and as set forth in the Walker Declaration, Cole Schotz does not hold or represent any interest adverse to the Debtors.  Cole Schotz's employment is necessary and in the best interests of the Debtors and their estates.

**K.    Application for Authority to Employ and Retain FTI Consulting, Inc. as Financial Advisor to the Debtors and Debtors-in-Possession**

84.    The Debtors are familiar with the professional standing and reputation of FTI. The Debtors understand that FTI has a wealth of experience in providing financial advisory services in restructurings and reorganizations and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

85.    Prior to the Retention Date, the Debtors engaged FTI from time to time to provide business and financial advice to the Debtors.  As a result, FTI has developed a great deal of

institutional knowledge regarding the Debtors' operations, finances and systems. This experience and knowledge will be valuable to the Debtors in their efforts to reorganize. Accordingly, the Debtors wish to retain FTI to provide assistance during this case.

86.     The services of FTI are deemed necessary to enable the Debtors to maximize the value of their estates and to reorganize successfully. Further, FTI is well qualified and able to represent the Debtors in a cost-effective, efficient and timely manner.

87.     FTI will provide such consulting and advisory services as FTI and the Debtors deem appropriate and feasible in order to advise the Debtors in the course of these chapter 11 cases, as described in detail in the application.

88.     FTI has informed the Debtors that, except as may be set forth in the Bibby Declaration, it (i) has no connection with the Debtors, its creditors or other parties in interest in this case, (ii) does not hold any interest adverse to the Debtors' estates, and (iii) believes it is a "disinterested person" as defined within Section 101(14) of the Bankruptcy Code.

89.     FTI will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new material facts or relationships are discovered or arise, FTI will supplement its disclosure to the Court. FTI has agreed not to share with any person or firm the compensation to be paid for professional services rendered in connection with these cases.

### L.     Application for Authority to Employ Kramon & Graham, P.A. as Special Counsel to the Debtors and Debtors-in-Possession, *Nunc Pro Tunc*

90.     K&G has served as the Debtors' outside general counsel since the inception of the Debtors' business, and has extensive knowledge of the Debtors' business and financial affairs, and their operations. K&G has represented and provided advice to the Debtors, and worked closely with and advised the Debtors' management, in connection with a number of business and

real estate transactions over the years, including many of the Debtors' loan transactions with their lenders.

91.     The Debtors want to continue to benefit from K&G's expertise, knowledge, and services with respect to the Debtors' general business, real estate, and litigation matters (other than litigation relating to the Debtors' bankruptcy proceedings).  K&G is well suited to continue providing legal services due to K&G's expertise in these areas.

92.     The Debtors believe, pursuant to their business judgment, that K&G is uniquely situated to advise the Debtors on the Representation matters in the most efficient and cost effective manner available to the Debtors, and that their retention of K&G as special counsel, pursuant to section 327(e) of the Bankruptcy Code, will provide efficiency benefits that will directly inure to the benefit of the Debtors' estates and creditors.

93.     K&G has stated its desire and willingness to act in this matter and to render the necessary professional services as special counsel for the Debtors, pursuant to section 327(e) of the Bankruptcy Code.

94.     Subject to this Court's approval, K&G has advised the Debtors that it will charge the Debtors for its legal services provided in connection with the Representation on an hourly basis in accordance with rates charged prepetition to the Debtors.  K&G will seek reimbursement of all costs and expenses incurred in connection with these chapter 11 cases.

95.     K&G has advised the Debtors that it will request, subject to the Courts' approval, reimbursement for all ordinary and necessary costs and expenses incurred by K&G on the Debtors' behalf, such as long-distance telephone and telecopier toll charges, mail and express mail charges, special or hand delivery charges, document retrieval, photocopying services, filing fees, travel expenses, computerized research time, transcription costs and other disbursements.

All requests for reimbursement will be consistent with the United States Trustee's Fee Guidelines and requirements established by this Court.

