# EXHIBIT A

## RATIFICATION AND MODIFICATION AGREEMENT

THIS RATIFICATION AND MODIFICATION AGREEMENT (this "Ratification Agreement") is made as of the _____ day of November, 2009 by and among GEMCRAFT HOMES GROUP, INC., a Maryland corporation, as Debtor and Debtor-in-Possession (the "Borrower"), GEMCRAFT HOMES, INC., a Maryland corporation, as Debtor and Debtor-in-Possession ("Gemcraft Homes"), GEMCRAFT HOMES FOREST HILL, LLC, a Maryland limited liability company, as Debtor and Debtor-in-Possession ("Forest Hill"), GEMCRAFT CHESAPEAKE, LLC, a Maryland limited liability company, as Debtor and Debtor-in-Possession ("Chesapeake"), DLM, LLC, a Maryland limited liability company, as Debtor and Debtor-in-Possession ("DLM"), TULL GARDENS, LLC, a Maryland limited liability company, ("Tull"), ST. HELEN'S, LLC, a Maryland limited liability company ("St. Helen's"), HARKINS PROPERTY, LLC, a Maryland limited liability company, as Debtor and Debtor-in-Possession ("Harkins"), THE PRESERVE AT JEFFERSON CREEK, LLC, a Maryland limited liability company, as Debtor and Debtor-in-Possession ("Jefferson Creek"), GEMCRAFT CAPITAL, LLC, a Maryland limited liability company ("Capital"), WILLIAM R. LUTHER, JR., VICKIE A. LUTHER, BRIAN E. FROMME and SHARON L. BABCOCK (the "Individual Guarantors" and together with the Entity Guarantors, the "Guarantors"), and REGIONS BANK (the "Lender").

## RECITALS

A.     On November 9, 2009 (the "Petition Date"), the Debtors (as defined below) have commenced cases (the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Maryland ("Bankruptcy Court"), have retained possession of their assets and are authorized under the Bankruptcy Code to continue operating their businesses as debtors-in-possession.

B.     Before the commencement of the Chapter 11 Cases, Lender made loans and advances and provided other financial or credit accommodations to Borrower secured by certain assets and properties of the Gemcraft Group (as defined below) as set forth in the Existing Loan Documents (as defined below).

C.     The Bankruptcy Court has entered a Financing Order (defined below) pursuant to which Lender may make post-petition loans and advances, and provide other financial accommodations, to Borrower secured by certain assets and properties of Borrower and Guarantors as set forth in the Financing Order and the Loan Documents (as defined below).

D.     The Financing Order provides that as a condition to the making of such post-petition loans, advances and other financial accommodations, Borrower and Guarantors shall execute and deliver this Ratification Agreement.

E.     Borrower and Guarantors desire to reaffirm their obligations to Lender pursuant to the Existing Loan Documents and acknowledge their continuing liabilities to Lender thereunder to induce Lender to make such post-petition loans and advances, and provide such other financial accommodations, to Borrower.

F.     Borrower and Guarantors have requested that Lender make post-petition loans and advances and provide other financial or credit accommodations to Borrower and make certain amendments to the Existing Loan Documents, and Lender is willing to do so, subject to the terms and conditions contained herein.

AGREEMENTS

NOW, THEREFORE, for valuable consideration Lender, Borrower and Guarantors mutually covenant, warrant and agree as follows:

1.     DEFINITIONS.

1.1     Additional Definitions.  As used herein, the following terms shall have the respective meanings given to them below:

(a)     "Bankruptcy Code" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

(b)     "Collateral" shall mean the Pre-Petition Collateral (as defined below), the Post-Petition Collateral (as defined below) and the Pledge Agreement Collateral (as defined below).

(c)     "Debt Schedule" shall mean the detailed schedule of the loan accounts and Obligations of the Borrower and the Guarantors with the Lender.

(d)     "Debtors" shall mean the Borrower, Gemcraft Homes, Forest Hill, Chesapeake, DLM, Harkins and Jefferson Creek.

(e)     "Entity Guarantors" shall mean Gemcraft Homes, Forest Hill, Chesapeake, DLM, Tull, St. Helen's, Harkins and Jefferson Creek.

(f)     "Existing Deeds of Trust" shall mean, collectively, the Acquisition and Development Mortgages as defined in the Loan Agreement, the Indemnity Deeds of Trust, Indemnity Mortgages, Deed of Trusts, Mortgages or similar instruments executed by one or more of the Entity Guarantors in favor of Lender or Trustees for the benefit of Lender, as in effect immediately before the Petition Date.

(g)     "Existing Guarantor Documents" shall mean, collectively, the documents entitled "Guaranty of Payment and Performance", or similar documents, executed by

one or more of the Guarantors as in effect immediately before the Petition Date.  The term "Existing Guarantor Documents" shall also mean and include each of the Existing Deeds of Trust and any other documents, executed by the Guarantors, as in effect immediately before the Petition Date, and the Pledge Agreement.

        (h)     "Existing Loan Agreement" shall mean the Second Amended and Restated Construction Loan Agreement, dated February 3, 2006, by and among Borrower, Entity Guarantors and Lender, as in effect immediately before the Petition Date.

        (i)     "Existing Loan Documents" shall mean the Loan Documents (as defined in the Existing Loan Agreement), including, but not limited to, the Existing Loan Agreement, the Existing Notes, the Existing Guarantor Documents and the letters of credit.

        (j)     "Existing Notes" shall mean each of the following, executed by Borrower to the order of Lender, as in effect immediately before the Petition Date:

        (i)     $75,000,000 Second Amended and Restated Promissory Note dated February 3, 2006 (the "Existing Construction Note").

        (ii)     $7,545,000.00 Promissory Note dated February 17, 2006 (the "Existing West Shores Note").

        (iii)     $1,781,000.00 Promissory Note dated June 1, 2006 (the "Existing Yellow Breeches Note").

        (iv)     $8,932,500.00 Promissory Note dated June 15, 2006 (the "Existing Brimington Note").

        (v)     $9,900,000 Promissory Note dated August 29, 2006 (the "Existing Tull Gardens Note").

Reference in this Ratification Agreement to the "Existing Acquisition and Development Notes" shall mean, collectively, the Existing West Shores Note, the Existing Yellow Breeches Note, the Existing Brimington Note and the Existing Tull Gardens Note.

        (k)     "Event of Default" shall have the meaning set forth in Section 6 hereof. The term "Default" shall mean one or more of Events of Default, whether or not any requirement for the giving of notice, the lapse of time, or both has been satisfied.

        (l)     "Financing Order" shall mean the Interim Financing Order, the Permanent Financing Order and such other orders relating thereto or authorizing the granting of credit by Lender to Borrower on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Cases.

(m)     "Gemcraft Group" shall mean the Borrower and the Entity Guarantors.

(n)     "Interim Financing Order" shall have the meaning set forth in Section 10.11 hereof.

(o)     "Letter of Credit Obligations" shall mean any and all obligations and liabilities of any of the Borrower or the Guarantors to the Lender whether created directly, indirectly or acquired by assignment, whether absolute or contingent, whether due or not, whether secured or not, whether now existing or hereafter arising which are in any way related to or connected with any letter of credit or similar assurance given by the Lender in favor or for the account of Borrower or any of the Entity Guarantors.

(p)     "Loans" shall mean any loans or other credit accommodations made by Lender to Borrower or any Guarantor before the execution of this Ratification Agreement or after the execution of this Ratification Agreement.

(q)     "Loan Agreement" shall mean the Third Amended and Restated Construction Loan Agreement dated as of the same date as this Ratification Agreement by and among the Borrower, the Entity Guarantors and the Lender.

(r)     "Loan Documents" shall mean, collectively, the Existing Loan Documents, as amended by this Ratification Agreement, the Loan Agreement and such other documents as are otherwise executed this date, or hereafter in each instance, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.   Reference in this Ratification Agreement to the Deeds of Trust, the Guarantor Documents, the Construction Note, and the Acquisition and Development Notes, shall mean the Existing Deeds of Trust, Existing Guarantor Documents, Existing Construction Note, and Existing Acquisition and Development Notes, respectively, as amended by this Ratification Agreement, in each instance, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(s)     "Material Budget Deviation" shall have the meaning set forth in Section 5.3(b) hereof.

(t)     "Obligations" shall mean all debts, obligations and liabilities of any of the Borrower or the Guarantors to the Lender of any kind or nature whatsoever, whether created directly, indirectly or acquired by assignment, whether absolute or contingent, whether due or not, whether secured or not, whether incurred by Borrower or Guarantors as principal, surety, endorser, guarantor or otherwise, whether now existing or hereafter arising and specifically to include but not to be limited to the obligation to make full and prompt payment of any principal, interest, financing charges, letter of credit fees or obligations, costs, fees, counsel fees, expenses, inspection fees, title premiums, indemnification payments or any other amounts previously, now or hereafter owed to the Lender.

(u)     "Overhead Budget" shall mean the initial corporate overhead budget to be delivered to Lender in accordance with Section 5.3(a) hereof, in form and substance satisfactory to Lender, setting forth the Projected Information (defined below) for the periods covered thereby, together with any subsequent or amended budget(s) thereto delivered to Lender, in form and substance satisfactory to Lender, in accordance with the terms and conditions hereof.

(v)     "Permanent Financing Order" shall have the meaning set forth in Section 10.12 hereof.

(w)     "Petition Date" shall mean the date of the commencement of the Chapter 11 Cases.

(x)     "Pledge Agreement" shall mean the Pledge and Security Agreement dated contemporaneously with this Ratification Agreement by Capital and the Individual Guarantors for the benefit of the Lender, as Agent for itself and the other lender who makes a DIP loan available.

(y)     "Pledge Agreement Collateral" shall mean the collateral granted to the Lender, as Agent for itself and the other lender who makes a DIP loan available, by Capital and the Individual Guarantors pursuant to the Pledge Agreement.

(z)     "Post-Petition Collateral" shall mean (1) the Pre-Petition Collateral of Lender, (2) additional real estate, improvements constructed thereon, and related plans, permits, and personalty acquired after the date hereof in accordance with the Loan Agreement, and (3) all of the unencumbered (other than by liens for taxes and mechanics liens), real and personal property of the Debtors (to the extent applicable), both now owned and existing and hereafter created, acquired and arising and regardless of where located:  (including, without limitation, all commercial tort claims), subject to entry of the Final Order; and all monies and other property of any kind received therefrom, and all cash and non-cash proceeds and products.

(aa)     "Post-Petition Obligations" shall mean all Obligations arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Case, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Case, and whether arising under or related to this Ratification Agreement, the Notes, the Deeds of Trust, the Loan Agreement, the Guarantor Documents, the other Loan Documents, a Financing Order, by operation of law or otherwise, and including, without limitation, all principal, interest, financing charges, letter of credit fees or obligations, servicing fees, debtor-in-possession facility fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

(bb)     "Pre-Petition Collateral" shall mean, collectively, (i) all of the "Trust Property" and all of the "Mortgaged Property" as those terms may be used or defined in any of the Existing Deeds of Trust as in effect immediately before the Petition Date, and (ii) all other security for the Pre-Petition Obligations as provided in the Existing Loan Agreement, the Existing Deeds of Trust, the Existing Guarantor Documents and the other Existing Loan Documents immediately before the Petition Date.

(cc)    "Pre-Petition Obligations" shall mean all Obligations arising at any time before the Petition Date, including interest on Pre-Petition Obligations that accrues after the Petition Date.

(dd)    "Ratification Agreement" shall mean this Ratification and Modification Agreement by and among Borrower, Guarantors and Lender, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.2    <u>Certain Amendments to Definitions</u>.

(a)    All references to any member of the Gemcraft Group in the Loan Documents shall be deemed, and each such reference is amended, to mean and include such member of the Gemcraft Group as defined herein, and its successors and assigns (including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such entity whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(b)    All references in the Loan Documents to the "Note", the "Acquisition and Development Notes", the "Guaranty", the "Deeds of Trust", and the "Loan Agreement" shall be deemed, and each such reference is amended, to mean such document, as amended by this Ratification Agreement and as ratified, assumed and adopted by Borrower and each Guarantor pursuant to the terms hereof and the Financing Order, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced. Without limiting the generality of the foregoing, any reference in the Loan Documents to the "Loan Agreement" shall mean the Loan Agreement as defined in this Ratification Agreement.

(c)    All references to the term "Loan Documents" in the Loan Documents shall be deemed, and each such reference is amended, to include, in addition and not in limitation, this Ratification Agreement and all of the Existing Loan Documents, as ratified, assumed and adopted by Borrower and each Guarantor pursuant to the terms hereof, and any other documents executed by Borrower or any Guarantor in connection herewith (including, without limitation, the Loan Agreement) as amended and supplemented hereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.3    <u>Interpretation</u>.

(a)    For purposes of this Ratification Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Loan Agreement.

(b)    All references to the term "Lender," "Borrower," or "Guarantors," or any other Person pursuant to the definitions in the recitals hereto or otherwise shall include its respective personal representatives, heirs, successors and assigns.  As used herein, the term "Person" shall have the meaning given the term "person" in the Loan Agreement.

(c)    All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular unless the context of such usage requires otherwise.

(d)    All terms not specifically defined herein which are defined in the Uniform Commercial Code, as in effect in the State of Maryland as of the date hereof, shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

2.    ACKNOWLEDGMENT.

2.1    Pre-Petition Obligations.  Borrower and each Guarantor acknowledge, confirm and agree that, as of November 10, 2009, Borrower is indebted to Lender in respect of all Pre-Petition Obligations in the aggregate principal amount of not less than $32,204,823.02, comprising outstanding principal of $30,370,638.92 plus two letters of credit outstanding for an additional $1,834,184.10, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses), indemnification payments and other charges accrued, accruing or chargeable with respect thereto, and all other charges now or hereafter owed by Borrower or Guarantors to Lender under the Existing Loan Documents, all of which are unconditionally owing by Borrower or Guarantors to Lender, without offset, defense or counterclaim of any kind, nature and description whatsoever.  The Pre-Petition Obligations are detailed in the Debt Schedule, dated as of November 10, 2009, which Borrower and Guarantors acknowledge is correct in all material respects.

2.2    Guaranteed Obligations.  Guarantors acknowledge, confirm and agree that:

(a)    all obligations of Guarantors under the Guarantor Documents are unconditionally owing by Guarantors to Lender without offset, defense or counterclaim of any kind, nature and description whatsoever, and

(b)    the absolute and unconditional guarantee of the payment of the Pre-Petition Obligations by Guarantors pursuant to the Guarantor Documents extends to all Post-Petition Obligations, subject only to the expressly stated limitations set forth in this Ratification Agreement, if any.

2.3    Acknowledgment of Liens and Security Interests.  Borrower and each Guarantor acknowledge, confirm and agree that Lender has and shall continue to have (a) valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral and Pledge Agreement Collateral heretofore granted to Lender pursuant to the Existing Loan Documents as in effect immediately before the Petition Date to secure all of the

Obligations, as well as (b) valid and enforceable first priority and senior security interests in and liens upon the Pledge Agreement Collateral and all Post-Petition Collateral granted to Lender, under the Financing Order or hereunder or under any of the other Loan Documents or otherwise granted to or held by Lender, in each case, subject only to liens or encumbrances expressly permitted by the Loan Agreement, if any, and any other liens or encumbrances expressly permitted by the Financing Order that may have priority over the liens in favor of Lender.

2.4    Binding Effect of Documents.    Borrower and each Guarantor acknowledge, confirm and agree that: (a) each of the Existing Loan Documents to which it is a party was duly executed and delivered to Lender by Borrower or such Guarantor and each is in full force and effect as of the date hereof, (b) the agreements and obligations of such Borrower or Guarantor contained in the Existing Loan Documents constitute the legal, valid and binding obligations of such Borrower or Guarantor enforceable against it in accordance with the terms thereof, and such Borrower or Guarantor has no valid defense, offset or counterclaim to the enforcement of such obligations, and (c) Lender is and shall be entitled to all of the rights, remedies and benefits provided for in the Loan Documents and the Financing Order.

2.5    Order of Enforcement and Application of Proceeds.   In addition to and not limitation of any other right, privilege or remedy accorded Lender under any of the Loan Documents:  Borrower and Guarantors  acknowledge and agree (i) Lender may enforce its rights and remedies under any of the Deeds of Trust and/or under any of the Acquisition and Development Mortgages in whatever order Lender may elect from time to time in its sole and absolute discretion and, without limiting the generality of the foregoing, Lender may foreclose (or otherwise pursue its remedies) under any such Deeds of Trust, and/or Acquisition and Development Mortgages, as to any one or more parcels of land and/or homes, in such order and in such manner and at such time or times, whether individually, simultaneously or successively as Lender may determine from time to time in Lender's sole and absolute discretion, and (ii) any amounts realized from the foreclosure or other exercise of remedies under any of the Deeds of Trust and/or any of the Acquisition and Development Mortgages or from any other enforcement action by the Lender, may be applied to such amounts outstanding under the Loan and/or under any of the Acquisition and Development Loans in such order and/or amount as Lender may determine at any time and from time to time in Lender's sole and absolute discretion, and Borrower and Guarantors expressly waive any right to control or object to the timing, order, nature or extent of the Lender's enforcement efforts, including, but not limited to, the timing, order, nature or extent of dispositions of any collateral securing repayment of the Loan or of any of the Acquisition and Development Loans and Borrower and Guarantors further expressly waive any right to control or object to the manner in which the Lender applies, against amounts outstanding under the Loan and/or under any of the Acquisition and Development Loans, the amounts realized from the foreclosure or other exercise of remedies under any of the Deeds of Trust and/or any of the Acquisition and Development Mortgages or from any other enforcement action by the Lender.

3.    ADOPTION AND RATIFICATION.

Borrower and each Guarantor (a) ratify, assume, adopt and agree to be bound by all of the Existing Loan Documents to which it is a party and (b) agree to pay all of the Pre-Petition

Obligations in accordance with the terms of such Existing Loan Documents, as amended by this Ratification Agreement, and in accordance with the Financing Order. All of the Existing Loan Documents, except as amended by this Ratification Agreement and the Financing Order, are incorporated herein by reference and are and shall be deemed adopted and assumed in full by Borrower and Guarantors, including by each member of the Gemcraft Group as Debtor and Debtor-in-Possession, and considered as agreements between Borrower or such Guarantor, on the one hand, and Lender, on the other hand. Borrower and each Guarantor ratify, restate, affirm and confirm all of the terms and conditions of the Existing Loan Documents, as amended and supplemented pursuant hereto or as amended and restated as described herein and the Financing Order, and Borrower and each Guarantor agree to be fully bound, including each member of the Gemcraft Group as Debtor and Debtor-in-Possession, by the terms of the Loan Documents to which Borrower or such Guarantor is a party.

4.    GRANT OF SECURITY INTEREST.

As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), each member of the Gemcraft Group, as Debtor and Debtor-in-Possession if applicable, and each Individual Guarantor grants, pledges and assigns to Lender, and also confirms, reaffirms and restates the prior grant to Lender of, continuing security interests in and liens upon, and rights of setoff against, all of the Collateral.

5.    ADDITIONAL REPRESENTATIONS, WARRANTIES, AND COVENANTS.

In addition to the continuing representations, warranties, and covenants heretofore and hereafter made by Borrower and Guarantors to Lender, whether pursuant to the Loan Documents or otherwise, and not in limitation thereof, Borrower and each Guarantor represent, warrant and covenant to Lender the following (which shall survive the execution and delivery of this Ratification Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition of the making of Loans by Lender:

5.1    Financing Orders. The Interim Financing Order has been duly entered, is valid, subsisting and continuing and has not been vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by Lender) and is not subject to any pending appeal or stay. The Permanent Financing Order shall be entered within fifty days of the Petition Date. Upon its entry, the Permanent Financing Order shall be duly entered, valid, subsisting and continuing and not vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by Lender) and is not subject to any pending appeal or stay.