96.     The professional services that K&G will render to the Debtors include the following:

(i)     Working with and assisting Cole Schotz in representing the Debtors in their roles as debtors-in-possession with respect to such business, real estate and, as requested, litigation matters as may arise in the course of their operations in continuing to operate and manage their businesses;

(ii)     Advising the companies concerning, and working with Cole Schotz in negotiation and documentation, financing agreements, and related transactions; and

(iii)     Performing all other legal services for and on behalf of the companies which may be necessary or appropriate for special counsel in connection with business, real estate and general litigation matters in connection with its Chapter 11 cases and the Companies' business and property.

97.     K&G has advised the Debtors that to does not hold any interest adverse to their estates, is a disinterested person, and because K&G's retention is in the best interests of the Debtors' estates.

**M.     Application for an Order Appointing The Garden City Group, Inc. as the Official Claims and Noticing Agent and to Provide Other Essential Services to the Debtors**

98.     By this motion, the Companies request the entry of an Order appointing Garden City to act as the official Claims Agent of the Clerk of the Bankruptcy Court in order to assume

full responsibility for the distribution of notices and proofs of claim, and maintenance, processing and docketing of proofs of claim filed in the Companies' chapter 11 case, and to provide such additional services as are described herein below.

99. The Companies estimate that there are approximately 1,000 potential creditors and other parties in interest who require notice of various matters. Given this estimate, it would be burdensome on the Court and the Clerk's Office to perform the services that Garden City will perform. To relieve the Clerk's Office of these burdens, the Companies propose to appoint Garden City as their notice and claims agent in this chapter 11 case.

100. I have been advised that Garden City is a well respected chapter 11 administrators with expertise in noticing, claims processing, claims reconciliation, balloting, and distribution, and that Garden City, therefore, is well qualified to provide the Companies with experienced noticing, claims, and balloting services in connection with this case.

**N.    Motion of the Debtors and Debtors-in-Possession for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 327 Authorizing the Debtors to Retain and Employ Professionals Used in the Ordinary Course of Business *Nunc Pro Tunc* to the Petition Date**

101. The Debtors employ certain Ordinary Course Professionals to render services relating to numerous issues that arise in the ordinary course of the Debtors' businesses. Prior to the Petition Date, the Ordinary Course Professionals were primarily attorneys, accountants and consultants who represented or advised the Debtors in various capacities.

102. The Ordinary Course Professionals currently listed in the motion are accountants used by the Debtors to prepare tax returns and audit the Debtors' financial statements. Without the assistance of the Ordinary Course Professionals, the Debtors would be unable to devote sufficient attention to these outstanding issues. Furthermore, few, if any, Ordinary Course

Professionals are likely to continue their vital work for the Debtors without the relief requested in this Motion.

103.    For the purpose of administrative efficiency, the Debtors seek to retain and employ, *nunc pro tunc* to the Petition Date, the Ordinary Course Professionals without having to file formal retention or fee applications for each of the Ordinary Course Professionals pursuant to sections 327, 328, 329 and 330 of the Bankruptcy Code.  The Debtors submit that it would be unduly burdensome to both the Debtors and the Court to require the Debtors to apply separately to this Court for approval of the retention of each Ordinary Course Professional.  Similarly, it would be unduly burdensome on the Court for each Ordinary Course Professional to apply separately for compensation and reimbursement of expenses.  Moreover, the Ordinary Course Professionals are unfamiliar with the fee application process employed in a bankruptcy case and might be less inclined to work with the Debtors if they were forced to adhere to such requirements in order to be compensated for services rendered.

104.    Because the Ordinary Course Professionals will not be involved in the administration of these chapter 11 cases, the Debtors do not believe that the Ordinary Course Professionals are "professionals," within the meaning of section 327 of the Bankruptcy Code, whose retention must be approved by the Court.

O.    **Motion of the Debtors and Debtors-in-Possession for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 328, and 331 Establishing Procedures for <u>Interim Compensation and Reimbursement of Professionals</u>**

105.    The Debtors seek entry of an Order pursuant to sections 105(a) and 331 of the Bankruptcy Code establishing an orderly, regular process for the allowance and payment of fees and reimbursement of reasonable, necessary expenses for attorneys and other professionals whose retentions are approved by this Court pursuant to sections 327, 328, or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation

and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code, on terms that satisfy the requirements of Bankruptcy Rule 2016 and Rule 2016-1 of the Local Rules. In addition, the Debtors request entry of an Order establishing a procedure for reimbursement of reasonable out-of-pocket expenses incurred by members of any Committee appointed in these chapter 11 cases.