5.2    Use of Proceeds. Notwithstanding anything to the contrary set forth in the Loan Agreement or in any of the other Loan Documents, all Loans and Letter of Credit Obligations provided by Lender to Borrower pursuant to the Financing Order, the Loan Agreement or otherwise, shall be used by Borrower for costs, expenses and fees in connection with the Loan Agreement and the transactions contemplated thereby and other proper corporate

purposes in accordance with the Budget pursuant to Section 5.3 of this Ratification Agreement; provided, that, no portion of the administrative expenses, priority claims or any other pre-petition claims in the Chapter 11 Cases, other than those directly attributable to the post-petition operation of the business of Borrower and the Entity Guarantors, shall be funded with the proceeds of Loans. All collections from Collateral and any other payments received in respect of the obligations owing by Borrower to Lender shall be applied by Lender in accordance with the Loan Agreement. Notwithstanding the foregoing, proceeds shall not be used by Borrower to affirmatively commence or support, or to pay any professional fees incurred in connection with, any adversary proceeding, motion or other action that seeks to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of Lender's pre-petition and/or post-petition liens, claims and rights or any other actions not expressly authorized by the Financing Order. Unless authorized by the Bankruptcy Court and approved by Lender in writing, no portion of any administrative expense claim or other claim relating to the Chapter 11 Case shall be paid with the proceeds of such Loans or Letter of Credit Obligations provided by Lender to Borrower, other than those administrative expense claims and other claims relating to the Chapter 11 Cases directly attributable to the operation of the business of Borrower or any Guarantor in the ordinary course of such business in accordance with the Loan Documents and other expenses (including professional fees) permitted under the Loan Documents and/or the Financing Order.

       5.3    Budget.

       (a)    The Gemcraft Group has prepared and delivered to Lender an initial thirty (30) day and thirteen (13) week Overhead Budget. The initial Overhead Budget has been thoroughly reviewed by Gemcraft Group, its consultant, and its management and sets forth for the periods covered thereby corporate overhead including general & administrative, marketing production and inside sales commission (collectively, the "Projected Information"). In addition to the initial Overhead Budget, by no later than 5:00 p.m. (Eastern time) on November 27, 2009 and as of the end of each fourth week thereafter, Borrower shall furnish to Lender, in form and substance satisfactory to Lender, an update of the Overhead Budget to omit the four (4) weeks just elapsed and add four (4) additional weeks, such that the Overhead Budget reflects a thirteen (13) week period on a rolling basis. Beginning on December 10, 2009 and on each Thursday thereafter, the Borrower shall submit a variance report that sets forth a comparison of the actual Projected Information to the Projected Information in the Overhead Budget, together with a certification from an officer of the Borrower that no Material Budget Deviation has occurred.

       (b)    Cash expenditures greater than one hundred ten (110%) percent of the projected amounts set forth in the Overhead Budget, in the aggregate, for any four (4) rolling period shall constitute a "Material Budget Deviation". Savings from one period shall be available for use in a later period, in each case consistent with the initial Overhead Budget provided to Lender on or before the date hereof as periodically updated in accordance herewith and with the Loan Agreement and the other Loan Documents as amended hereby.

       (c)    Borrower and each Guarantor confirm, acknowledge and agree that (i) a Material Budget Deviation as set forth in Section 5.3(b) hereof shall constitute an Event of

Default and (ii) the failure to deliver any Overhead Budget or any reports with respect to any Overhead Budget, in form and substance satisfactory to Lender, as provided in Section 5.3(a) hereof, shall constitute an Event of Default. Notwithstanding any approval by Lender of the initial Overhead Budget or any subsequent or amended Overhead Budget(s), Lender will not, and shall not be required to, provide any Loans or Letter of Credit Obligations to Borrower pursuant to the Overhead Budget, but shall only provide Loans and Letters of Credit in accordance with the terms and conditions set forth in the Loan Agreement as amended by this Ratification Agreement, the other Loan Documents and the Financing Order. Lender is relying upon the Borrower's delivery of, and compliance with, the Overhead Budget in accordance with this Section 5.3 in determining to enter into the post-petition financing arrangements provided for herein.

5.4    Retention of Consultant.

(a)    The Gemcraft Group shall continue to retain, at all times during which the Obligations remain outstanding, FTI Consulting or such other Person acceptable to Lender as its consultant, at the sole cost and expense of the Gemcraft Group, on terms and conditions acceptable to Lender, and subject to approval of the Bankruptcy Court. The consultant shall, among other things, assist the Gemcraft Group in the preparation of and compliance with, on an ongoing basis, the Budget.

(b)    Borrower and Guarantors irrevocably authorize and direct the consultant to consult with Lender and to share with Lender all non-privileged budgets, records, projections, financial information, reports and other information prepared by or in the possession of the consultant relating to the Collateral or the financial condition or operations of the businesses of Borrower. Borrower agrees to provide the consultant with complete access to all of the books and records of Borrower and Guarantors, all premises of Borrower and Guarantors and all management and employees of Borrower and Guarantors as and when deemed necessary by the consultant.

(c)    Borrower and Guarantors shall not amend, modify or terminate the retention agreement with the consultant without the prior written consent of Lender. Borrower and Guarantors acknowledge and agree that Borrower shall cause the consultant to keep Lender (i) fully informed of the progress of the business and operations of Borrower and Guarantors and respond fully to any inquiries of Lender regarding the business and operations of Borrower and Guarantors and (ii) communicate and fully cooperate with Lender and share all information with Lender regarding Borrower and Guarantors, and the business and operations of Borrower and Guarantors.

(d)    If the consultant resigns, Borrower shall immediately notify Lender in writing and provide Lender with a copy of any notice of resignation immediately upon the sending of such notice by such consultant. Any replacement or successor consultant shall be acceptable to Lender and shall be retained pursuant to a new retention agreement on terms and conditions acceptable to Lender within fifteen (15) business days immediately following the notice of resignation of the resigning consultant. Failure to comply with the terms and conditions of this Section shall constitute an Event of Default.

5.5    <u>Ratification of Blocked Account Agreement</u>.  To the extent Lender deems it necessary in its discretion and upon Lender's request, Borrower and Guarantors shall promptly provide Lender with evidence, in form and substance satisfactory to Lender, that the account agreements between Borrower, Capital, and the Individual Guarantors provided for under the Loan Documents have been ratified and amended by the parties thereto, or their respective successors in interest, in form and substance satisfactory to Lender, to reflect the commencement of the Chapter 11 Cases, that the Obligations include both the Pre-Petition Obligations and the Post-Petition Obligations, and that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral.

5.6    <u>ERISA</u>.  Borrower and each Guarantor represent and warrant with, to and in favor of Lender that (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of Borrower or any Guarantor arising under ERISA, whether held by the Pension Benefit Guaranty Corporation (the "PBGC") or the contributing sponsor of, or a member of the controlled group thereof, any pension benefit plan of any Borrower or Guarantor and (b) no notice of lien has been filed by the PBGC (or any other Person) pursuant to ERISA against any assets or properties of Borrower or any Guarantor.

5.7    <u>Compliance with Financing Orders</u>.  The Debtors shall comply in all material respects with the Financing Orders.

5.8    <u>DIP Financing</u>.  The Debtors shall not, directly or indirectly, incur or apply (or permit the application by any Person) to the Bankruptcy Court for authority to incur, or suffer to exist, any (i) indebtedness having the priority afforded by Section 364(c) or (d) of the Bankruptcy Code (including any Superpriority Claims) other than the financing provided by Capital and contemplated to be provided by M&T Bank, or with Lender's written consent.

5.9    <u>Alteration of Rights of Lender</u>.  The Debtors shall not, directly or indirectly, seek to limit, affect or modify, or apply (or permit the application by any Person) to the Bankruptcy Court to limit, affect or modify any of the Lender's rights with respect to the Obligations (or its liens with respect to the Obligations and the priority thereof), pursuant to any Reorganization Plan or otherwise.

5.10    <u>Plan of Reorganization</u>.  The Debtors shall file a plan of reorganization which provides for payment in full of all post-petition Obligations by the reorganized Debtors and the other Guarantors in accordance with the terms and conditions contained in the Loan Documents, the release of all claims against the Lender, and the ownership and management of the reorganized Debtors acceptable to the Lender.

5.11    <u>Confirmation</u>.  The Debtors shall obtain confirmation of a plan of reorganization or liquidation acceptable to the Lender in form and substance within nine (9) months of the Petition Date or such longer time as the Lender may agree.

5.12    <u>Chapter 11 Claims</u>.  In connection with, and only to the extent incurred on or after the consummation date in respect of, a Reorganization Plan, the Debtors shall not apply

(or permit the application by any Person) to the Bankruptcy Court for authority to, directly or indirectly, incur, create, assume, suffer or permit any claim, lien or encumbrance (other than post-Petition Date Permitted Liens) against the Borrower, the Debtors, or any of the assets in the Chapter 11 Cases to be <u>pari</u> <u>passu</u> with, or senior to, the liens and claims of the Lender granted and arising hereunder and under the Orders.

5.13    <u>Critical Vendor Payments</u>.  The Debtors shall not, directly or indirectly, make any payments to vendors or suppliers or any other Person on account of any pre-Petition Date indebtedness without the prior written consent of the Lender or order of the Bankruptcy Court on notice to the Lender.

5.14    <u>Reclamation Claims</u>.  The Debtors shall not make any payments or transfer any property on account of claims asserted by any vendors of the Borrower for reclamation in accordance with Section 546(g) of the Bankruptcy Code.

6.    <u>BANKRUPTCY EVENTS OF DEFAULTS</u>.

The occurrence of any one or more of the following events shall constitute a default under the provisions of this Ratification Agreement:

(a)    the occurrence of any condition or event which constitutes any "Event of Default", as defined in the Financing Order, this Ratification Agreement, or any Loan Document;

(b)    conversion of the Chapter 11 Cases to chapter 7 cases under the Bankruptcy Code;

(c)    dismissal of the Chapter 11 Cases or any subsequent chapter 7 cases of the Debtors either voluntarily or involuntarily;

(d)    the grant of a lien on or other interest in any property of any Debtor on which Lender has a lien, other than a lien or encumbrance permitted by the Financing Order;

(e)    the filing by any Debtor of any Objection (as defined in the Financing Orders) to the Obligations, liens, rights or remedies of the Lender;

(f)    a Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Lender (and no such consent shall be implied);

(g)    the appointment of a trustee as to any Debtor pursuant to sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(h)    the filing of a plan of reorganization or liquidation in the Chapter 11 Cases by any entity which does not provide for payment in full of all post-petition Obligations in cash on the effective date thereof (or within eleven days after the entry of the order of confirmation,

whichever is shorter, or such other time as the Lender may agree) in accordance with the terms and conditions contained herein;

(i)     the confirmation of any plan of reorganization or liquidation in the Chapter 11 Cases, to which Lender has not consented in writing, which does not provide for payment in full of all Obligations on the effective date thereof (or within eleven days after the entry of the order of confirmation, whichever is shorter, or such other time as the Lender may agree) in accordance with the terms and conditions contained herein or otherwise acceptable to the Lender; or

(j)     any Failure of Borrower or any Guarantor to comply with any of the terms or provisions of this Ratification Agreement.

7.     <u>AMENDMENTS</u>.

7.1     <u>Amendment of Construction Note</u>.  The Construction Note is amended as follows:

(a)     The first sentence of Section 1 of the Construction Note is deleted and is replaced with the following:

> The disbursed unpaid balance of the portion of the Principal Sum advanced before November ___, 2009 shall bear interest at the fluctuating rate which is Two Hundred Forty (240) basis points above the one (1) month "Libor Rate", as defined below.  The disbursed unpaid balance of the portion of the Principal Sum advanced on or after November ___, 2009 shall bear interest at the fluctuating rate which is Three Hundred Sixty (360) basis points above the one (1) month "Libor Rate".

(b)     Section 3 of the Note is deleted in its entirety and is replaced with the following:

> 3.     <u>Repayment of Principal Sum</u>.  This Note shall mature, and the entire disbursed unpaid balance of the Principal Sum and all accrued and unpaid interest thereon and all other fees and charges due hereunder shall be due and payable on the "Due Date" (defined below).  As used herein, the "Due Date" shall be the earlier to occur of (i) November 9, 2010, or (ii) the date upon which an Order confirming a plan of reorganization becomes final in the Chapter 11 case of Gemcraft Homes Group,

Inc., in the United States Bankruptcy Court for the District of Maryland.

7.2 <u>Amendment of Construction Note</u>. The Construction Note is amended as follows: Provided no Event of Default has occurred under any of the Loan Documents, interest which accrues on those advances of the Principal Sum which were made before the date of this Ratification Agreement shall not be due and payable monthly, but, rather, such interest shall accrue and shall be due and payable upon the earlier to occur of (i) the Due Date, as defined in such Note, or (ii) when paid by the Borrower. (Interest which accrues on those advances of the Principal Sum which are made on or after the date of this Ratification Agreement, shall be paid monthly, in arrears, on the first day of each month, as set forth in such Note.)

7.3 <u>Amendment and Restatement of Existing Loan Agreement</u>. The Existing Loan Agreement has this date been amended and restated in its entirety in the form of the Loan Agreement.

8. <u>ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS</u>.

8.1 <u>Suspension of Certain Events of Default</u>. For the period from the date of this Ratification Agreement, through and including the date upon which the Construction Note matures according to its terms or an Event of Default is declared in writing by Lender, whichever is earlier, the occurrence of the events described on Schedule 8.1 ("Schedule of Suspended Events") dated contemporaneously herewith shall not constitute an Event of Default under any of the Loan Documents if such event occurs as to one or more of the Debtors (but this provision shall not apply if such event occurs as to any of the Guarantors, other than the Debtors). Immediately following such date, the period of suspension shall automatically terminate and the occurrence or continuation of any such events shall constitute an Event of Default under the Loan Documents to the same extent as it did before the Petition Date.

8.2 <u>Partial Limitation on Liability of Individual Guarantors</u>. (a) Notwithstanding anything to the contrary contained in the Guarantor Documents, executed by the Individual Guarantors, if no Event of Default occurs under any of the Loan Documents between the date of this Ratification Agreement and the date upon which the Lender receives, aggregate payments on account of the sale of Collateral after the date of this Ratification Agreement, which aggregate payments are indefeasibly applied to reduce the Pre-Petition indebtedness outstanding under the Existing Loan Documents by $27,370,638.92, then the liability of the Individual Guarantors under the Guarantor Documents shall thereafter be reduced so that the Individual Guarantors will not be required to pay the last $3,000,000 of any deficiency in principal and/or interest which may be incurred by Lender in connection with the Pre-Petition indebtedness outstanding under the Existing Loan Documents. Notwithstanding the foregoing, the Individual Guarantors shall be fully liable under the Guarantor Documents (i) for all Post-Petition Obligations, (ii) for any and all Pre-Petition indebtedness in excess of such $3,000,000 amount, and (iii) if, at any time, Borrower or any of the Guarantors undertakes or promotes, directly or indirectly, any action, including, without limitation, the filing of any proceeding in an effort to take advantage of any bankruptcy, reorganization, moratorium or similar law, to prevent, impede, delay or hinder the Lender from foreclosing the liens of any one

or more of the Deeds of Trust or otherwise from executing upon any of the Collateral, or (iv) if, at any time, Borrower or any of the Guarantors, directly or indirectly, attempts to challenge, vitiate, contest or set aside or impair any foreclosure sale or conveyance in lieu thereof with respect to all or any part of the Collateral or attempts to claim any right, title or interest in any of the Collateral or any part thereof or any interest therein, unless Borrower's or such Guarantor's actions are ultimately determined to be valid by the entry in favor of Borrower or such Guarantor of a final, non-appealable judgment by a court of competent jurisdiction.

(b)     Additionally, the Individual Guarantors shall not be relieved from any liability, obligation or agreement (and shall be obligated to pay to Lender and/or to defend, hold harmless and indemnify Lender from and against any loss, cost, claim, damage, liability or expense (including reasonable attorney's fees) that results from or can reasonably be attributed to any one or more of the following:

1.     fraud or material misrepresentations or concealment;

2.     conversion, misapplication or misappropriation of rents, revenues, profits, end buyer deposits or sales proceeds received by Borrower or any Guarantor and not paid to Lender, or insurance or condemnation proceeds;

3.     failure to cause the Collateral to be insured as and to the extent required by the Lender's loan documents; and

4.     any liability, cost, damage or expense incurred by Lender resulting from or in connection with any environmental matter, including location on or emission or discharge from the Collateral of any asbestos or toxin or hazardous material or substance, including any liability resulting from any indemnification contained in the Deeds of Trust or other Loan Documents.

9.     RELEASE.

9.1     Release of Pre-Petition Claims.

(a)     Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, in consideration of the agreements of Lender contained herein and the making of any Loans by Lender, Borrower and each of the Guarantors, for valuable consideration, on behalf of themselves and their respective personal representatives, heirs, successors, assigns, and other legal representatives, absolutely, unconditionally and irrevocably releases, remises and forever discharge Lender and its respective successors and assigns, and its present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Lender and all such other parties being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities

whatsoever (individually, a "Pre-Petition Released Claim" and collectively, "Pre-Petition Released Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which the Borrower and/or any of the Guarantors or any of their personal representatives, heirs, successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or before the day and date of this Ratification Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Loans and or the Loan Agreement, as amended and supplemented through the date hereof, and the other Loan Documents. This paragraph 9.1(a) shall have no effect until entry of the Permanent Financing Order and shall be subject to qualification or limitation that may be set forth in the Permanent Financing Order.

(b)     Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, Borrower and each of the Guarantors, on behalf of themselves and their personal representatives, heirs, successors, assigns, and other legal representatives, absolutely, unconditionally and irrevocably, covenant and agree with each Releasee that they will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by Borrower and any Guarantor pursuant to this Section 9.1. If Borrower or any Guarantor violates the foregoing covenant, Borrower and each of the Guarantors agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

9.2     Release of Post-Petition Claims.    Upon (a) the receipt by Lender of payment in full of all Obligations in cash or other immediately available funds, plus cash collateral or other collateral security acceptable to Lender to secure any Obligations that survive or continue beyond the termination of the Loan Documents, and (b) the termination of the Loan Documents (the "Payment Date"), in consideration of the agreements of Lender contained herein and the making of any Loans by Lender, Borrower and each of the Guarantors covenant and agree to execute and deliver in favor of Lender a valid and binding termination and release agreement, in form and substance satisfactory to Lender. If Borrower or any of the Guarantors violates such covenant, Borrower and each of the Guarantors agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

9.3     Releases Generally.

(a)     Borrower and each of the Guarantors understand, acknowledge and agree that the releases set forth above in Sections 9.1 and 9.2 hereof may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

(b)     Borrower and each of the Guarantors agree that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be

discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 9.1 hereof and, when made, Section 9.2 hereof.

10.    <u>CONDITIONS PRECEDENT</u>.