106.    The Debtors believe that the proposed Compensation Procedures described in the motion will enable the Debtors to monitor costs of administration closely, maintain level cash flow availability, and implement efficient cash management procedures.  Moreover, the the Debtors believe that these procedures will allow the Court and key parties in interest to ensure the reasonableness and necessity of the compensation and reimbursement sought pursuant to such procedures.

107.    The Debtors submit that the efficient administration of the chapter 11 cases will be significantly aided by establishing the foregoing interim compensation and expense reimbursement procedures.  Accordingly, the Debtors believe that the Compensation Procedures are in the best interests of the Debtors, their estates, and creditors.

### III.    Conclusion

108.    As a home building enterprise that grew from a single sales trailer to a successful company with over $300 million in annual sales in just 16 years, the Companies have developed an exceptional reputation in the Mid-Atlantic region.  To continue to deliver quality homes, maintain this reputation, and to position the companies for future success, the Companies have now filed chapter 11 to attempt to reorganize during these daunting economic times.  Approval of the First-Day Motions filed by the Companies is a critical step for the Companies to attempt to reorganize their businesses, as such approval will (a) facilitate the continuation of the Companies' existing cash management systems and other business operations without

interruption, and authorize the Companies to obtain postpetition financing, (b) preserve home buyer and vendor relationships, (c) maintain employee morale and confidence and (d) establish certain other administrative procedures to promote a smooth transition into chapter 11.  The First-Day Motions are the springboard for the Companies' desired plan to restructure their financial affairs and emerge from chapter 11 as smaller but more profitable companies.

Dated:  November 9, 2009

/s/ William R. Luther, Jr.
William R. Luther, Jr.

# Exhibit A

## List of First-Day Motions

A.   Debtors' Motion for Order under 11 U.S.C. § 364(b) (A) Authorizing Debtors to Obtain Unsecured Postpetition Financing from Gemcraft Capital, LLC, (B) Scheduling Hearings for Interim and Final Approval, and (C) Granting Related Relief.

B.   Debtors' Motion for Interim and Final Orders Pursuant to Section 366 of the Bankruptcy Code (i) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (ii) Deeming Utility Providers Adequately Assured of Payment for Future Utility Services, and (iii) Establishing Procedures for Determining the Adequate Assurance of Payment.

C.   Debtors' Motion for an Order Authorizing Payment of Prepetition Wages, Compensation, Employee Benefits, Expense Reimbursement and Related Items, and the Continuation of Certain Employment Policies in the Ordinary Course.

D.   Debtors' Motion for an Order (i) Authorizing Debtors to Continue Use of their Centralized Cash Management System, Existing Bank Accounts and Business Forms, and (ii) Waiving Temporarily the Deposit and Investment Requirements of Section 345 of the Bankruptcy Code.

E.   Debtors' Motion for Order Authorizing the Debtors to (A) Honor Existing Prepetition Contracts for Sale of Homes and to Apply Purchaser Deposits, and Pay Expenses Incurred, at Closing and (B) Enter into Contracts for Homes and Close on Sales of Homes Postpetition, in the Ordinary Course of Business.

F.   Debtors' Motion for Authority to Honor Existing Warranty Claims.

G.   Motion of the Debtors for an Order Directing Joint Administration of their Related Chapter 11 Cases.

H.   Debtors' Motion for an Order Extending the Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs.

I.   Debtors' Motion for Order Authorizing Debtors to File Consolidated Mailing Matrix and Consolidated List of 30 Largest Unsecured Creditors.

J.   Application for Authority to Employ Cole, Schotz, Meisel, Forman & Leonard, P.A. as Counsel to the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date;

K.   Application for Authority to Employ and Retain FTI Consulting, Inc. as Financial Advisor to the Debtors and Debtors-in-Possession.