In addition to any other conditions contained herein or the Loan Agreement with respect to the Loans and other financial accommodations available to Borrower (all of which conditions, except as modified or made pursuant to this Ratification Agreement shall remain applicable to the Loans and be applicable to other financial accommodations available to Borrower), the following are conditions to Lender's obligation to extend further loans, advances or other financial accommodations to Borrowers pursuant to the Loan Agreement:

10.1    Borrower and Guarantors shall furnish to Lender all financial information, projections, budgets, business plans, cash flows and such other information as Lender shall reasonably request from time to time, together with supporting documentation, each in form and substance consistent with prior such reports provided to Lender by Borrower and reasonably satisfactory to Lender;

10.2    as of the Petition Date, the Existing Loan Documents shall not have been terminated;

10.3    no trustee, examiner or receiver or the like shall have been appointed or designated with respect to any Debtor, or its respective business, properties and assets and no Debtor shall have filed any motion or proceeding seeking such relief;

10.4    the execution and delivery of this Ratification Agreement and all other Loan Documents to be delivered in connection herewith by Borrower and Guarantors in form and substance satisfactory to Lender;

10.5    Lender shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to Lender pursuant to the Existing Loan Documents as in effect immediately before the Petition Date to secure all of the Obligations, as well as, upon approval of the Bankruptcy Court, valid, enforceable and perfected first priority and senior security interests in and liens upon all Post-Petition Collateral granted to Lender under the Financing Order or hereunder or under any of the other Loan Documents or otherwise granted to or held by Lender, in each case, subject only to encumbrances expressly permitted by Lender and any other liens or encumbrances expressly permitted by the Financing Order that may have priority over the liens in favor of Lender;

10.6    the execution or delivery to Lender of all other Loan Documents, and other agreements, documents and instruments which, in the good faith judgment, of Lender are necessary or appropriate, to implement the terms of this Ratification Agreement and the other Loan Documents, as modified pursuant to this Ratification Agreement, all of which contains provisions, representations, warranties, covenants and Events of Default, as are satisfactory to Lender and its counsel;

10.7    satisfactory review by counsel for Lender of legal issues attendant to the post-petition financing transactions contemplated hereunder;

10.8    Lender's completion of its business and legal due diligence, with results satisfactory to Lender, including field inspections of the business and Collateral of Borrower and Guarantors in accordance with Lender's customary procedures and practices and as otherwise required by the nature and circumstances of the businesses of Borrower and Guarantors;

10.9    The Gemcraft Group shall comply in full with the notice and other requirements of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to any relevant Financing Order in a manner acceptable to Lender and its counsel, and an Interim Financing Order shall have been entered by the Bankruptcy Court not later than November 23, 2009 (as amended, modified, supplemented or extended from time to time with Lender's consent, the "Interim Financing Order") authorizing the secured financing under the Loan Documents as ratified and amended hereunder on the terms and conditions set forth in this Ratification Agreement and, among other things, modifying the automatic stay, authorizing and granting the first priority, perfected liens and senior security interest in favor of Lender, in each case as described in this Ratification Agreement and in the Financing Order, and granting super-priority expense claims to Lender with respect to all obligations due Lender, subject to no priority claim or administrative expenses of the Chapter 11 Case and any future proceeding which may develop out of such case, including liquidation and bankruptcy.  Notwithstanding the foregoing, the Lender's superpriority rights shall exclude funds provided to the Debtors by Capital, shall share equally with M&T Bank as long as M&T Bank provides post-petition date financing approved by the Bankruptcy Court, and shall exclude any property on which any other creditor has a lien (other than a mechanic's lien or a lien for real property taxes).  The Interim Financing Order shall authorize post-petition financing under the terms set forth in this Ratification Agreement for a period not to exceed thirty (30) days and in the amounts set forth in the Budget with respect to such period, and it shall contain such other terms and provisions as Lender and its counsel shall reasonable require;

10.10   On or before the expiration of the Interim Financing Order and in no event later than fifty days after the Petition Date, the Bankruptcy Court shall have entered a Permanent Financing Order authorizing the secured financing on the terms and conditions set forth in this Ratification Agreement, granting to Lender the senior security interests and liens described above and super-priority administrative expense claims described above (except as otherwise specifically provided in the Interim Financing Order), and modifying the automatic stay and other provisions required by Lender and its counsel, including, without limitation, a release of all claims and causes of action upon the full repayment of all obligations of Borrower to Lender on terms satisfactory to Lender ("Permanent Financing Order").  Lender shall not provide any Loans (or other financial accommodations) other than those authorized under the Interim Financing Order unless, on or before the thirtieth (30th) day following the date of the commencement of the Chapter 11 Cases, such Permanent Financing Order shall have been entered, there shall be no appeal or other contest with respect to either of such orders and the time to appeal or contest such orders shall have expired (the "Permanent Financing Order", and together with the Interim Financing Order, collectively, the "Financing Orders");

10.11   Other than the voluntary commencement of the Chapter 11 Cases, no material impairment of the priority of Lender's security interests in the Collateral shall have occurred from August 15, 2009 to the Petition Date;

10.12   No material misstatements in or omissions from the materials previously furnished to Lender by Borrower or any Guarantor shall have been made and Lender shall be satisfied that any financial statements delivered to it fairly present the business and financial conditions of Borrower and the Guarantors;

10.13   No Event of Default shall have occurred or be existing under any of the Existing Loan Documents, as modified pursuant hereto, and assumed by Borrower and Guarantors, except for the Suspended Events.

11.    CONDITIONS SUBSEQUENT.

In addition to any other conditions contained herein or in the Loan Agreement, with respect to the Loans and other financial accommodations available to Borrower (all of which conditions, except as modified or made pursuant to this Ratification Agreement shall remain applicable to the Loans and be applicable to other financial accommodations available to Borrower), the following are conditions to Lender's obligation to extend further loans, advances or other financial accommodations to Borrower pursuant to the Loan Agreement:

11.1   On or before 120 days after the Petition Date, or such later time as the Lender may agree, the Debtors shall have filed a plan of reorganization and disclosure statement in the Chapter 11 Cases in accordance with terms and conditions for the treatment of all Obligations which are acceptable to the Lender.

11.2   On or before nine (9) months after the Petition Date, or such later time as the Lender may agree, the Debtors shall have obtained an order confirming a plan of reorganization in the Chapter 11 Cases in accordance with terms and conditions of the Loan Documents for the treatment of all Obligations which are acceptable to the Lender.

11.3   The Creditors' Committee shall not have filed any complaint or other proceeding asserting any claim against the Lender or the Lender Releasees (as defined above) or challenge to the valid, priority, or extent of the liens and security interests in favor of the Lender.

12.    MISCELLANEOUS.

12.1   Amendments and Waivers.   Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

12.2   Further Assurances.   Borrower and each of the Guarantors shall, at its expense, at any time or times duly execute and deliver, or shall use its best efforts to cause to be

duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional deeds of trust, mortgages, security agreements, collateral assignments, UCC financing statements or amendments or continuations thereof, landlord's or mortgagee's waivers of liens and consents to the exercise by Lender of all the rights and remedies hereunder, under any of the other Loan Documents, any Financing Order or applicable law with respect to the Collateral, and do or use its best efforts to cause to be done such further acts as may be reasonably necessary or proper in Lender's opinion to evidence, perfect, maintain and enforce the security interests of Lender, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Ratification Agreement, any of the other Loan Documents or the Financing Order.  Upon the request of Lender, at any time and from time to time, Borrower and each of the Guarantors shall, at its cost and expense, do, make, execute, deliver and record, register or file updates to the filings of Lender with respect to the Intellectual Property with the United States Patent and Trademark Office, the financing statements, mortgages, deeds of trust, deeds to secure debt, and other instruments, acts, pledges, assignments and transfers (or use its best efforts to cause the same to be done) and will deliver to Lender such instruments evidencing items of Collateral as may be requested by Lender.

12.3    Headings.  The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

12.4    Counterparts.   This Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement. In making proof of this Ratification Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto.  Delivery of an executed counterpart of this Ratification Agreement by telefacsimile or electronic mail shall have the same force and effect as delivery of an original executed counterpart of this Ratification Agreement.   Any party delivering an executed counterpart of this Ratification Agreement by telefacsimile also shall deliver an original executed counterpart of this Ratification Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Ratification Agreement as to such party or any other party.

12.5    Additional Events of Default.  The parties hereto acknowledge, confirm and agree that the failure of the Borrower or any of the Guarantors to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by the Borrower or any of the Guarantors in connection herewith shall constitute an Event of Default under each of the Loan Documents.

12.6    Costs and Expenses.  Borrower shall pay to Lender on demand all costs and expenses that Lender incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Ratification Agreement and the other Loan Documents and the Financing Order, including, without limitation: (a) reasonable attorneys' and paralegals' fees and disbursements of counsel to, and reasonable fees and expenses of consultants, accountants and other professionals retained by, Lender; (b) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) for any amendment, supplement, waiver, consent, or subsequent closing in connection with this Ratification

Agreement, the other Loan Documents, the Financing Order and the transactions contemplated thereby; (c) taxes, fees and other charges for recording any agreements or documents with any governmental authority, and the filing of mortgages, deeds of trust, UCC financing statements and continuations, and other actions to perfect, protect, and continue the security interests and liens of Lender in the Collateral; (d) sums paid or incurred to pay any amount or take any action required of Borrower and Guarantors under the Loan Documents or the Financing Order that Borrowers and Guarantors fail to payor take; (e) costs of appraisals, inspections and verifications of the Collateral and including travel, lodging, and meals for inspections of the Collateral and Borrower's operations by Lender or its agent and to attend court hearings or otherwise in connection with the Chapter 11 Case; (f) costs and expenses of preserving and protecting the Collateral; (g) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Lender (both for its officers and employees and third party inspectors retained by the Lender) during the course of periodic field inspections of the Collateral and Borrowers' operations; (h) costs and expenses (including reasonable attorneys' and paralegals' fees, and disbursements) paid or incurred to obtain payment of the Obligations, enforce the security interests and liens of Lender, sell or otherwise realize upon the Collateral, and otherwise enforce the provisions of this Ratification Agreement, the other Loan Documents and the Financing Order, or to defend any claims made or threatened against Lender arising out of the transactions contemplated hereby (including, without limitation, preparations for and consultations concerning any such matters), (i) the costs of any title insurance policies, endorsements or other title insurance premiums and costs of title, lien, judgment or other similar searches; and (j) recording, recordation or transfer taxes in connection with the Deeds of Trust including, but not limited to, recordation tax that has previously, now or may hereafter become due on account of the occurrence of a default under any of the Loan Documents. The foregoing shall not be construed to limit any other provisions of the Loan Documents regarding costs and expenses to be paid by Borrower or any Guarantors. All sums provided for in this Section 12.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Loan Documents. Lender is irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by Lender with respect to any Borrower or any of the Guarantors.

        12.7   <u>No Novation</u>. In no event shall this Ratification Agreement or anything contained herein or in any document executed on or about the date hereof be deemed a waiver, discharge, novation, substitution or replacement of the Existing Notes, the Existing Guarantor Documents, the Existing Deeds of Trust or the other Existing Loan Documents or the debts secured thereby and it is understood and agreed between the parties hereto that the Existing Deeds of Trust and the other Existing Loan Documents shall continue unimpaired as security for the Obligations, as herein modified, all in accordance with the purposes, provisions, terms, covenants and conditions set forth in the Existing Loan Documents, all of which shall remain in full force, operation and effect, except as modified by this Ratification Agreement or other documents executed this date in connection herewith.

        12.8   <u>Effectiveness</u>. This Ratification Agreement shall become effective upon the execution hereof by Lender and the entry of the Interim Financing Order.

12.9   <u>WAIVER OF JURY TRIAL</u>.  THE BORROWER, THE GUARANTORS AND THE LENDER VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.

IN WITNESS WHEREOF, the parties have executed this Ratification Agreement, under seal, as of the day and year first above written.

WITNESS/ATTEST:                         GEMCRAFT HOMES GROUP, INC.
                                        As Debtor and Debtor-in-Possession


_____         By:_____(SEAL)
                                            William R. Luther, Jr.
                                            President

                                        GEMCRAFT HOMES, INC.
                                        As Debtor and Debtor-in-Possession


_____         By:_____(SEAL)
                                            William R. Luther, Jr.
                                            President
                                        GEMCRAFT HOMES FOREST HILL, LLC
                                        As Debtor and Debtor-in-Possession


_____         By:_____(SEAL)
                                            William R. Luther, Jr.
                                            President


                                        GEMCRAFT HOMES CHESAPEAKE, LLC
                                        As Debtor and Debtor-in-Possession


_____         By:_____(SEAL)
                                            William R. Luther, Jr.
                                            President

DLM, LLC

_____     By:_____(SEAL)
                                        William R. Luther, Jr.
                                        President


TULL GARDENS, LLC

By:   DLM, LLC, Sole Member

_____        By:_____(SEAL)
                                           William R. Luther, Jr.
                                           President


ST. HELEN'S, LLC

_____     By:_____(SEAL)
                                        William R. Luther, Jr.
                                        Managing Member

HARKINS PROPERTY, LLC
As Debtor and Debtor-in-Possession

By:   Gemcraft Homes Forest Hill, LLC,
        Manager and Sole Member

_____        By:_____(SEAL)
                                                      William R. Luther, Jr.
                                                      President

_____        By:_____(SEAL)
                                                      William R. Luther, Jr.
                                                      Manager


THE PRESERVE AT JEFFERSON CREEK, LLC
As Debtor and Debtor-in-Possession

_____        By:_____(SEAL)
                                                  William R. Luther, Jr.
                                                  Managing Member


GEMCRAFT CAPITAL, LLC

_____        By:_____(SEAL)
                                                  William R. Luther, Jr.
                                                  Managing Member


_____        _____(SEAL)
                                                  William R. Luther, Jr.


_____        _____(SEAL)
                                                  Vickie A. Luther


_____        _____(SEAL)
                                                  Brian E. Fromme

_____         _____(SEAL)
                                      Sharon L. Babcock


                                      REGIONS BANK


_____         _____(SEAL)
                                      Name:
                                      Title:

Schedule 8.1 to Ratification and Modification Agreement

Schedule of Suspended Defaults

References are to the Existing Loan Agreement

1.  Filings of petitions for relief under the Bankruptcy Code by the Debtors in breach of Section 6.1(n)

2.  Impairment of security in breach of Section 6.1(i)

3.  Failure to provide additional funds as required by Section 5.2(a)

4.  Tangible Net Worth, Maximum Debt to Tangible Net Worth, and Minimum Liquid Assets Financial Covenant from Section 5.2(y)

5.  Failure to use proceeds of advances as required by Section 5.2(i)

6.  The corresponding defaults under the Existing Guaranty Documents and other Existing Loan Documents

7.  Such additional items as may be identified by Borrower or Guarantors before closing on the Ratification Agreement or thereafter with the express written consent of the Lender.

## THIRD AMENDED AND RESTATED
## CONSTRUCTION LOAN AGREEMENT

THIS THIRD AMENDED AND RESTATED CONSTRUCTION LOAN AGREEMENT (this "Agreement") is made this ____ day of _____, 2009, by and among GEMCRAFT HOMES GROUP, INC., a Maryland corporation, as Debtor and Debtor in possession (the "Borrower"), GEMCRAFT HOMES, INC., a Maryland corporation, as Debtor and Debtor in possession ("Gemcraft Homes"), GEMCRAFT HOMES FOREST HILL, LLC, a Maryland limited liability company, as Debtor and Debtor in possession ("Forest Hill"), GEMCRAFT CHESAPEAKE, LLC, a Maryland limited liability company, as Debtor and Debtor in Possession ("Chesapeake"), DLM, LLC, a Maryland limited liability company, as Debtor and Debtor in possession ("DLM"), TULL GARDENS, LLC, a Maryland limited liability company ("Tull"), ST. HELEN'S, LLC, a Maryland limited liability company ("St. Helen's"), HARKINS PROPERTY, LLC, a Maryland limited liability company, as Debtor and Debtor in possession ("Harkins"), THE PRESERVE AT JEFFERSON CREEK, LLC, a Maryland limited liability company, as Debtor and Debtor in Possession ("Jefferson Creek", and together with Gemcraft Homes, Forest Hill, Chesapeake, DLM, Tull, St. Helen's and Harkins the "Guarantors") and REGIONS BANK (the "Lender").

## RECITALS

A.    On June 9, 2005, the Lender loaned to the Borrower, and certain of the Guarantors, up to Forty Million Dollars ($40,000,000.00) (as increased or otherwise modified from time to time, the "Loan").  In connection therewith, the Borrower, the Lender and others entered into certain documents, including, but not limited to, a Loan Agreement, which, on September 16, 2005, was amended and restated in the form of the Amended and Restated Loan Agreement (the "Amended Loan Agreement").

B.    On February 3, 2006, the Lender increased the amount of the Loan to Seventy-five Million Dollars ($75,000,000.00) and made certain other changes to the terms of the Loan.  In connection therewith, the Borrower and certain of the Guarantors executed, among other things, a Second Amended and Restated Construction Loan Agreement (the "Second Amended Loan Agreement") and a Second Amended and Restated Promissory Note (as the same may from time to time be extended, amended, restated, supplemented or otherwise modified, the "Note").  Those Guarantors that did not execute the Second Amended Loan Agreement subsequently assumed the obligations of the "Guarantors" thereunder.  The Second Amended Loan Agreement and the Note have been modified numerous times prior to the date of this Agreement.  As more particularly described in the Second Amended Loan Agreement, the Loan consists of a borrowing base facility (the "Borrowing Base Facility"), four (4) acquisition and development loans (each an "Acquisition and Development Loan", and collectively, the "Acquisition and Development Loans"), and other related indebtedness.

C.    The Guarantors and William R. Luther, Jr., Vickie A. Luther, Brian E. Fromme and Sharon L. Babcock (the "Individual Guarantors") previously executed various documents entitled "Guaranty of Payment and Performance" or similar documents (as the same may from

time to time be extended, amended, restated, supplemented or otherwise modified, individually a "Guaranty" and collectively, the "Guarantees"). Certain of the Guarantors have executed various indemnity deeds of trust, indemnity mortgages, deeds of trust or mortgages, which have been recorded in various jurisdictions (as the same may from time to time be extended, amended, restated, supplemented or otherwise modified, individually a "Deed of Trust" and collectively, the "Deeds of Trust") to secure their obligations under one or more of the Guarantees.

D.     On November 9, 2009 (the "Petition Date"), the Borrower, Gemcraft Homes, Forest Hill, Chesapeake, DLM, Harkins and Jefferson Creek (together, the "Gemcraft Group") commenced a case or cases (collectively, the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Maryland (the "Bankruptcy Court"), have retained possession of their assets and are authorized under the Bankruptcy Code to continue the operation of their businesses as debtors in possession.

E.     The Borrower, the Guarantors, the Individual Guarantors and an Affiliate (defined below) of the Borrowers, Gemcraft Capital LLC, a Maryland limited liability company ("Gemcraft Capital") have requested that the Lender continue to make advances in connection with the Loan, after the Petition Date, all as more fully set forth in that certain Ratification and Modification Agreement executed on or about the date hereof by and among the Borrower, the Guarantors, the Individual Guarantors, Gemcraft Capital and the Lender (as the same may from time to time be extended, amended, restated, supplemented or otherwise modified, the "Ratification Agreement"). Capitalized terms which are used but not defined in this Agreement shall have the meanings given those terms in the Ratification Agreement.

F.     The Borrower, the Guarantors and the Lender desire to modify certain of the terms of the Loan to, among other things, convert the Borrowing Base Facility portion of the Loan into a three-part discretionary credit facility for purposes of making post Petition Date advances, consisting of (i) a revolving builder line of credit, (ii) a non-revolving development line of credit, and (iii) a revolving overhead line of credit, and  in connection therewith, the Borrower, the Guarantors and the Lender have agreed to amend and restate the Second Amended Loan Agreement in its entirety, as set forth below.