L.   Application for Authority to Employ Kramon & Graham, P.A. as Special Counsel to the Debtors and Debtors-in-Possession, *Nunc Pro Tunc* to the Petition Date.

M.  Application for Authority to Employ The Garden City Group, Inc. as Noticing, Claims, and Balloting Agent and to Provide Other Essential Services to the Debtors and Debtors-in-Possession.

N.  Motion of the Debtors and Debtors-in-Possession for Entry of an Order Pursuant to 11 U.S.C. §§ 105 and 327 Authorizing the Debtors to Retain and Employ Professionals Used in the Ordinary Course of Business *Nunc Pro Tunc* to the Petition Date.

O.  Motion of the Debtors and Debtors-in-Possession for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 328, and 331 Establishing Procedures for Interim Compensation and Reimbursement of Professionals.

# Exhibit B

# Gemcraft Homes, Inc., et al. (Debtors)

## Combined 30-Day Cash Flow Forecast

| Week beginning | Week 1<br>11/7/09 | Week 2<br>11/14/09 | Week 3<br>11/21/09 | Week 4<br>11/28/09 | Week 5<br>12/5/09 | Total |
|---|---|---|---|---|---|---|
| **Beginning Cash** | $ 1,030,245 | $ 1,145,245 | $ 872,863 | $ 1,003,708 | $ 999,483 | $ 1,030,245 |
| | | | | | | |
| **Receipts:** | | | | | | |
| Cash Receipts | | | | | | |
| Net Co. Proceeds from Settlements | - | 65,423 | 130,846 | 457,960 | 93,141 | 747,369 |
| Advances from Current Lenders | | | | | | |
| Existing WIP | 1,793,353 | 1,296,328 | 1,089,648 | 1,026,753 | 1,175,574 | 6,381,655 |
| New Starts | - | 1,027,000 | 1,027,000 | 1,027,000 | 1,279,800 | 4,360,800 |
| Land Development | | | | | | |
| Collateral Preservation | - | - | - | 30,995 | - | 30,995 |
| Loan from Gemcraft Capital, LLC | 250,000 | - | - | - | - | 250,000 |
| Other | | | | | | |
| Mortgage/Title Income | - | 60,000 | - | - | - | 60,000 |
| Rental Income | - | - | - | 41,052 | - | 41,052 |
| **Total Receipts** | 2,043,353 | 2,448,750 | 2,247,493 | 2,583,760 | 2,548,515 | 11,871,871 |
| | | | | | | |
| **Disbursements:** | | | | | | |
| Payment to Subcontractors | 1,793,353 | 2,323,328 | 2,116,648 | 2,053,753 | 2,455,374 | 10,742,455 |
| Other Vendor Payments | | | | | | |
| Collateral Preservation | - | - | - | 30,995 | - | 30,995 |
| Land Development | | | | | | |
| Corporate Overhead | | | | | | |
| General & Administrative | - | 77,327 | - | 84,258 | - | 161,585 |
| Marketing | - | 92,024 | - | 95,780 | - | 187,804 |
| Production | - | 158,487 | - | 210,223 | - | 368,710 |
| Inside Sales Commission | - | 69,968 | - | 94,288 | - | 164,255 |
| Professional Fees | | | | | | |
| Debtor | - | - | - | - | - | - |
| Bank | - | - | - | - | - | - |
| UCC | - | - | - | - | - | - |
| Bank Fees/Interest | 135,000 | - | - | 18,689 | - | 153,689 |
| **Total Disbursements** | 1,928,353 | 2,721,133 | 2,116,648 | 2,587,985 | 2,455,374 | 11,809,492 |
| | | | | | | |
| **Net Operating Cash** | 115,000 | (272,382) | 130,846 | (4,226) | 93,141 | 62,379 |
| | | | | | | |
| **Ending Cash** | $ 1,145,245 | $ 872,863 | $ 1,003,708 | $ 999,483 | $ 1,092,624 | $ 1,092,624 |