<u>AGREEMENTS</u>

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) paid by each of the parties to the other and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree that the Second Amended Loan Agreement is amended and restated in its entirety as hereinafter set forth, provided that nothing herein or in any of the other Loan Documents (defined below) shall be construed as a substitution, replacement or novation of the Borrower's or the Guarantors' indebtedness under the terms of any of the Loan Documents, which indebtedness is due and owing without offset or defense and is in full force and effect and it is understood and agreed that the terms and conditions as hereinafter set forth shall be applicable and shall control with respect to the rights and obligations of the parties in connection with the disbursement and administration of the Loan and to the extent any of the terms, provisions and conditions as hereinafter contained are inconsistent with any of the terms, provision and conditions of the Second Amended Loan Agreement, the

terms, provision and conditions hereof shall in all such instances prevail and be controlling.  The Second Amended Loan Agreement is hereby amended and restated as follows:

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) paid by each of the parties to the other, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

1.    <u>Construction of the Project</u>.

The Borrower and the Guarantors agree that the Borrower shall make available the proceeds of the Loan to the Guarantors, and the Guarantors shall use the proceeds to refinance or acquire real property, which will be subjected to the lien of the Deeds of Trust from time to time ("the Land") and to construct thereon pre-approved models of single-family detached homes, town homes and/or condominiums ("the Project") in accordance with final plans, drawings and specifications heretofore or hereafter to be delivered to and approved by the Lender (the "Plans and Specifications").  No material changes shall be made in the Plans and Specifications and no material change orders to any contracts shall be executed without the prior written consent of the Lender and of any governmental authorities having jurisdiction.  No material work other than that shown in the Plans and Specifications shall be authorized or undertaken in the construction of the Project without the prior written consent of the Lender.  As used herein, a "material" change or "material" work shall be any one or more change or items of additional work which, in the aggregate, increases or decreases the cost of any single home, townhome or condominium by more than Fifteen Thousand Dollars ($15,000.00).  Notwithstanding anything to the contrary contained elsewhere in this Agreement, all contracts of sale and all other contracts, agreements, permits and other documents relating to the Project shall be entered into by one or more of the Guarantors, not by the Borrower.  The cost of the Project shall include all costs of construction and all other costs both direct and indirect.  The Borrower and the Guarantors agree to pay all such costs as they become due and payable.

2.    <u>Payment of Expenses</u>.

The Borrower shall promptly pay to the Lender, upon demand, all costs, fees and expenses of the Lender of whatever nature, incurred after the Petition Date, in connection with the making and ongoing administration of the Loan, it being the understanding and agreement of the parties that the Loan shall be made without any cost to the Lender.  Such costs, fees and expenses shall include, but not be limited to, loan origination fees, points, credit report fees, recording charges and taxes, title insurance charges, attorneys' fees (including the reasonable fees of the Lender's attorneys), bond premiums, letter of credit fees, Lender or third party inspection fees, fees for environmental reports or audits, experts or consultant's fees and appraisal fees.  The Borrower agrees that the Lender may, at the Borrower's expense, retain an inspector to conduct periodic inspections of the Project or that the Lender may utilize an officer, employee or other agent of the Lender to conduct such inspections and charge the Borrower a reasonable fee therefor, as determined by the Lender.  The Borrower further agrees that if any such costs, fees and expenses are not paid on demand, the Lender, in addition to and not in limitation of any other right or remedy otherwise available to the Lender and whether before or after the occurrence of an Event of Default (defined below), may from time to time and without

the authorization or consent of the Borrower, pay the same from the Lender's funds and/or make advances of Loan proceeds to the Lender or to third parties to pay for or to reimburse the Lender for any and all such costs, fees and expenses.  In addition to the foregoing, the Borrower specifically agrees that the Lender may make advances from Loan proceeds as described in Section 1.3 of the Deeds of Trust and such advances shall be secured by the Deeds of Trust as described therein.  The Borrower remains obligated with respect to the Lender for any of the foregoing costs, fees and expenses incurred prior to the Petition Date.

      3.    <u>Non-assignability</u>.

      This Agreement is executed for the sole benefit of the Lender as additional security for its Loan and no right to the benefits of this Agreement or to any advances of the Loan shall be assignable in whole or in part except upon written consent by the Lender.  Neither the Loan nor any right to an advance hereunder shall be subject to the process of any court upon legal action by or against the Borrower or by or against anyone claiming by, through or under the Borrower. Nothing herein contained shall be considered as modifying, affecting or subordinating the obligations heretofore given or to be given by the Borrower or the Guarantors as security for the Loan, and the same shall remain in full force and effect, this Agreement being intended only as additional security and protection for the Loan and to assure the Lender that the proceeds of the Loan shall be used only for the purposes herein provided.  All Loan proceeds will be advanced to the Borrower or, at the Lender's election, as otherwise set forth in this Agreement.  The Guarantors have no right to receive from the Lender any advance or any proceeds of the Loan.

      4.    <u>Advances</u>.

      4.1    <u>Use of Proceeds</u>.  Subject to the terms of this Agreement (including, but not limited to, the discretionary nature of the Lender's obligation to make advances of Loan proceeds), the proceeds of the Loan shall be advanced by the Lender (a) in the Lender's sole discretion (and without any obligation on the part of the Lender to do so) to pay interest on the Note when due without further authorization or consent of the Borrower, (b) to pay or to refinance a portion of the purchase price for the Land, in accordance with purchase contracts approved by the Lender, (c) to pay reasonable and customary costs for labor, services, materials and associated costs incurred in connection with the construction of the homes upon the Land, (d) to fund development expenses with respect to certain properties which are the subject of Acquisition and Development Loans previously made by the Lender, as well as ongoing real estate taxes and maintenance expenses for those properties, (e) to fund temporary overhead shortfalls of the Borrower and Guarantors, or (f) as otherwise authorized by the Lender in its sole discretion from time to time.

      4.2    <u>Requisitions</u>.  Advances by the Lender for the purposes set forth in 4.1(b), 4.1(c), 4.1 (d) and 4.1(e) above shall be made (i) upon presentation of a requisition on a form provided by the Lender requiring such information, on such subjects and in such detail as the Lender shall require from time to time, and (ii) with respect for advances made for the purposes set forth in 4.1 (c) and  4.1 (d) above, after inspection and approval by a representative of or person retained by the Lender, and (iii) with respect to advances made for the purposes set forth in 4.1(b) above, in accordance with disbursement schedules prepared by the Lender from time to

time (such disbursement schedules to be satisfactory to the Lender in form and content in the Lender's sole discretion). The requisition required hereunder shall be signed by the Borrower or, at the Lender's election, the Guarantors, and any other person as required by the Lender from time to time, each of whom shall certify to the accuracy of the statements or representations made therein. All advances at the sole option of the Lender, will be made to the Borrower or, at the Lender's election, to the Guarantors (or any of them) or (i) directly to contractors, subcontractors, material suppliers or other persons furnishing labor, services or materials used or to be used on or in the Project (including extras approved by the Lender) or (ii) jointly to the Borrower (or, at the Lender's election, to the Guarantors (or any of them)) and to any contractors, subcontractors, material suppliers or other persons furnishing labor, services or materials used or to be used on or in the Project (including extras approved by the Lender). Advances for acquisition of lots may, at the Lender's election, in its sole discretion, be made directly to the Borrower (or, at the Lender's election, to the Guarantors (or any of them)) or to any title company, closing attorney or other settlement officer, or jointly to any one or more of the foregoing as the Lender in its sole discretion may determine. The Lender shall not have any obligation to make any disbursement of Loan proceeds for materials to be used in the Project until those materials have been physically incorporated into one of the homes that constitutes the Project.

      4.3    <u>Discretionary Nature of Loan</u>. Notwithstanding anything to the contrary contained elsewhere in this Agreement or in any of the other Loan Documents, the Lender's obligation to make any disbursement of Loan proceeds is discretionary and the Lender is not obligated to make any advance of Loan proceeds for any purpose, unless, with respect to each and every advance, the Lender elects to do so in its sole discretion. Without limiting the generality of the foregoing, the following are examples of certain conditions, among others, which the Lender may consider in electing to make an advance under this Agreement:

      (a)    <u>Requisition</u>. The Borrower shall have delivered to the Lender the documentation meeting the requirements of Section 4.2 above.

      (b)    <u>Event of Default Hereunder</u>. No Event of Default or event which, with notice or lapse of time or both, would constitute an Event of Default under this Agreement, shall have occurred, and the Borrower and the Guarantors shall be in compliance with every term, provision, condition and covenant of this Agreement and of the other Loan Documents.

      (c)    <u>Permits, Etc</u>. All permits, public works agreements, and other approvals of any governmental authority and any private approvals or other authorizations required by law in connection with the Project (or any home which is a part of the Project), through the then current stage of construction of the Project (or any home which is a part of the Project), shall have been issued and continue in full force and effect and no proceedings shall be pending or threatened with respect to the revocation or suspension thereof.

      (d)    <u>Lien Waivers</u>. If requested by the Lender, at its sole option, the Borrower or the Guarantors shall have furnished waivers of liens and receipts of payment from any contractor, subcontractor or supplier of materials designated by the Lender for all work performed or materials supplied to the date of the immediately preceding requisition.

(e)    <u>Title Endorsement</u>. If requested by the Lender, at its sole option, the title insurance company insuring the title to the Land shall issue a title continuation or endorsement, down-dating the Lender's title insurance policy and showing that the Land is clear of liens (other than the lien of the Deed of Trust and any other liens expressly permitted by the Lender) to the date of such disbursement and that no claims for mechanics' or similar liens and no financing statements affecting the Land or any improvements constructed thereon, or any part thereof, other than in favor of the Lender, have been filed or submitted and containing such affirmative coverage as the Lender may require.

(f)    <u>Conformity with Plans and Specifications</u>. All construction work which has been completed shall be in full conformity with the Plans and Specifications and satisfactory, in all respects, to the Lender.

(g)    <u>Location Survey</u>. Any location survey requested by the Lender shall reveal that all of the improvements constructed by the Guarantors are within the boundary lines of the lots upon which such improvements have been constructed and that none of the improvements violate any setback or other restrictions applicable thereto.

(h)    <u>Building Permits</u>.  If requested by the Lender, the Lender shall have received copies of all building permits or other necessary for the construction of the home for which a draw is requested.

(i)    <u>Legal Matters</u>. All legal matters incidental to the Project and the making and ongoing administration of the Loan and the Bankruptcy Case shall be satisfactory to the Lender and its counsel in their sole discretion.

(j)    <u>Costs</u>.  All costs, expenses, charges and fees which are to be paid by the Borrower or the Guarantors in connection with the making or ongoing administration of the Loan shall have been paid.

(k)    <u>Additional Conditions to Construction Draws</u>. Before payment of any draw for construction of any home on the Land, the Lender shall have received, with respect to such home, evidence satisfactory to the Lender of: (i) the due and proper approval and recordation of any subdivision plat or condominium declaration and plat or homeowner's association documentation which is required by the Lender; (ii) the availability of all utilities, public and private, to each improvement on the Land; (iii) the completion of all roads necessary to permit the improvements to be used for their intended purposes; (iv) the correct placement of all improvements on the Land (with respect to lot lines, setbacks, etc.); and (v) the approval of any applicable architectural review committee or similar body with respect to such improvements.

(l)    <u>Additional Conditions to Land Acquisition Draws</u>.  Before payment of any draw for acquisition of any real property after the date of this Agreement, the Borrower or the Guarantors shall provide to the Lender any or all of the following that may be requested by the Lender, all of which must be in form and content satisfactory to the Lender: (i)

Financing Statements and amendments or supplements to the Deeds of Trust and the other Loan Documents, or a new deed of trust or mortgage, all as required by the Lender to extend the Lender's lien and the application of the Loan Documents to the real property being acquired; (ii) an endorsement to the Lender's title insurance policy, or, at the Lender's election, a new title insurance commitment, without exception objectionable to the Lender and containing such affirmative insurance or endorsements as may be required by the Lender (including, but not limited to affirmative coverage against mechanics' liens and creditor's rights coverage), insuring, among other things, that the Lender has a first priority lien on such real property; (iii) the proposed deed of the real property to be acquired; (iv) endorsements to the builder's risk, worker's compensation and public liability insurance policies to cover the real property being acquired and evidence that such property is not in a flood hazard area; (v) evidence of the availability of all utilities with respect to such property; (vi) an environmental site assessment of such property satisfactory to the Lender from an environmental engineer or other professional satisfactory to the Lender; (vii) soils tests of such property satisfactory to the Lender; (viii) evidence satisfactory to the Lender that no moratorium or similar building ban affects the property to be acquired; (ix) evidence satisfactory to the Lender that appropriate roads and utilities are available to such property and are sufficient to service such property; (x) subordination agreements from any purchasers of such property reciting that the purchaser's interest in the property is subject and subordinate to the lien of the Deeds of Trust and (xi) any other document, assurance or matter required by the Lender (including building permits and approval of any architectural review committee, if available).  The Guarantors and any other appropriate person shall subject all such property to the lien of the Deeds of Trust so that the Lender shall have a first priority lien thereon and first priority security interest in all personalty and contract rights associated therewith.  The Guarantors and the Borrower shall execute, acknowledge, where appropriate, and deliver all agreements and documents which the Lender, in its sole discretion, considers necessary or convenient to subject such property and all associated personalty and contract rights to the liens established by the Loan Documents.  Without limiting any other right, power or remedy of the Lender or any other obligation or agreement of the Borrower or the Guarantors contained herein or in any of the other Loan Documents, the Borrower and the Guarantors, as well as any other guarantor of the Loan, acknowledge and agree that lots will be acquired by the Guarantors from time to time with Loan proceeds and homes constructed on those lots and further acknowledge and agree that no further acknowledgment or consent of the Borrower or of the Guarantors or such other guarantors is required in connection with the acquisition of any such lots or any construction thereon and that the Borrower and the Guarantors, as well as any other guarantors of the Loan, shall remain fully liable and obligated under all of the Loan Documents notwithstanding that the Borrower or the Guarantors or such other guarantors have no knowledge of and/or has not consented to the acquisition of any lot or the construction of any home thereon.

(m)     Conformance to Law.  The Land and the Plans and Specifications shall comply with (i) all environmental standards, statutes, laws, regulations and the requirements applicable thereto, (ii) all zoning, subdivision, building or other laws, regulations, codes or other legal requirements applicable to the proposed construction upon and use of the Land, and (iii) all other laws and legal requirements of any court or governmental body having jurisdiction over the Land or the proposed construction upon and use of the Land.

(n)    Appraisals.  The Lender shall have the right to require at any time and from time to time, as a condition to the making of an advance with respect to any lot or home, or otherwise, appraisals of all or any of the lots and homes or other property which constitute or will constitute a part of the Land, which appraisals must be from an appraiser satisfactory to the Lender and in form and substance satisfactory to the Lender.  The Borrower shall be required to pay the cost for all such appraisals provided, however, unless an Event of Default has occurred, the Borrower shall not be required to pay for the cost of appraising any specific lot or home or other property more often than once in any one (1) year period.

(o)    Additional Virginia Provisions.  The Borrower and the Guarantors shall have instituted or put into place any and all procedures, as may be requested by the Lender, in order to insure that the lien of the Lender's Deeds of Trust have priority over unfiled mechanics liens or to enable the Lender to obtain title insurance with affirmative mechanics lien coverage, including, but not limited to, appointment of a mechanics lien agent, designation on all building permits of the appropriate mechanics lien agent, proper posting of building permits adjacent to each construction site, inspections and any other procedures which the Lender, in its sole discretion or the Lender's title insurance company may require.  In addition, the Lender shall have obtained such title insurance coverage, including, but not limited to, such affirmative coverage over mechanics liens, and updated endorsements thereof as the Lender may, in its sole discretion, from time to time require.  The Borrower and the Guarantors shall execute and/or deliver such information, agreements and indemnities as the Lender's title insurance company may require in connection with any title insurance requested by the Lender.

(p)    Additional Debtor in Possession Advance Requirements.  All conditions precedent as set forth in the Ratification Agreement shall have been and continue at all times to be fully satisfied.

(q)    Certain Additional Requirements.    The Borrower and the Guarantors shall have delivered to the Lender:

(i)    endorsements to all of the Lenders policies of title insurance, down dating the effective date of such policies to the date of the first advance of Loan proceeds made after the date of this Agreement and containing such affirmative coverage and such endorsements as the Lender may require in its sole discretion;

(ii)    incumbency and signature certificates, corporate resolutions, stockholder consents and member consents approving the execution of this Agreement and the Ratification Agreement and as is otherwise required by the Lender;

(iii)    a written opinion of counsel to the Borrower, the Guarantors, the Individual Guarantors and Gemcraft Capital (which counsel must be acceptable to the Lender) in form and content satisfactory to the Lender and its counsel in their respective sole discretion;

(iv)    such financial information, cash flow projections, business models, budgets and other financial and business information as the Lender may require;

(v)    termination of all existing financing statements in favor of CP Land Investments, LLC naming the Individual Guarantors as debtors;

(vi)    a Pledge and Security Agreement, in form and substance satisfactory to the Lender, executed and delivered by Gemcraft Capital and the Individual Guarantors (as the same may from time to time be amended, restated, supplemented or otherwise modified, the "Pledge Agreement"), pursuant to which the Individual Guarantors and Gemcraft Capital pledge and assign to the Lender, and grant to the Lender a security interest in, certain tax refunds owed to the Individual Guarantors, and certain bank accounts into which the proceeds of such tax refunds have been or will be deposited, together with such other documents relating thereto as the Lender may require;

(vii)    evidence that there shall have been established an unsecured debtor in possession financing facility (the "Gemcraft Capital DIP Facility") provided by Gemcraft Capital to Gemcraft Homes and DLM to provide a Five Million Dollar ($5,000,000.00) revolving line of credit for operating capital for the business of the Borrower and the Guarantors, the terms of which must be satisfactory to the Lender and must, within fifteen (15) days after the date of this Agreement, receive approval and an Interim Order issued by the Bankruptcy Court. Any obligations under such facility must be subordinate in time of payment to the Loan and any other obligations owed to the Lender; and

(viii)    such information as the Lender may require with respect to any other debtor in possession financing or proposed debtor in possession financing.

As set forth above, satisfaction of the foregoing conditions shall not require the Lender to make any advance of Loan proceeds under this Agreement, as the making of any such advance is within the sole discretion of Lender at all times.

4.4    <u>Timing and Place of Advances</u>. The Lender shall have seven (7) business days within which to advance each requisition after it (and any supporting documentation) is duly submitted and received by the Lender and after the Lender has elected to make the advance. All advances shall be made at such place as the Lender shall designate. At the Lender's election, all advances made to the Borrower will be made into a commercial checking account with the Lender, which the Borrower shall maintain and utilize throughout the term of the Loan.  The Lender anticipates that it will not make approved advances of Loan proceeds more frequently than once every two (2) weeks.

4.5    <u>No Claim against Lender</u>.  The Lender shall in no event be responsible or liable to the Borrower or to any person other for any advance of or failure to advance the proceeds of the Loan or any part thereof and neither the Borrower, the Guarantors nor any contractor, subcontractor, professional, supplier or other person shall have any right or claim against the Lender under this Agreement or the administration thereof.

4.6    <u>Additional Safeguards as to Application of Disbursements</u>.  The Lender may require the Borrower or the Guarantors at any time and from time to time, as a condition of

making disbursements or further disbursements, to: (a) produce receipts, vouchers, or other writings evidencing that prior disbursements have been applied to the payment of all sums due professionals, general contractors (if any) subcontractors, suppliers and materialmen supplying services, labor or materials to the Project (or any home which is a part of the Project); and (b) specify the exact amount of each disbursement which is to go to the various professionals, general contractors (if any), subcontractors, suppliers and materialmen and supply bills, invoices, requisitions or other requests for payment by such professionals, general contractors (if any), subcontractors, suppliers or materialmen to support the amounts so specified. The Lender shall further have the right to require, prior to any disbursement of Loan proceeds, that each general contractor (if any), subcontractor, professional, materialman, supplier or other payee: (i) certify to the Lender that all labor, material or supplies were supplied directly to the Project (or any home which is a part of the Project) and not to any other project or property; (ii) acknowledge receipt of any and all payments which have been made for prior disbursement requests; and (iii) release (if not previously done) any right to file a mechanic's or materialman's lien against the Land or the Project (or any home which is a part of the Project) for work done or materials supplied to the point of the most recent disbursement request. If the Lender exercises its rights hereunder and determines that Loan proceeds are not being properly applied after disbursement, the Lender may suspend further disbursements until the Lender's objections have been cured, to the satisfaction of the Lender.

        4.7    <u>Requisition Representations</u>. Each request for advance of Loan proceeds by the Borrower shall constitute a representation and certification by the Borrower that: none of the items for which payment is proposed to be made has formed the basis for any payment heretofore made to the Borrower; each item for which payment is proposed to be made is or was necessary in connection with the Project (or any home which is a part of the Project); no Event of Default exists; and no threatened or actual liens, statutory or otherwise, exist or are threatened by any mechanic, workman, contractor, professional or supplier with respect to the Project (or any home which is a part of the Project).

        4.8    <u>Limitation on Construction and Acquisition Advances</u>.

        (a)    The following are guidelines which the Lender may consider in electing to make advances and, without implying that the Lender has any obligation to make any advance of Loan proceeds, the Lender, unless it elects to waive the following provisions, will not make any advance of Loan proceeds:

        (i)    for acquisition of any lot or the construction of any home thereon, unless the Lender, in its sole discretion has (i) approved the application submitted by the Borrower (described in Section 4.9 below), and (ii) elected to make available Loan proceeds for the acquisition of such lot and/or the construction of the home thereon; or

        (ii)    for acquisition of any Inventory Lot (defined below). As used herein, an "Inventory Lot" is a lot (other than a lot upon which a Spec Home (defined below) is to be built) which is not subject to an Approved Contract (defined below). As used herein, an "Approved Contract" shall mean a binding contract of sale (with a bona fide third party purchaser, who has been approved by an institutional lender for permanent financing),

which contract contains no contingencies (other than a reasonable and customary financing contingency – which does not contain a house-to-sell contingency), is fully satisfactory in form and content to the Lender, in the Lender's sole discretion, is bound by a deposit of not less than two percent (2%) of the sale price for any non-VA/FHA transaction, or such maximum deposit as a seller may require in a VA/FHA transaction and is in full force and effect and free from default by either party thereto); or

(iii)    for acquisition of any lot within six (6) months after the date of this Agreement, unless such lot was included in the Gemcraft Sold Contract Backlog, most recently delivered to the Lender prior to the date of this Agreement, or unless such lot is subject to an Approved Contract; or

(iv)    with respect to acquisition and construction of any Spec Home if the Per-Unit Maximum Loan Amount (defined below) of all Spec Homes which have been, are being or have been approved to be constructed upon the Land exceeds (or with the addition of any Spec Home to be constructed upon the Land would exceed) Five Million Five Hundred Thousand Dollars ($5,500,000.00). The foregoing limitation shall apply regardless of the actual amount of Loan proceeds outstanding at any one time. As used herein (i) the term "Spec Home" shall mean a lot and the home to be constructed thereon which is not subject to an Approved Contract, and (ii) the term "Per-Unit Maximum Loan Amount" means the maximum amount of Loan proceeds (as computed by the Lender) which may be made available to the Borrower for acquisition of any lot and construction of any home thereon; or

(v)    for acquisition of any lot upon which a Spec Home is to be built in excess of the lesser of (i) seventy-five percent (75%) of a Guarantor's cash purchase price of such lot, or (ii) seventy-five percent (75%) of the Lender's appraised value of such lot; or

(vi)    for acquisition of any lot upon which a Pre-Sold Home (defined below) is to be built, in excess of the lesser of (i) one hundred percent (100%) of a Guarantor's cash purchase price of such lot, or (ii) one hundred percent (100%) of the Lender's appraised value of such lot. As used herein, a "Pre-Sold Home" is a lot and the home to be constructed thereon which is subject to an Approved Contract; or

(vii)    (except as set forth in (ix) below) with respect to acquisition and construction of any Spec Home, in excess of the lesser of (i) seventy-five percent (75%) of the Lender's appraised value of such Spec Home, or (ii) ninety-five percent (95%) of a Guarantor's cost for such Spec Home; or

(viii)    with respect to acquisition and construction of any Spec Home, the construction of which the Lender was financing prior to the date of this Agreement, in excess of the lesser of (i) eighty percent (80%) of the Lender's appraised value of such Spec Home, or (ii) ninety-five percent (95%) of a Guarantor's cost for such Spec Home; or

(ix)    with respect to acquisition and construction of any Pre-Sold Home in excess of the lesser of (i) eighty percent (80%) of the Lender's appraised value of such

lot and home (adjusted, in the Lender's sole discretion, for options), or (ii) one hundred percent (100%) of the sale price of such lot and home pursuant to an Approved Contract, or (iii) one hundred percent (100%) of the Guarantor's cost for such lot and home; or

        (x)     for construction with respect to any model of home, unless the Lender, in its sole discretion, has approved, in writing, the construction of such model of home; or

        (xi)     for acquisition of any lot or the construction of any home in any subdivision unless the Lender, in its sole discretion, has approved, in writing, the acquisition of lots or the construction of homes in such subdivision.

        (b)     <u>Other Limitations and Provisions</u>.

        (i)     If at any time after construction of a Pre-Sold Home commences, the Approved Contract with respect to such Pre-Sold Home is terminated or is in default, then the Borrower shall immediately pay to the Lender an amount equal to the difference between the amount the Lender funded with respect to acquisition and construction for such Pre-Sold Home and the amount the Lender would have funded if such Pre-Sold Home had been a Spec Home.

        (ii) If the Lender finances the construction of a Pre-Sold Home and the Pre-Sold Home is not settled and released from the lien of the Lender's Deed of Trust within six (6) months from the date of the first advance for construction with respect to such Pre-Sold Home, then the Borrower shall immediately pay to the Lender  an amount equal to the difference between the amount the Lender funded with respect to acquisition and construction for such Pre-Sold Home and the amount the Lender would have funded if such Pre-Sold Home had been a Spec Home.

        (iii)     If the Lender has advanced Loan proceeds for the acquisition of any lot, and construction of a house is not substantially commenced on such lot within two (2) months from the date the Lender made the acquisition advance, then the Borrower must immediately repay to the Lender the amount of Loan proceeds advanced for the acquisition of such lot.

        (iv)     If the Lender advances Loan proceeds for the acquisition of any lot or for the construction of any home on a lot owned by one of the Guarantors, and a home is not constructed thereon and sold and the required partial release fee paid to release such lot and home from the lien of the Lender's Deeds of Trust within eight (8) months from the date of the acquisition funding of such lot (or from the initial construction funding if one of the Guarantors owned the lot), then the Borrower shall, immediately, repay to the Lender any and all Loan proceeds advanced with respect to acquisition of such lot and the construction of a home thereon, provided, however, this requirement shall not apply with respect to a Spec Home, which the Lender has agreed, in writing, may be used by one of the Guarantors as a "model home", as such term is generally understood in the home building industry.

4.9    Application Procedure.  At the request of the Lender, the Borrower must submit to the Lender an application, relating to each lot and/or home with respect to which the Borrower requests an advance, which application must be in form and content satisfactory to the Lender, in the Lender's sole discretion, and which must contain, among other things, a copy of any contract of sale relating to the lot, the recorded record plat for the lot, and a copy of the Borrower's contract status report, in form and substance satisfactory to the Lender.

4.10    Revolving Acquisition and Construction Line of Credit.  Subject to and in accordance with the terms, conditions, and provisions of this Agreement, the Lender may, in its discretion, make advances from time to time to the Borrower from the date hereof until the date the Note matures for the acquisition or refinance of lots and the construction of homes thereon provided that the sum of (i) the aggregate outstanding principal amount of all advances, plus (ii) the aggregate outstanding principal amount of all advances previously made under the Borrowing Base Facility, and (iii) the aggregate outstanding principal amount of all other amounts advanced by the Lender under the Loan prior to the Petition Date (exclusive of the Acquisition and Development Loans) shall not at any time exceed the amount of Twenty-two Million Dollars ($22,000,000.00) (the "Acquisition and Construction Line of Credit").  Within such limits, the Borrower may borrow, repay, and reborrow hereunder at any time and from time to time from the date of this Agreement until the date the Note matures.  It is the intention of the parties that the outstanding principal amount of the Acquisition and Construction Line of Credit shall at no time exceed the amount stated in this Section, and if, at any time an excess for any reason exists, the full amount of such excess, together with accrued and unpaid interest thereon as herein provided, shall be immediately due and payable in full. The Borrower and the Guarantors agree that, as of the date of this Agreement, the aggregate outstanding principal amount of all advances made under the Loan (exclusive of the Acquisition and Development Loans) is Thirty-two Million Two Hundred Four Thousand Eight Hundred Twenty-three  Dollars and Two Cents ($32,204,823.02) .

4.11    Development Line of Credit.  Subject to and in accordance with the terms, conditions and provisions of this Agreement, the Lender may, in its discretion, make available to the Borrower, from the date hereof until the date the Note matures, a non-revolving development line of credit (the "Development Line of Credit") in the amount of Two Million Dollars ($2,000,000.00).  The Development Line of Credit may be used to fund the completion of development of the Brimmington and West Shores at New Milford development projects, which are currently the subject of separate Acquisition and Development Loans made by the Lender.  In addition, the Lender may make advances from the Development Line of Credit to pay real estate taxes and other costs to maintain permits and ensure code compliance with any of the properties which are subject to the Acquisition and Development Mortgages and also with respect to the land known as the Hills of London Grove Property and the land known as the Harkins Property (the "Additional Collateral Properties").  The Development Line of Credit is a non-revolving line of credit.

4.12    Overhead Line of Credit.  Subject to and in accordance with the terms, conditions and provisions of this Agreement, the Lender may, in its discretion, make advances from time to time to the Borrower from the date hereof until the Overhead Line of Credit Termination Date (defined below) to fund temporary overhead shortfalls (e.g., payroll, utilities,

insurance and otherwise as approved by the Lender) in connection with the ordinary day-to-day operations of the Borrower and the Guarantors, as set forth in the Overhead Budget (as defined in the Ratification Agreement) in the aggregate principal amount at any one time outstanding up to, but not exceeding the amount of One Million Dollars ($1,000,000.00) (the "Overhead Line of Credit").  Within such limits, the Borrower may borrow, repay and re-borrow hereunder at any time and from time to time from the date of this Agreement until the Overhead Line of Credit Termination Date.  It is the intention of the parties that the outstanding principal amount of the Overhead Line of Credit shall at no time exceed the amount stated in this Section and if, at any time an excess for any reason exists, the full amount of such excess, together with accrued and unpaid interest thereon is herein provided, shall be immediately due and payable in full.  As used herein, the "Overhead Line of Credit Termination Date" shall mean the earlier to occur of (i) the date which six (6) months from the date hereof, or (ii) the date of the occurrence of Pledged Collateral Receipt Event (as defined in the Pledge Agreement).

Notwithstanding anything to the contrary contained elsewhere in this Agreement or in the Note, any and all amounts outstanding under the Overhead Line of Credit shall be due and payable in full and must be repaid on or before the Overhead Line of Credit Termination Date.

Advances under the Overhead Line of Credit will only be available to the extent that the Borrower demonstrates  that the Available Overhead Funds (as defined in the Pledge Agreement) have been used to pay such overhead expenses and that additional funds are necessary to pay the balance of such overhead expenses.

4.13    Partial Release Provisions.    Provided the conditions precedent to the issuance of a partial release of any home, as set forth in the Deed of Trust are satisfied, the Lender will release individual completed homes from the liens of the Deeds of Trust in order to permit sales to unrelated third parties in the ordinary course of the Guarantors' business pursuant to Approved Contracts upon payment to the Lender of an amount equal to the greater of (i) the sum of: the Deferred Financing Fee (defined below), due with respect to such lot and home, plus one hundred percent (100%) of all advances made after the date of this Agreement from the Acquisition and Construction Line of Credit allocated by the Lender to such lot and home, plus one hundred percent (100%) of all advances made before the date of this Agreement allocated by the Lender to such lot and home (including under any Acquisition and Development Loan), plus one hundred percent (100%) of the advances under the Development Line of Credit allocated by the Lender to such lot and home, or (ii) the Adjusted Net Proceeds from the sale of such lot and home.  As used herein, "Adjusted Net Proceeds" shall mean the gross proceeds from the sale of such lot or home less reasonable and customary settlement costs paid to unrelated third parties, less, if applicable, the Overhead Amount (defined below).  As used herein, the "Overhead Amount" shall mean fifteen percent (15%) of the gross proceeds of sale of the lot or home, provided, however, such amount shall be allowed only if there is a zero balance on the Overhead Line of Credit and only until the date which is six (6) months after the date of this Agreement. After the date which is six (6) months from the date of this Agreement and at anytime when there is any balance on the Overhead Line of Credit, the Overhead Amount shall be zero. In addition to the foregoing, the Lender may require that the Borrower pay any accrued but unpaid interest

accrued on amounts advanced after the date of this Agreement (whether or not an interest payment is then due) as a condition to granting any such partial release. Notwithstanding the foregoing, the Lender may issue a partial release of any home upon payment of an amount less than that specified above in this Section 4.13, if the Lender elects to do so in its sole discretion.

Provided that no Event of Default has occurred, the Lender agrees to allocate proceeds received in return for the partial release of a lot or home from a lien created by one of the Deeds of Trust in the following order: first, to the Deferred Financing Fee; second, to principal advanced after the date of this Agreement and to interest accrued on principal advanced after the date of this Agreement (to the extent the Lender required payment of interest a condition of granting the requested release); third, to principal advanced under the Borrowing Base Facility prior to the date of this Agreement; fourth, to the allocated principal amount of the Acquisition and Development Loan which financed, in part, the lot to be released; and fifth, as otherwise determined by the Lender in the Lender's sole discretion. After the occurrence of an Event of Default, the Lender may allocate such proceeds as determined by the Lender in the Lender's sole discretion.

4.14   Letters of Credit. If the Lender at any time or from time to time agrees to issue any letter of credit, bond or similar assurance (a "Letter of Credit") for the account of the Borrower, any of the Guarantors and/or any other person in connection with the Project, the following terms and conditions shall be applicable:

(a)   Issuance of Letters of Credit. The Lender shall have no obligation to issue any Letters of Credit unless the Lender shall elect to do so in its sole discretion. Without limiting the generality of the foregoing, the Lender may require, as a condition precedent to the issuance of any Letter of Credit, that all of the conditions to the making of advances, set forth in Section 4.3 above, are satisfied. At the Lender's election, certain obligations of the party for whose account the Letters of Credit are issued (the "Applicant") may be evidenced by a Letters of Credit Note and/or a Standby LC Application and Agreement or similar document (collectively, as the same may from time to time be extended, amended, restated, supplemented or otherwise modified, the "Letters of Credit Note"). Also, at the Lender's election, the Lender may require, as a condition to the issuance of any Letters of Credit, that one or more persons designated by the Lender guaranty the Applicant's obligations under the Letters of Credit Note and otherwise related to the Letters of Credit, which guaranty may, at the Lender's election, be evidenced by a Letters of Credit Guaranty (as the same may from time to time be extended, amended, restated, supplemented or otherwise modified, the "Letters of Credit Guaranty"). The obligations of the Applicant under the Letters of Credit Note and the obligations of any parties to the Letters of Credit Guaranty shall be in addition to and supplemental to, and shall not limit the obligations of the Applicant or any of the parties to the Letters of Credit under this Agreement or under any of the other Loan Documents. Both the Applicant and any persons that execute the Letters of Credit Guaranty shall be deemed to have agreed to all of the terms of this Agreement and of all of the terms of all of the other Loan Documents. Any Letters of Credit Note or Letters of Credit Guaranty are "Loan Documents" as defined in this Agreement.

(b)   Payment of Fee. Each of the Borrower and the Guarantors agree, jointly and severally, to pay to the Lender upon demand the Lender's then current letter of credit

fee and any other then applicable charges that the Lender requires to be paid in connection with the issuance of any Letter of Credit at the time such Letter of Credit is issued.

(c)    Obligation of Repayment.    Each of the Borrower and the Guarantors, jointly and severally (i) authorize the Lender to honor and pay drafts made under any Letter of Credit in an amount up to the maximum amount of such Letter of Credit, and (ii) absolutely, unconditionally and irrevocably agree to repay to the Lender upon demand any and all amounts so honored or paid by the Lender, together with interest as set forth in the Letters of Credit Note, from the date advanced by the Lender until the Lender has been reimbursed in full.

(d)    Obligations Absolute.    The obligations of the Borrower and the Guarantors under Section 4.14(c) above shall be absolute, unconditional and irrevocable and shall be paid strictly as provided therein under all circumstances, including without limitation the following: (i) any lack of validity or enforceability of any of the Letters of Credit; (ii) any amendment or waiver of or any consent to departure from any or all of the terms of the Letters of Credit, this Agreement or the other Loan Documents; (iii) the existence of any claim, setoff, defense or other right of the Applicant, the Borrower or the Guarantor against the Lender or any other person, whether in connection with this Agreement, any Letter of Credit or any of the other Loan Documents; and (iv) any statement presented under any of the Letters of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect whatsoever.

(e)    Uniform Customs and Practice.    At the Lender's election, to be made in the Lender's sole and absolute discretion, the Lender may incorporate into any Letter of Credit the Uniform Customs and Practice for Documentary Letters of Credit, as published as of the date of issue of any Letter of Credit by the International Chamber of Commerce (the "UCP"). If the Lender so elects, the UCP shall in all respects be deemed a part of the Letter of Credit and of this Agreement as fully as if incorporated therein and herein.

(f)    Draws on Letters of Credit.    The Lender shall not be responsible for verifying the existence of any act, condition or statement made by any party in relation to their drawing or presentment under any Letter of Credit or in verifying or passing judgment on the reasonableness of any statement made by any party in relation to their drawing or presentment under any Letter of Credit. The Lender shall not be obligated to inquire into the use that may be made of any advance under any Letter of Credit by the beneficiary thereof and will not be liable in any respect for any wrongful use that may be made by such beneficiary of any funds so advanced.

(g)    Waivers of the Borrower and the Guarantors.    Neither the Lender nor any of the Lender's correspondents shall be responsible for (i) the use which may be made of any Letter of Credit or for any acts or omissions of any beneficiary in connection therewith, (ii) the validity, sufficiency or genuineness of documents or drafts, even if such documents or drafts should in fact prove to be in any or all respects invalid, insufficient, fraudulent or forged, or (iii) errors, omissions, interruptions or delays in transmission or delivery of any messages by mail or otherwise. The Lender shall not be responsible for any act, error, neglect or default of any of its correspondents and the happening of any one or more of the contingencies referred to above

shall not affect, impair or prevent the vesting of any of the Lender's rights or powers under the Letters of Credit Note, the Letters of Credit Guaranty, this Agreement or the other Loan Documents or limit or impair any obligations or agreements of the Borrower or the Guarantors thereunder or hereunder. Without limiting the generality of the foregoing, any action, inaction or omission taken or suffered by the Lender or by any of the Lender's correspondents, under or in connection with any Letter of Credit or any draft, document or property, if in good faith, and in conformity with applicable laws shall be binding upon the Borrower and the Guarantors and shall not place the Lender or any of its correspondents under any resulting liability to the Borrower or the Guarantors.

(h)    Modifications to Letters of Credit.  In the event of any change or modification with respect to (i) the amount or duration of the Letter of Credit, (ii) the drawing, negotiation, presentation, acceptance of maturity of any drafts, acceptances or other documents, or (iii) any of the other terms or provisions of any Letter of Credit, the obligations of the Applicant, the Borrower and the Guarantors under the Letters of Credit Note, the Letters of Credit Guaranty, this Agreement and the other Loan Documents shall be binding upon the Borrower and the Guarantors in all respects with regard to the Letter of Credit as so changed or modified.

(i)    Indemnity.  Each of the Borrower and the Guarantors shall, jointly and severally, defend, indemnify and hold the Lender harmless from and against all loss, damage, claim or expense (including attorneys' fees) arising out of the issuance by the Lender of any Letter of Credit, or any other action taken or omitted by the Lender, in connection with any Letter of Credit.

(j)    Conflicts.  In the event of any conflict between the terms of this Section 4.14 and the terms of any application and agreement for letter of credit or similar document now or hereafter executed by the Borrower or any of the Guarantors, the Lender, in its sole and absolute discretion, shall have the right and power to select which conflicting provision shall prevail and be controlling.

4.15    Cessation of Advances.  The Borrower and the Guarantors acknowledge and agree that the Loan is a discretionary credit facility and that the Lender shall not, under any circumstances whatsoever, have any obligation to make any advance of Loan proceeds for any purpose unless the Lender elects, with respect to each such advance, to do so in its sole discretion.  Mention in this Agreement of specific requirements with respect to advances or specific conditions precedent to the making of advances are illustrative only and should not be construed to imply that the Lender has a duty to make any advance under any circumstance. Neither the making of any advances in the past nor any course of conduct that may be undertaken with respect to the making of advances shall vary the discretionary nature of the Loan.  The Lender can refuse to make any advance or cease making all advances at any time for any reason or for no reason, all in the Lender's sole discretion.

5.    Representations and Warranties and Covenants of the Borrower and the Guarantor.

   5.1 <u>Representations and Warranties</u>.  The Borrower and the Guarantors each represent and warrant to the Lender that:

    (a) <u>Financial Information</u>.   To the best of the knowledge of the Borrower and the Guarantors, the financial information, budget and cash flow projections, delivered to the Lender in connection with the Borrower's request to obtain debtor in possession financing, is true and correct in all material respects, subject to the timing of the commencement of the Lender's advances under this Agreement and M&T's (defined below) advances under the anticipated M&T Facility.

    (b) <u>Authority</u>.  Subject to Bankruptcy Court approval, the Borrower has full power and authority (i) to make the Loan, (ii) to execute and deliver the Loan Documents, (iii) to incur and perform the obligations provided for in the Loan Documents, and (iv) to secure the Loan with the collateral covered by and in accordance with the terms of the Loan Documents.  No consent or approval of the officers, directors or the stockholders of the Borrower or of any public authority or regulatory body other than the Bankruptcy Court is required as a condition to the validity or enforceability of the Loan Documents, or if required, the same has been duly obtained.

    (c) <u>Enforceability of Loan Documents</u>.  The Loan Documents have been duly executed and delivered by the Borrower, constitute the valid and legally binding obligations of the Borrower, and are enforceable against the Borrower in accordance with their respective terms, subject to approval of the Bankruptcy Court.

    (d) <u>Loan Documents</u>.  The (i) execution and delivery of, and performance of the Borrower's obligations under (1) the Note, (2) this Agreement, and (3) the other Loan Documents, (ii) consummation of the transactions contemplated thereby, and (iii) compliance with the provisions thereof, do not and will not violate, conflict with, result in the breach of, or constitute (with notice or lapse of time, or both) a default under, the corporate charter or by laws of the Borrower or under any document or agreement by which the Borrower is bound, or under any law, ordinance, order, rule, regulation, or to the best of the Borrower's knowledge, information and belief, any other legal requirement applicable to the Borrower of any court or governmental body having jurisdiction over the Borrower or over the Land.

    (e) <u>Conformance to Law</u>. The Land and the Plans and Specifications comply with (i) all environmental standards, statutes, laws, regulations and requirements applicable thereto, (ii) all zoning, subdivision, building or other laws, regulations, codes or other legal requirements applicable to the proposed construction upon and use of the Land, and (iii) all other laws and legal requirements of any court or governmental body having jurisdiction over the Land or the proposed construction upon and use of the Land.

    (f) <u>Condemnation</u>.   No proceeding has been threatened or commenced, by any authority having the power of eminent domain, to condemn any or all of the Land.

(g)    <u>Moratorium</u>.    No federal, state or local governmental body or agency has imposed any moratorium or similar ban or measure which would affect the issuance of building permits or otherwise adversely affect the Project.

(h)    <u>Covenants, Restrictions, Easements and Agreements</u>.

(i)    Neither the Borrower nor the Guarantors nor any of the Land nor any improvements constructed thereon is in violation of any covenant, restriction, easement or agreement encumbering any or all of the Land, of record or in fact.

(ii) If completed in accordance with the Plans and Specifications, the proposed construction upon and use of the Land will not be in violation of any existing covenant, restriction, easement or agreement encumbering all or any of the Land, of record or in fact.

(iii) The Guarantors or some other person has executed all required (and is not in default under any) subdivision agreements or public works agreements or other instrument of a similar nature relating to the Project and covering the construction or installation of any roadway, sidewalk, utility line or facility or other improvement, and has posted or, prior to the funding of the Loan, will have posted any and all performance or other bonds, letters of credit or monies in lieu thereof, required by the provisions of any such subdivision agreements, public works agreements or other instruments.

(i)    <u>Leases</u>.    There exists no leases, licenses or other agreements granting any person rights of occupancy with respect to all or any part of the Land.

(j)    <u>Utilities</u>. All utility services necessary for the construction of the Project and the operation of the Project for its intended purpose are available on site (e.g., wells and septic systems) or at the boundaries of the Land, without any cost or fees for connection (other than standard connection charges), including water supply, storm and sanitary sewer facilities, gas, electric and telephone facilities.  The respective lines and treatment or generating plants are of adequate size and capacity to service the Project for the full utilization of its intended purposes.

(k)    <u>Roads</u>.  All roads necessary for the full utilization of the Project for its intended purposes have either been completed or the necessary rights of way therefore have either been acquired by the appropriate governmental authority or have been dedicated to public use and accepted by such governmental authority and all necessary steps have been taken by the Guarantors or some other person and such governmental authority to assure the complete construction and installation thereof.

(l)    <u>Accuracy of Information</u>.  All information, documents, reports, statements, financial statements, and data submitted by or on behalf of the Borrower or the Guarantors in connection with the Loan are true, accurate, and complete and contain no knowingly false, incomplete or misleading statements.

(m)     Title.  The Guarantors have good and marketable title to all real and personal property which constitutes security for the Loan and the Lender's lien thereon, pursuant to the Loan Documents, shall be a first lien and security interest.

(n)     Compliance.  The Borrower and the Guarantors are each in compliance with all of the terms, conditions and provisions contained in the Loan Documents.

(o)     Corporate Matters.  The Borrower (i) has the power to own its property and carry on its business as now being conducted, (ii) is duly qualified to do business in the State of Maryland and in each other jurisdiction in which it does business, and (iii) is a corporation duly organized and validly existing in good standing under the laws of its jurisdiction of incorporation. The Borrower, through its proper representatives, has delivered to the Lender true and correct copies of the corporate charter and bylaws of the Borrower and each amendment or supplement thereto by which the Borrower is formed and under which it exists on the date hereof, each of which is in fully force and effect on the date hereof and is subject to no amendment or supplement not attached thereto.  The stockholders of the Borrower consist of and only of William R. Luther, Jr., Vickie A. Luther, Brian E. Fromme and Sharon L. Babcock.

(p)     Fiscal Year.  The fiscal year of the Borrower and of each of the Guarantors begins on January 1 and ends on December 31.

Each request for funding of Loan proceeds, and the receipt of the funds requested thereby, shall constitute an affirmation by the Borrower and the Guarantors that the representations and warranties of the Borrower and the Guarantors set forth herein are all true and correct as of the date of each such request for funding.

5.2     Covenants of the Borrower and the Guarantors.  The Borrower and the Guarantors covenant and agree with the Lender as follows:

(a)     Inspection.  The Guarantors shall, at all times, permit the Lender to enter upon the Land and inspect the Project and all materials to be used in the construction thereof and to examine all detailed plans and drawings pertaining to the Project and shall cooperate and cause all contractors, subcontractors or materialmen to cooperate with the Lender or any inspector retained by the Lender to enable the Lender or such inspector to perform its functions hereunder.

(b)     Evidence of Title.  The Guarantors shall deliver to the Lender, on demand, any contracts, bills of sale, statements, receipted vouchers or agreements, under which the Guarantors claim title to any materials, fixtures or articles incorporated in the Project or subject to the lien of the Deeds of Trust.

(c)     Correction of Defects. The Guarantors shall, upon demand by the Lender, commence and proceed promptly and diligently to correct any defect in the Project or any departure from the Plans and Specifications not approved by the Lender.  The Lender or any inspector retained by the Lender shall determine in its discretion whether the Guarantors are acting promptly and diligently.  The disbursement of any portion of the proceeds of the Loan

shall not constitute a waiver of the Lender's right to require compliance with this covenant with respect to any such defects or departures from the Plans and Specifications.

(d)     Project Contracts.  The Guarantors shall deliver to the Lender, from time to time upon demand, the names, telephone numbers, addresses and principal contacts of all persons with whom the Guarantors intend to contract for the construction of the Project or for the furnishing of services, labor or materials for the Project and obtain the written approval of the Lender prior to executing any such contracts.  Upon the Lender's request from time to time, the Guarantors shall (i) assign their interest in any such contracts to the Lender, upon terms satisfactory to the Lender (and shall obtain the consent to such assignment by all other parties to such contracts); and (ii) secure the agreement of all professionals supplying tangible work product in connection with the Project (e.g., plans, drawings, reports, studies, etc.) to permit the Lender to utilize such tangible work product without cost or charge to the Lender or payment to such professional.

(e)     Records.  The Guarantors shall keep adequate records and books of account with respect to the Land and the Project in accordance with generally accepted accounting principles and shall permit the Lender, by its agents, accountants and attorneys, to visit and inspect the Land and the Project and examine such records and books of account and to discuss the affairs, finances and accounts pertaining thereto with representatives and agents of the Guarantors at such times as may be requested by the Lender.

(f)     Compliance with Law. The Guarantors shall, at all times, comply with all laws, ordinances, codes or regulations (including, but not limited to, those pertaining to zoning, subdivision, building or the environment) of any governmental authority, agency or body and with all orders, decrees or rulings of any court and with all private restrictive covenants and agreements applicable to the Land or the Project.

(g)     Litigation, Etc.  Except with respect to matters disclosed in the Bankruptcy case: The Borrower or the Guarantors shall promptly notify the Lender of any action or prospective claims or litigation, including tax deficiencies, which may be asserted against the Borrower or the Guarantors and of any prospective condemnation, change of zoning or other action affecting the Land.

(h)     Project Payments.  The Guarantors shall promptly pay all contractors or subcontractors and materialmen the amounts justly due to them and receive the disbursements hereunder, and hold the right to receive such disbursements, as trust funds to be applied for the purpose of paying the cost of the improvements constituting the Project.  The Borrower shall promptly re-loan to the Guarantors all Loan proceeds the Borrower obtains from the Lender.

(i)     Location Survey.  As soon as the footings and foundations of any improvement are in, the Guarantors, upon the request of the Lender, shall deliver to the Lender a location survey prepared by a registered engineer showing the location of the improvement on its respective lot with relation to the boundary lines thereof and setback restrictions applicable thereto and stating that such location is in compliance with all setback and other applicable

restrictions. As construction progresses, the Guarantors shall supply such further location surveys as the Lender may reasonably require from time to time to assure itself that the improvements do not extend beyond such boundary lines and setback and other restrictions, and that each home is within the boundary lines of its lot and setback and other restrictions applicable thereto.

(j)     Dismissal of Contractors and Subcontractors. The Guarantors shall not engage or continue to employ any contractor or subcontractor who the Lender, in its sole discretion, determines is not properly performing, or cannot properly perform, the work to be done by such contractor or subcontractor.

(k)     Maintenance of Collateral. All real and personal property standing as security for the Loan shall be kept and maintained in a state of good condition and repair and its value shall at all times be protected and preserved by the Guarantors. The Guarantors shall provide all security measures reasonably necessary in the opinion of the Lender to protect the Lender's collateral from vandalism, theft or mischief, which measures shall, upon the Lender's request, include the hiring of a security guard.

(l)     Project Agreements. The Lender shall have the right to review and approve, prior to execution by the Guarantors, all public and private agreements, plats, documents and approvals required for the approval, construction, completion or use of the Project including, but not limited to, agreements, plats, documents and approvals with respect to subdivision (or condominium declarations or plats, if applicable), the construction of roads or the installation of water, sanitary sewer, storm water management, gas and electric, telephone, or similar or related utility systems. The Guarantors shall comply with and perform all public and private agreements, plats, documents and approvals entered into with respect to the approval, construction, completion or use of the Project.

(m)     Utilities. The Guarantors shall submit to the Lender from time to time upon the Lender's request, appropriate evidence of the availability and continued availability of the utility services required for the use of the Project and the Guarantors' ability to have the utilities installed and connected and ready for use for the Project prior to the completion thereof. The Guarantors shall grant to local utility companies such easements as are necessary for the installation of their utility services, subject, however, to the Lender's right to approve the specific easement grants.

(n)     Roads. The Guarantors shall, upon the Lender's request from time to time, provide evidence to the Lender, with respect to any lot or the improvement to be constructed thereon, that all roads adjoining such lot have been completed or are the subject of appropriate public works agreements and posted bonds.

(o)     Agreements Affecting the Land. The Lender shall have the right to review and approve prior to execution and recordation among the appropriate Land Records, all restrictive covenants and all easements which the Guarantors intend to impose upon the Land. The Guarantors shall submit to the Lender copies of all such restrictive covenants or easements, prior to execution and recordation of same, for the Lender's review and approval and, upon

execution and recordation, copies of the executed and recorded restrictive covenants or easements shall be furnished to the Lender.  The Lender may require the Guarantors, as a condition of approving easements, to submit a survey or site plan of the Land showing the exact location of the easements with respect to the improvements constructed or to be constructed thereon.

   (p) <u>Signs</u>. The Guarantors shall allow one or more signs provided by the Lender to be displayed in prominent places in each subdivision which constitutes a portion of the Land with unobstructed visibility to the general public during the term of the Loan, advertising the fact that the Lender is providing financing for the Project.

   (q) <u>Contracts of Sale</u>.  The Lender shall have the right upon request to elect to review and approve all contracts of sale for any of the homes to be constructed on the Land, which approval shall include the proposed sales price, as well as the terms and conditions of each of the contracts of sale (including but not limited to terms and conditions pertaining to subordination of the purchaser's interest under such contracts of sale to the Lender's Deeds of Trust) and the financial qualifications of the proposed purchaser, and the Guarantors shall, if requested by the Lender, submit copies of all proposed contracts of sale (and pre-qualification worksheets) for review and approval prior to execution.  The Guarantors, upon request of the Lender, shall submit to the Lender copies of the fully executed contracts of sale (and pre-qualification worksheets) after execution.  All contracts for the sale of the Land shall be entered into by the Guarantors as seller and not by the Borrower.

   (r) <u>Further Assurances</u>.  Each of the Borrower and the Guarantors agrees, at the Borrower's or the Guarantors' expense, to execute such other and further documents including, without limitation, confirmatory deeds, deeds of trust, notes, security agreements, agreements, financing statements, continuation statements, and the like as may from time to time in the sole opinion of the Lender or the lender's counsel be necessary, convenient or proper to grant, perfect or continue the perfection of the liens, security interests, and other assurances of repayment and performance by the Borrower or the Guarantors to the extent set forth in the Loan Documents, it being the intention of the Borrower and the Guarantors to provide a full and absolute warranty of further assurances to the Lender.  Each of the Borrower and the Guarantors does hereby irrevocably appoint the Lender as the Borrower's or the Guarantors' attorney in fact to execute any such documents in the Borrower's or the Guarantors' name and on the Borrower's or the Guarantors' behalf and such power of attorney shall constitute a power of attorney coupled with an interest and be irrevocable.

   (s) <u>Subordination; Subrogation</u>.  If the Borrower has previously advanced or shall hereafter advance any sums to the Guarantors or their successors or assigns or if the Guarantors or their successors or assigns shall hereafter become indebted to the Borrower, such sums and indebtedness (the "Subordinated Debt") shall be subordinate in all respects to the amounts now or hereafter due and owing to the Lender under the Loan Documents and so long as any part of the Loan or any interest accrued thereon remains unpaid, the Borrower will not demand nor will the Borrower receive payment of, exchange, request or obtain collateral or security or guarantees for, effect any assignment, subordination or transfer to others of, grant, obtain or accept any security interest in or lien on or assert, bring or participate in any action, suit

or proceeding for the enforcement of, collection of or realization on all or any part of the Subordinated Debt. The Borrower hereby irrevocably waives (a) all rights the Borrower may have at law or in equity to seek subrogation, contribution, indemnification or any other form of reimbursement from the Guarantors, or any other person now or hereafter primarily or secondarily liable for the Loan, (b) any right to enforce any remedy that the Lender now has or may hereafter have against the Guarantors, and (c) the benefit of, and any right to participate in, any security now or hereafter held by the Lender. Notwithstanding the foregoing provisions of this Section 5.2(s), so long as no Event of Default has occurred, Gemcraft Homes and DLM may make scheduled repayments in accordance with the terms of the Gemcraft Capital DIP Facility.

(t)     Assignment of Project Documents by the Borrower and the Guarantors. The Borrower and each of the Guarantors assigns, transfers, and conveys to the Lender all of its right, title, and interest in and to any and all rights including, but not limited to contract rights, which it may now or at any time hereafter own, possess, use, enforce, have a license to use or from which it shall otherwise benefit with respect to the Project including, without limitation, the Plans and Specifications and any and all permits, approvals, licenses, contracts, subcontracts, title insurance binders or policies, insurance policies, letters of credit, performance and payment bonds, easements, restrictive covenants, utility connection agreements, site plans, plans and specifications and appraisals (the "Project Documents"), and the Borrower and the Guarantors further authorize the Lender, upon the occurrence of any Event of Default under any of the Loan Documents, to then demand, receive, and enforce all of the Borrower and the Guarantors' rights under the Project Documents. The Lender may, if it so elects, after the occurrence of an Event of Default under any of the Loan Documents, reassign all of its right, title, and interest in and to the Project Documents, or any of them, to any persons or entities for the purpose of allowing and assisting such persons or entities to complete the Project as contemplated by the Loan Documents. The Borrower and the Guarantors warrant and represent that there have been no other assignments of the Project Documents, and that the Project Documents are, to the best of the Borrower and the Guarantors' knowledge, information, and belief after due inquiry, the valid and enforceable obligations of the parties thereto. The Borrower and the Guarantors irrevocably constitute and appoint the Lender as their attorney-in-fact under the terms and conditions herein set forth, which power of attorney is irrevocable and coupled with an interest, to demand, receive, and enforce all of the Borrower and the Guarantors' rights under the Project Documents, to make any required payments under the Project Documents and to perform on behalf of and in the name of the Borrower and the Guarantors. The Lender shall have no obligation to the Borrower and the Guarantors or to any other person to perform any of the Borrower and the Guarantors' obligations under any of the Project Documents. The Borrower and the Guarantors shall indemnify the Lender against any loss, cost, claim, damage, liability or expense (including attorneys' fees) incurred by the Lender in connection with the enforcement by any person of any of the Borrower and the Guarantors' obligations under any of the Project Documents.

(u)     Disbursement Errors: Partial Releases. In the event the Lender determines that any Loan proceeds have been disbursed in error (regardless of whether the error was committed by the Lender or its agents, servants, officers or employees) the Borrower shall immediately repay any such Loan proceeds to the Lender upon demand. In the event the Lender

determines that any portion of the Land or the Project has been released from the lien of the Deed of Trust without payment of the correct release fee (even if the Lender originally requested an incorrect release fee), the Borrower shall immediately pay to the Lender upon demand the difference between the release fee paid and the correct amount of the release fee.

(v)     Hazardous Materials; Contamination.  The Borrower agrees to (a) give written notice to the Lender immediately upon the Borrower's acquiring knowledge of the presence of any Hazardous Materials (as defined in the Deed of Trust) on the Land or of any Hazardous Materials Contamination (as defined in the Deed of Trust) with a full description thereof (and the Borrower hereby represents and warrants to the Lender that, to the best of the Borrower's knowledge, as of the date of this Agreement, there are no Hazardous Materials on, in or under the Land and the Land is not affected by any Hazardous Materials Contamination); (b) promptly comply with any laws requiring the removal, treatment or disposal of such Hazardous Materials or Hazardous Materials Contamination and provide the Lender with satisfactory evidence of such compliance; (c) if the Lender has a reasonable basis for so requesting, provide the Lender, within thirty (30) days after a demand by the Lender, with a bond, letter of credit or similar financial assurance, in amount, form, content and issued by a surety satisfactory to the Lender, evidencing to the Lender's satisfaction that the necessary funds are available to pay the cost of removing, treating and disposing of such Hazardous Materials or Hazardous Materials Contamination and discharging any lien which may be established on the Land as a result thereof; and (d) defend, indemnify and hold harmless the Lender from any and all claims, loss, cost, damage, liability or expense (including attorneys' fees) which may now or in the future (whether before or after the release of the Deed of Trust) result from the presence of any Hazardous Materials on the Land or any Hazardous Materials Contamination. After the occurrence of an Event of Default or if the Lender has a reasonable basis for so requesting, within twenty (20) days after notice from the Lender, the Borrower shall provide the Lender, at the Borrower's expense, with an environmental site assessment or environmental audit report, or an update of the same, in form, content, assessing such conditions and prepared by persons as are satisfactory to the Lender. It is understood and agreed that all of the Borrower's obligations under this Section shall survive termination of this Agreement, repayment of the Loan and the release or foreclosure of the Deed of Trust or the delivery of a deed-in-lieu of foreclosure of the Deed of Trust.

(w)     Financing Reporting.  In addition to all other financial information which the Borrower or the Guarantors are required to provide to the Lender under the terms of this Agreement, or under the terms of any of the other Loan Documents, the Borrower and the Guarantors shall provide to the Lender:

(i)     Annual Financial Statements.  The Borrower shall deliver to the Lender as soon as available, but in no event later than May 31, 2010 with respect to the fiscal year ending December 31, 2009, and thereafter, by May 31, with respect to each preceding fiscal year, the balance sheet and statement of income and retained earnings of the Borrower and each of the Guarantors for the fiscal year then ended setting forth in comparative form the corresponding figures for the preceding fiscal year, such financial statements will be compiled by a firm of certified public accountants satisfactory to the Lender.

(ii)    <u>Other Periodic Financial Statements</u>.  The Borrower shall furnish to the Lender promptly after becoming available and, in any event, within thirty (30) days after the end of each calendar month, the balance sheet of the Borrower and each Guarantor as of the end of monthly period, a statement of profit and loss of the Borrower and each Guarantor for such period, and for the period from the beginning of the fiscal year to the end of such period, setting forth in each case, in comparative form, the corresponding figures for the corresponding period of the preceding fiscal year, certified by the Borrower's chief accounting officer or chief financial officer.  The Lender recognizes that Borrower's and each Guarantors' internally prepared financial statements will be prepared on a "GAAP basis".

(iii)    <u>Tax Returns</u>.  The Borrower shall furnish to the Lender within thirty (30) days of filing but in no event later than the latest date permitted pursuant to two (2) duly obtained filing date extensions, which, in any event, do not extend the date for filing beyond October 15 of the year in which such return was otherwise due copies of the federal tax returns and related forms K-1 and supporting schedules of the Borrower and the Guarantors.

(iv)    <u>Business Plan; Inventory Reports; Sales Reports, etc.</u>  The Borrower shall deliver to the Lender, within thirty (30) days of each quarter end (i) monthly project sales reports for such quarter, (ii) global presold, speculative finished lot, speculative unit and model reports on a quarterly basis, and (iii) quarterly business plan results (actual vs. budget) consistent with the Borrower's practice.  The Borrower shall furnish to the Lender the Borrower-prepared business plan and budget of the Borrower annually within forty-five (45) days of the Borrower's fiscal year end.

(v)    <u>Administrative Reporting</u>.  The Borrower shall provide to the Lender, at any time and from time to time, within five (5) days after the Lender's request:  (i) sales contract reports for the Borrower and the Guarantors, and (ii) any other reporting information requested by the Lender from time to time. In addition, the Borrower shall provide to the Lender, monthly, by the fifth day of each month, sales contract reports for the Borrower and the Guarantors for the preceding month.

(vi)    <u>Compliance Certificate</u>.  Within twenty-five (25) days after the end of each calendar quarter, if requested by the Lender, the Borrower shall deliver to the Lender a compliance certificate, which compliance certificate: (i) certifies that no Event of Default, or event which, with the giving of notice or the passage of time or both would or could constitute an Event of Default, exists as of the date of such certificate or, if an Event of Default, or event which, with the giving of notice or the passage of time or both would or could constitute an Event of Default, does exist, identifying with specificity the same and the actions being taken by the Borrower to cure the same; (ii) certifies whether, as of the end of such month, the Borrower and the Guarantors were in compliance with the financial covenant set forth in Section 5.2 (y) below and setting forth calculations supporting that statement; (iii) contains such other information as the Lender may reasonably require; (iv) is in a form satisfactory to the Lender; and (v) is certified on behalf of the Borrower and the Guarantors by a person satisfactory to the Lender.  The Lender may revise the form of such compliance certificate from time to time.

(vii)    Other Information.    The Borrower shall submit to the Lender, from time to time, upon not less than ten (10) days notice from the Lender, such other financial information or reports concerning the Borrower, the Guarantors and/or the Project as the Lender may require.  All financial statements and reports shall be on a consolidated and combined basis, unless otherwise requested.

(x)    Financial Covenant.  The Borrower and the Guarantors shall at all times comply with the following financial covenant:  Annual profit distribution, as determined by the Lender, may not exceed forty percent (40%) of after-tax net income of the Borrower and the Guarantors.

The Lender shall have the right to adjust the foregoing financial covenant once in any calendar year, upon not less than fifteen (15) days prior written notice to the Borrower and the Guarantors.

(y) Title Company.  The Lender shall have the right, in its sole and absolute discretion, to approve the title agent and/or underwriter selected by the Borrower to provide lender's title insurance in connection with the Loan and/or to conduct closings of the Loan or transactions related thereto and the Lender may, at any time, require the Borrower to utilize a different title agent and/or underwriter for such purposes.  The Borrower shall cause the title agent and/or underwriter providing title insurance to the Lender in connection with the Loan to comply with all of the terms and provisions of the lender's title instruction letter or letters, including, but not limited to, timely delivery and/or recording of executed documents in connection with closings and timely delivery of recorded documents and title policies or final endorsements.  In the event the title agent and/or underwriter fail timely to comply with all of the requirements of the lender's title instruction letter or letters, then the Lender, among other remedies, shall have the right to cease making advances under the Loan.

(z)    Payments, Disbursements, etc.    Neither the Borrower nor any of the Guarantors shall make or permit to be made any loan, payment, distribution, transfer, investment, disbursement or other advance of any of the income or assets (whether monetary or non-monetary), whether now owned or hereafter acquired, of the Borrower or of any of the Guarantors, to any person or entity that is not obligated to repay the Loan.  Provided, however, the foregoing shall not be construed to prohibit (i) payments for taxes, insurance, consumer goods, living expenses, political and charitable contributions, or estate planning, or (ii) for services and/or materials rendered in connection with development of real property or the construction of homes thereon, so long as such payments are made only to or for the benefit of entities in which neither the Borrower nor any Guarantor has any direct or indirect ownership or other financial interest; or (iii) to repay any debtor in possession lender approved by an Order issued by the Bankruptcy Court or to make any other payments as otherwise approved by an Order of the Bankruptcy Court.

(aa)    Acquisition and Development Loans.    The Borrower and the Guarantors acknowledge that the Lender previously made the following loans, which are referred to herein as the "Acquisition and Development Loans":

(i)      $7,545,000 loan made on February 17, 2006 in connection with the West Shores at New Milford property (the "West Shores Loan").

(ii)      $1,781,000 loan made on June 1, 2006 in connection with the Yellow Breeches property (the "Yellow Breeches Loan").

(iii)      $8,932,500 loan made on June 15, 2006 in connection with the Brimmington property (the "Brimmington Loan").

(iv)      $9,900,000 loan made on August 29, 2006 in connection with the Tull Gardens property (the "Tull Gardens loan").

Each of the Acquisition and Development Loans is secured by, among other things, a first priority mortgage (each, an "Acquisition and Development Mortgage" and collectively, the "Acquisition and Development Mortgages") on the property which is the subject of the respective Acquisition and Development Loan. The Borrower and the Guarantors acknowledge and agree that the Lender has no obligation to make any further disbursements under any of the Acquisition and Development Loans. The documents that now or hereafter evidence, guaranty or secure the Acquisition and Development Loans, as the same may be amended, extended, supplemented, restated or otherwise modified from time to time, are included within the definition of "Loan Documents" as set forth in this Agreement.

(bb)     Financing Fee.  In consideration of making available advances of the Loan after the date of this Agreement, the Borrower agrees to pay to the Lender the following amounts (collectively, the "Financing Fee"), which shall be deemed fully earned on the date of this Agreement: (i) One Hundred Twenty-five Thousand Dollars ($125,000.00), which shall be due and payable in full on the date of this Agreement (provided, however, such payment shall require approval of the Bankruptcy Court and will be funded with an advance of Loan proceeds), and (ii) an amount (the "Deferred Financing Fee") equal to one-half of one percent (1/2 %) of the aggregate advances made by the Lender (both before and after the date of this Agreement) with respect to acquisition of any lot or construction of any home, as allocated and determined by the Lender, which amount shall be due and payable at the time the Lender releases such lot or home from the lien of one of the Deeds of Trust.

(cc)     Restrictions on Land Purchases.  The Borrower and the Guarantors agree that neither they nor any Affiliate of the Borrower or of the Guarantors will enter into any contracts or options to purchase or otherwise commit themselves to acquire or close on the acquisition of any building lots, raw land or other real property without the Lender's prior written consent. The Lender will not unreasonably withhold its prior written consent to requests for acquisition of finished building lots under lot purchase contracts which require no minimum lot purchases, so long as each such finished building lot is the subject of an Approved Contract with one of the Guarantors or an Affiliate of one of the Guarantors.

(dd)     No Commitments to Complete Development.  The Borrower and the Guarantors agree that neither the Borrower, nor any of the Guarantors nor any Affiliate of the Borrower or of any of the Guarantors will enter into any contracts or make any commitments to complete any improvements or any horizontal development of any lots or land, except as may be

approved in writing by the Lender in its sole discretion. The foregoing prohibition shall apply with respect to any lots or land which are the subject of the liens of the Deeds of Trust or of the Acquisition and Development Mortgages, or which are the subject of any other lien in favor of any other lender (other than a lender providing debtor in possession financing with respect to such lots or land approved by the Bankruptcy Court). Additionally, the Borrower and the Guarantors agree that neither the Borrower nor the Guarantors nor any Affiliate of the Borrower or of any of the Guarantors will post any bond, enter into any letter of credit agreement or enter into any agreement with any municipality, related to the development of any lots or land which may impose any obligation upon the Borrower, any of the Guarantors or any Affiliate (other than with respect to the development of land which is being financed pursuant to debtor in possession financing approved by the Bankruptcy Court), except as may be approved in writing by the Lender in its sole discretion.

(ee)    <u>Equalization of Debtor in Possession Lenders</u>. The Borrower and the Guarantors have advised the Lender they intend to seek debtor in possession financing from other lenders, including, but not limited to, Manufacturers and Traders Trust Company ("M&T"). As an inducement to the Lender to provide immediate debtor in possession financing, the Borrower and the Guarantors agree that if the terms of any subsequent debtor in possession financing, whether provided by M&T or any other lender (each a "DIP Lender"), are more favorable (as to the other DIP Lender) in any respect then the terms of the Loan, then the Lender shall be entitled to modify the material terms of the Loan so that the terms of the Loan are, taken as a whole, at least as favorable to the Lender as the terms of the debtor in possession financing provided by the other DIP Lender. For instance, if the other debtor in possession financing is at an effective interest rate higher than the effective interest rate applicable to the Note (taking into account all associated fees), the interest rate applicable to the Note shall, at the option of the Lender, be increased to such higher rate; if the financing or similar fee paid to such other DIP Lender, taken as a whole, is greater (on a proportionate basis) then the Financing Fee which the Borrower is paying to the Lender, the Financing Fee shall, at the option of the Lender, be similarly increased; in the event such other DIP Lender has obtained a guaranty from Gemcraft Capital, the Lender shall be entitled to obtain a similar guaranty; in the event that there is any additional collateral provided to any other DIP Lender, which did not secure or secure to the same extent that other DIP Lender prior to closing the other debtor in possession financing, then the Lender shall be entitled to a lien on a pari passu basis on such additional collateral with the other DIP Lender. Without limiting the generality of the foregoing, in the event that M&T or any other DIP Lender provides an overhead line of credit or other credit accommodation similar to the Overhead Line of Credit described in Section 4.12 above, then on the day of closing of such facility, the Borrower shall cause an advance to be made under that facility to reduce on a pro-rata basis the amount outstanding under the Overhead Line of Credit (e.g., if the other facility is in an amount equal to One Million Dollars ($1,000,000.00) and the outstanding balance under the Overhead Line of Credit is Five Hundred Thousand Dollars ($500,000.00), then the Borrower would cause an advance to be made thereunder in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00), which shall be used to reduce the outstanding principal balance of the Overhead Line of Credit). The provisions of this Section 5.2(ii) shall be liberally construed to protect the interests of the Lender.

(ff)    <u>Payments to Contractors</u>.  Without limiting the application of any other provision set forth in this Agreement, all contracts and agreements between the Guarantors and all subcontractors and service and material suppliers, which are applicable to any period after the date of this Agreement, must require, at all times, that the Guarantors pay all subcontractors and service and material suppliers within thirty (30) days after such subcontractor or supplier issues an invoice.

6.    <u>Events of Default and Remedies</u>.

6.1    <u>Events of Default</u>.  The occurrence of any one or more of the following events shall constitute an Event of Default under this Agreement and the other Loan Documents:

(a)    <u>Payment</u>.  The Borrower fails to make any payment due under the terms of this Agreement within ten (10) days after the same shall have become due and payable.

(b)    <u>Performance of Agreement</u>.  The Borrower or the Guarantors fails to perform or comply with any term or condition of this Agreement (other than as described elsewhere in this Section 6), and such failure continues uncured for thirty (30) days after written notice thereof to the Borrower or the Guarantors, provided, however, if such failure is not susceptible of cure within thirty (30) days, then no Event of Default shall have occurred so long as the Borrower or the Guarantors commences cure within such thirty (30) day period and thereafter continuously and diligently pursues cure and completes cure within forty-five (45) days after such notice.

(c)    <u>Default under Loan Documents</u>. A default (after the expiration of applicable grace or cure periods, if any) or any Event of Default (as defined therein) under the Note, the Deed of Trust or any of the other Loan Documents or if Gemcraft Capital or any of the Individual Guarantors fail to comply with any of the terms, provisions or agreements contained in the Pledge Agreement.

(d)    <u>Falsity of Representation or Warranty</u>.   Any representation, warranty, certification or statement contained herein or heretofore or hereafter furnished with respect to this Agreement or any of the other Loan Documents by or on behalf of the Borrower or the Guarantors proves to have been false in any respect at the time as of which the facts therein set forth were represented, warranted, stated or certified (or on the date reaffirmed, pursuant to Section 5.1 of this Agreement) or omits any liability or claim against the Borrower or the Guarantors or omits to state a fact necessary to make any such representation, warranty, certification, or statement not misleading in light of the circumstances under which it was furnished.

(e)    <u>Failure to Continue Construction</u>. The construction of any home is not carried on with reasonable dispatch or at any time is discontinued for a period of fifteen (15) days for reasons other than war, acts of God or the public enemy, acts of government, fires, floods, epidemics, quarantine restrictions, strikes, lockouts, or labor disputes.

(f)     <u>Failure to Correct Defects</u>.  The construction of any home is not in accordance with the Plans and Specifications and the Guarantors fail promptly upon notice thereof from the Lender to commence and diligently proceed to correct the same.

(g)     <u>Liens</u>.  A lien for the performance of work or the supply of materials is created after the Petition Date, against any portion of the Land or any improvements thereon, unless such lien is bonded off, to the satisfaction of the Lender, within ten (10) days after the date it is created.

(h)     <u>Survey Defects</u>.  Any survey required by the Lender during the term of the Loan shows any matter with respect to any lot or the home thereon not approved by the Lender, unless within forty-five (45) days after notice to the Guarantors either, (i) such matter has been corrected to the Lender's satisfaction, or (ii) the Borrower has repaid to the Lender all Loan proceeds advanced during the term of the Loan with respect to such lot or home.

(i)     <u>Impairment of Security</u>.  The occurrence of any condition or situation which, in the sole determination of the Lender, may result in the Borrower being unable to repay the Loan in accordance with the terms of the Note or which constitutes a danger to or impairment of the security for the Loan, if such condition or situation is not, in the Lender's sole determination, remedied within thirty (30) days after notice thereof to the Borrower.

(j)     <u>Failure to Permit Entry</u>.  The Lender or its agents or any inspector retained by the Lender is not permitted to enter upon the Land to inspect the Project or the materials used in the construction thereof or the detailed plans and drawings which are kept at the construction site or elsewhere.

(k)     <u>Failure to Obtain or Maintain Permits. Etc</u>.  The revocation or refusal to issue, by any federal, state or local government or agency with jurisdiction over the Project, of a required permit or approval or the issuance of a stop work order, if such revocation, refusal or order is not rescinded or otherwise cured or discharged within a period of thirty (30) days following written notice to the Guarantor.

(l)     <u>Additional Borrowings</u>.  The making by the Borrower of any additional borrowings, whether secured or unsecured, from any third party for purposes of the Project, which borrowings have not been approved in writing by Lender.

(m)     <u>Misuse of Loan Proceeds</u>.  The use of the Loan proceeds by either the Borrower or the Guarantors (with respect to Loan proceeds which have been reloaned to the Guarantors) for any purpose other than for the Project.

(n)     <u>Judgments, Liens</u>.  Any judgment in excess of Twenty-five Thousand Dollars ($25,000.00) is entered after the Petition Date, against the Borrower, and such judgment is not discharged, satisfied, dismissed or bonded within thirty (30) days after the date entered, or if any judgment in excess of Two Hundred Fifty Thousand Dollars ($250,000.00) is entered against the Borrower or the filing of an attachment or tax lien against any of the

Borrower's property, unless such attachment or tax lien is discharged, stayed or indemnified against within thirty (30) days of its entry, to the Lender's satisfaction.

(o)      Corporate, Partnership, Limited Liability Company or Individual Defaults.  If the Borrower is a corporation or if any general partner or member of the Borrower is a corporation:  if any of the stock of any stockholder of the Borrower or such general partner, or such member is transferred to, pledged to, or encumbered by any person, or if the Borrower or such general partner or such member should take any action which would have the effect of changing the relative distribution of the stock of the Borrower or such general partner or such member (except, it shall be permissible to transfer or redistribute stock in a Borrower or a general partner or a member of a Borrower to or among those persons owning any such stock on the date of this Agreement or to the estates of any such persons upon their death), or if the Borrower or such general partner or such member should dissolve or liquidate or not pay all corporate taxes or not comply with all applicable laws necessary to preserve its corporate franchise.  If the Borrower is a partnership:  if any partnership interest of any partner of the Borrower is transferred to, pledged to, assigned to or encumbered by any person, or if there should be any change in the relative partnership interests of the Borrower (except, it shall be permissible to transfer or redistribute partnership interest in a Borrower to or among those persons owning any such partnership interest on the date of this Agreement or to the estates of any such persons upon their death), or if the Borrower should dissolve or liquidate or not pay all taxes or not comply with all applicable laws necessary to preserve its partnership existence.  If the Borrower is a limited liability company:  if any membership interest of any member of the Borrower is transferred to, pledged to, assigned to or encumbered by any person, or if there should be any change in the relative membership interests of the Borrower (except, it shall be permissible to transfer or redistribute membership interest in a Borrower to or among those persons owning any such membership interest on the date of this Agreement or to the estates of any such persons upon their death), or if the Borrower should dissolve or liquidate or not pay all taxes or not comply with all applicable laws necessary to preserve its limited liability company existence.  If the Borrower is an individual:   if the Borrower dies and (1) the personal representatives of the estate of the decedent fail, within fifteen (15) days of the written request of the Lender, to acknowledge, in a writing satisfactory to the Lender, the liability of the personal representatives of the estate of the decedent for the obligations of the decedent under and in accordance with the terms of the Loan Documents, or (2) if the personal representatives of the estate of the decedent make any distribution or any payment of any assets of the estate (other than ordinary and necessary expenses of operating the estate) without the prior written consent of the Lender.

(p)      Financial Covenant Compliance.    If the Borrower and the Guarantors fail at any time to comply with any of the provisions of Section 5.2(x) above.

(q)      Consolidated Financial Statement.  If the Borrower fails to submit, within the time specified in Section 5.2 (w) above, any financial reporting in the form and substance and otherwise in strict compliance with the requirements of, Section 5.2 (w) above.

(r)  <u>Ownership by William R. Luther, Jr.</u>.  If at any time William R. Luther, Jr., owns less than fifty-one percent (51%) of the voting and beneficial membership, stock or other ownership interest of the Borrower or of any of the Guarantors.

(s)  <u>Draw Under Letter of Credit</u>.  If any person shall draw on any Letter of Credit now or hereafter issued or posted by the Lender for the account of the Borrower or any of the Guarantors or any other person in connection with the Loan.

(t)  <u>Cross Default</u>.  A default (after the expiration of applicable grace or cure periods, if any) by the Borrower, or any Affiliate of the Borrower, under any obligation or indebtedness owed to the Lender, regardless of when created or whether direct, indirect, primary, secondary, contingent, secured or unsecured.

(u)  <u>Failure to Notify of Suit</u>.  If the Borrower fails to notify the Lender within fifteen (15) days after the Borrower obtains actual knowledge that an action or proceeding has been filed against the Borrower in which any person seeks a monetary judgment against the Borrower in excess of Two Hundred Thousand Dollars ($200,000.00).

(v)  <u>Other DIP Financing</u>. An event of default (which is not cured within any applicable grace or cure period) occurs under any debtor in possession financing provided by M&T or any other DIP Lender, or the debtor in possession financing arrangement provided by M&T is terminated.

6.2  <u>Remedies of the Lender</u>.  Upon the occurrence of any Event of Default, the Lender shall have the right, at any time thereafter to exercise any of the following rights, powers or remedies:

(a)  <u>Restriction of Disbursements</u>.  Make no further disbursements under this Agreement and to apply all funds of the Borrower or the Guarantors then held by the Lender in any capacity to the payment of the principal of and interest on the Note and all other sums which may be or become due and payable under any of the Loan Documents; or restrict disbursements hereunder to such amounts and for such purposes as the Lender deems appropriate under the circumstances then prevailing.

(b)  <u>Protection of Project</u>.  Take such steps as the Lender deems appropriate to protect the Project from damage or injury, including employment of watchmen or other protective services, all at the expense of the Borrower and the Guarantors.

(c)  <u>Completion of Project</u>.  Enter upon the Land for the purpose of causing the continuation or completion of the development, construction and equipping of the Project and causing the Borrower's and the Guarantors' obligations under this Agreement to be fulfilled, and for such purposes each of the Borrower and the Guarantors hereby irrevocably appoint the Lender as its lawful attorney-in-fact, with full power of delegation and substitution, to act for such purpose in the Borrower's or the Guarantors' name, including, but not limited to, the power to continue the construction of the Project and avail itself and procure performance of all contracts thereof made by the Guarantors, to modify such contracts or to enter into new

contracts with the same or other contractors, subcontractors, architects, suppliers or agents, to make such corrections or changes in the Plans and Specifications as may in the sole judgment of the Lender be necessary or desirable for the continuance of the work, to pay, settle or compromise any bills, claims or liens incurred in connection with the construction and equipping of the Project, to prosecute or defend any action or proceeding in connection therewith, to execute such applications and certificates as may be required by any governmental authority or any agreement by the Guarantors, to satisfy any obligation of the Lender owed to any governmental authority or other person, in the event the Lender has given any assurance, by letter of credit, letter agreement, contract or otherwise to any governmental authority or other person in connection with the Guarantors' obtaining any subdivision, performance, payment or similar type of bond, or subdivision approval or public works agreement, and to perform any other act and to execute and deliver all documents and instruments as the Lender, in its sole discretion, may deem appropriate for such purposes, and to use the funds then remaining to be disbursed hereunder or which may have otherwise been allocated or made available thereof or to pay the cost thereof, it being specifically agreed that this power of attorney is a power coupled with an interest which cannot be revoked; and it is further agreed that any advance of funds for such purposes shall be deemed advances pursuant to this Agreement and secured by the Deeds of Trust, and if it shall be necessary for the Lender to advance amounts in excess of the amount remaining to be disbursed under this Agreement or otherwise available to the Lender in order to accomplish such purposes, the Borrower agrees to reimburse the Lender for the amount of such excess together with interest at the default rate provided in the Note, and authorizes the Lender to apply funds received from the sale or rental of any portions of the Land or any improvements thereon to the repayment of such excess before the same are applied for any other purpose.  Each of the Borrower and the Guarantors ratifies and confirms all actions taken, done or performed by the Lender pursuant to the above power of attorney.  Each of the Borrower and the Guarantors authorizes all persons to deal with and rely upon the Lender's power and authority pursuant to the above power of attorney and waives any requirement for persons dealing with the Lender pursuant to the above power of attorney to inquire as to the Lender's power and authority or the application of funds received by the Lender.   Any action taken by the Lender under this Agreement may, in the Lender's sole discretion, be thereafter terminated or changed and this Agreement or any action taken under this Agreement shall in no way be construed as imposing any obligation upon the Lender to act or continue to act on the Borrower's or the Guarantors' behalf or otherwise to complete the construction of the Project or fulfill any obligation of the Borrower or the Guarantors in connection with the Project.

(d)      Setoff.  Setoff against and apply any funds of the Borrower on deposit with or under the control of the Lender to the payment of any amounts owing to the Lender under or in connection with the Loan Documents, without any notice to the Borrower and without resort to any judicial proceeding.

(e)      Letters of Credit.  In the sole and absolute discretion of the Lender, advance from the undisbursed portion of the Loan an amount equal to the aggregate of the then potential unfunded obligations of the Lender under any and all Letters of Credit.  Any advance made pursuant to this Section shall be, at the election of the Lender (i) deemed to be an advance of Loan proceeds and, therefore, evidenced by the Note, guaranteed pursuant to the Guarantees and secured by the Deeds of Trust and the other Loan Documents, and (ii) be made without

notice to or request by the Borrower or the Guarantors. The Lender, in its sole and absolute discretion, may deposit the proceeds of any advance made pursuant to this Section in a non-interest bearing escrow account with the Lender. Each of the Borrower and the Guarantors, jointly and severally, as security for the payment of any amounts due under the Loan Documents, hereby pledges, assigns, transfers and sets over and grants to the Lender a security interest in and to and lien upon the escrow account referred to in this Section and all cash, credits, monies, notes, instruments and other personal property maintained from time to time in the escrow account, now or hereafter placed into the escrow account, and all additions thereto and substitutions thereof and all cash and non-cash proceeds thereof, together with all powers and rights of the Borrower or the Guarantors therein, whether presently held or hereafter acquired. Each of the Borrower and the Guarantors represents, warrants and agrees that the Lender has and shall have a perfected first priority pledge, lien and security interest in and upon the escrow account and the proceeds of the escrow account as increased or decreased from time to time. The provisions of this paragraph shall not be construed to limit any right, power or remedy the Lender may have under any Letters of Credit Note, any Letters of Credit Guaranty, the Guarantees or the Deeds of Trust.

(f)     Other Rights. Exercise any other right, power or remedy provided in any of the other Loan Documents or at law or in equity.

7.     Miscellaneous.

7.1     Notices. Any notice required or permitted by or in connection with the Agreement (but without implying any duty or obligation to give a notice if not expressly required by the terms of this Agreement) shall be in writing and shall be deemed to have been given and received on the date delivered by hand, or on the first business day after the date delivered to a commercial overnight courier or on the second business day after the date deposited in the United States mail, certified mail, postage prepaid, return receipt requested, to the person to whom such communication is to be given, at the addresses designated in the Note, for the Borrower and the Lender, and in the Deed of Trust for the Guarantors. In addition to the foregoing, any written notice in fact received by the Borrower or the Guarantors shall be considered effective upon receipt.

7.2     No Waiver: Cumulative Remedies. No failure by the Lender to exercise and no delay in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other further exercise thereof or the exercise of any other right, power or privilege provided at law or in equity or under the Note or the Deed of Trust or any of the other Loan Documents. Each waiver shall be strictly construed and shall apply only to the next succeeding advance. All remedies provided herein are cumulative with all other remedies provided herein or in any other of the Loan Documents, or otherwise available at law or in equity.

7.3     Liability of the Lender. The Lender shall not be liable hereunder for any act or omission by it, in the absence of fraud or gross negligence. The Lender shall incur no liability to the Borrower or to the Guarantors by acting upon any certificate or other paper believed by it to be genuine and purporting to be signed by the proper party or with respect to

anything which the Lender may do or refrain from doing unless it amounts to fraud or gross negligence. The Lender may consult with counsel selected by it, and any action taken or suffered in good faith by it in accordance with the opinion of such counsel shall be full justification and protection to it.

       7.4   <u>Lender not Liable for Project</u>.  Neither the approval by the Lender of the Plans and Specifications, nor any subsequent inspections or approvals of the Project during construction shall constitute a warranty or representation by the Lender or any of its agents, representatives or designees to anyone as to the technical sufficiency or adequacy or safety of the Project or any improvements on the Land or any of its or their component parts, including, without limitation, its fixtures, equipment or furnishings, nor shall such approvals or inspections constitute such a warranty or representation as to the subsoil conditions involved in the Project or any other physical condition or feature pertaining to the Project.  All acts, including any failure to act, relating to the Project by any agent, representative or designee of the Lender are performed solely for the benefit of the Lender to assure repayment of the Loan and are not for the Borrower's or Guarantors' benefit or the benefit of any other person, including, without limitation, purchasers, tenants, or other occupants.  The Borrower agrees to indemnify the Lender and to hold it harmless against any loss, cost, damage or expense (including attorneys' fees) resulting from any and all claims, actions, settlements, or liability for acts or failure to act in connection with the Project, including, but not limited to, any such loss, cost, damage or expense (including attorneys' fees) incurred if Lender is made a party to any suit or proceedings brought by any person (including, without limitation, the Guarantors, purchasers, tenants or other occupants) in connection with the Project.

       7.5   <u>Estoppel Certificates</u>.  The Borrower, within five (5) days after written request, shall furnish an estoppel certificate or written statement, duly acknowledged, of the amounts advanced to it under this Agreement and the amounts due under the Note and the indebtedness secured by the Deed of Trust, and whether any offsets or defenses exist thereunder or against the said indebtedness secured by the Deed of Trust.

       7.6   <u>Survival of Agreements</u>. All agreements, representations and warranties of the Borrower or the Guarantors made in this Agreement shall survive the making of the advances hereunder.

       7.7   <u>Successors</u>.  This Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective personal representatives, heirs, successors and permitted assigns.  This Agreement shall also be binding upon the Guarantors and their respective personal representatives, heirs, successors and assigns.  Any assignment attempted by the Borrower without the prior written consent of the Lender shall be void.

       7.8   <u>Severability</u>.  In case any provision (or any part of any provision) contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision) of this Agreement but this Agreement shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained herein but only to the extent it is invalid, illegal or unenforceable.

2165183.1

7.9     <u>Final Agreement and Amendments</u>.  This Agreement, together with the other documents executed in connection with this transaction, constitute the final and entire agreement and understanding of the parties and any term, condition, covenant or agreement not contained herein or therein is not a part of the agreement and understanding of the parties. Neither this Agreement, nor any term, condition, covenant or agreement hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

7.10     <u>Time</u>.  Time is of the essence of all of the Borrower's and the Guarantors' obligations and agreements under this Agreement.

7.11     <u>Number, Gender, Captions, etc</u>.  Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine or neuter gender shall include all genders.  The captions contained herein are for purposes of convenience only and are not a part of this Agreement.  Whenever used herein, the word "person" or "persons" shall mean and include a corporation, an association, a partnership, a limited liability company, an organization, a business, an individual, a government or political subdivision or agency thereof, or an estate or trust.  Reference in this Agreement to the "sole discretion" of the Lender shall mean the Lender's "sole and absolute discretion."  Reference in this Agreement to a "home" or to a "house" shall mean and include a single family detached home, a townhome and a condominium unit, unless the context shall clearly dictate a contrary meaning.  As used in this Agreement, the term "Loan Documents" shall mean any document or agreement previously, now or hereafter evidencing, guaranteeing, securing or submitted by or on behalf of the Borrower, any of the Guarantors, any of the Individual Guarantors, Gemcraft Capital or any other person in connection with the Loan, including, but not limited to, this Agreement, the Ratification Agreement, the Note, the Guarantees, the Deeds of Trust, the Acquisition and Development Mortgages, any of the documents executed in connection with any of the Acquisition and Development Loans and the Pledge Agreement, as any of the same may from time to time be extended, amended, restated, supplemented or otherwise modified.  As used herein, an "Affiliate" of the Borrower (or of any Guarantor) shall mean any person, which directly or indirectly controls, is controlled by, or is under common control with the Borrower (or such Guarantor).

7.12     <u>Joint and Several Liability</u>.  The liabilities, obligations and agreements of each person constituting the Borrower and the Guarantors shall in all cases be joint and several. Without limiting the generality of the foregoing, (i) whenever this Agreement imposes an obligation on the Guarantors the entire obligation shall be imposed on each of the persons which constitute the Guarantors; (ii) whenever the Guarantors makes a grant, agreement, covenant, representation, warranty or etc., in this Agreement, such grant, agreement, covenant, representation, warranty or etc., shall be deemed made by each of the persons which constitute the Guarantors; (iii) whenever this Agreement provides that the Lender shall have a right or remedy against the Guarantors, the Lender shall have such right or remedy against each of the persons which constitute the Guarantors; (iv) the occurrence of an Event of Default as to any of the persons constituting the Guarantors or the failure of any of such persons to comply with any provision of this Agreement in any instance shall be considered to be an Event of Default or

failure to comply by all such persons; and (v) in the event of any ambiguity or question whether, in any instance, the term "Guarantors" refers to only one or to all of the persons which constitute the Guarantors, the ambiguity or question shall be resolved in favor of the Lender.

7.13    <u>Governing Law</u>.  This Agreement shall be deemed executed and delivered in and shall be construed, governed, and enforced in accordance with the laws of the State of Maryland in effect from time to time.

7.14    <u>Conflicts between Loan Documents</u>.   In the event there is a conflict between any provisions of two or more Loan Documents (or between any two or more provisions within any one Loan Document), the Lender, in its sole discretion, shall determine which provision shall control.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed under seal as of the day and year first above written.

WITNESS/ATTEST:                    GEMCRAFT HOMES GROUP, INC.
                                   As Debtor and Debtor in possession


_____            By:_____(SEAL)
                                        William R. Luther, Jr.
                                        President



                                   GEMCRAFT HOMES, INC.
                                   As Debtor and Debtor in possession


_____            By:_____(SEAL)
                                        William R. Luther, Jr.
                                        President



                                   GEMCRAFT HOMES FOREST HILL, LLC
                                   As Debtor and Debtor in possession


_____            By:_____(SEAL)
                                        William R. Luther, Jr.
                                        President



                                   GEMCRAFT HOMES CHESAPEAKE, LLC
                                   As Debtor and Debtor in possession


_____            By:_____(SEAL)
                                        William R. Luther, Jr.
                                        President

DLM, LLC

As Debtor and Debtor in Possession


_____    By:_____(SEAL)
                                   William R. Luther, Jr.
                                   President



TULL GARDENS, LLC

By:  DLM, LLC, Sole Member

_____          By: _____(SEAL)
                                     William R. Luther, Jr.
                                      President



ST. HELEN'S, LLC

_____    By:_____(SEAL)
                               William R. Luther, Jr.
                                Managing Member



HARKINS PROPERTY, LLC
As Debtor and Debtor in possession

By:  Gemcraft Homes Forest Hill, LLC,
       Manager and Sole Member


_____    By:_____(SEAL)
                               William R. Luther, Jr.
                                President


_____    By:_____(SEAL)
                               William R. Luther, Jr.
                                Manager

THE PRESERVE AT JEFFERSON CREEK, LLC
As Debtor and Debtor in possession


_____    By:_____(SEAL)
                                   William R. Luther, Jr.
                                   Managing Member



REGIONS BANK


_____    By: _____(SEAL)
                                        Name:
                                        Title: