> **THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AND NO ONE MAY SOLICIT ACCEPTANCES OR REJECTIONS OF THE PLAN OF REORGANIZATION UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION.  THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER MODIFICATION PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THE DISCLOSURE STATEMENT.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | |
|---|---|
| In re:   GEMCRAFT HOMES, INC., | Case No. 09-31696 (NVA) |
| | (Chapter 11) |
| Debtor. | |
| In re: Gemcraft Homes, Inc. | Case No. 09-31696 (NVA) |
| DLM, LLC | Case No. 09-31702 (NVA) |
| Gemcraft Homes Group, Inc. | Case No. 09-31703 (NVA) |
| Gemcraft Homes Forest Hill, LLC | Case No. 09-31704 (NVA) |
| Gemcraft Chesapeake, LLC | Case No. 09-31706 (NVA) |
| Harkins Property, LLC | Case No. 09-31707 (NVA) |
| The Preserve at Jefferson Creek, LLC | Case No. 09-31708 (NVA) |
| S & M Properties, LLC, | Case No. 09-31709 (NVA) |
| Debtors. | (Jointly Administered under |
| | Case No. 09-31696 (NVA)) |

### DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE WITH RESPECT TO DEBTORS' JOINT PLAN OF REORGANIZATION

**COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.**

Irving E. Walker (Bar No. 00179)
Gary H. Leibowitz (Bar No. 24717)
G. David Dean (Bar No. 26987)
300 East Lombard Street, Suite 2000
Baltimore, MD  21202
Telephone: 410-230-0660
Facsimile: 410-230-0667
iwalker@coleschotz.com
gleibowitz@coleschotz.com
gdean@coleschotz.com

Dated:  April 16, 2010

Counsel for the
Debtors and Debtors in Possession

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..............................................................................................1

    A.    Purpose of Disclosure Statement ..........................................................1

    B.    Disclaimer ..............................................................................................2

II.   GENERAL INFORMATION ON CONFIRMATION PROCEDURE AND
    VOTING ......................................................................................................3

    A.    Plan Confirmation Process ...................................................................3

    B.    Voting on the Plan .................................................................................4

    C.    Acceptance of the Plan ..........................................................................6

    D.    Additional Information ...........................................................................6

III.  GENERAL INFORMATION CONCERNING THE DEBTORS ......................7

    A.    Founding and Background ......................................................................7

    B.    Debtors' Business Structure ...................................................................7

    C.    Prepetition Capital Structure .................................................................9

    D.    Events Leading to Bankruptcy ...............................................................9

IV.   THE BANKRUPTCY CASES .....................................................................10

    A.    The Chapter 11 Cases ..........................................................................10

V.    THE PLAN PROPONENTS' PLAN OF REORGANIZATION ....................13

    A.    Classes of Claims and Equity Interests ...............................................13

    B.    Treatment of Claims and Equity Interests ...........................................16

    C.    Classified Claims and Equity Interests ...............................................17

    D.    Means for Implementation of Plan ......................................................28

    E.    Treatment of Executory Contracts and Unexpired Leases...................31

    F.    Provisions Governing Distributions.....................................................31

G.    Procedures for Resolving Disputed Claims ...........................................................33

H.    Conditions Precedent to the Effective Date and Consummation of the Plan ...........................................................................................................................34

I.    Cramdown ...................................................................................................................34

J.    Injunction and Subordination Rights ....................................................................34

K.    Retention of Jurisdiction ........................................................................................35

L.    Miscellaneous Provisions........................................................................................36

VI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .................41

VII.    FEASIBILITY OF THE PLAN ....................................................................................42

VIII.    BEST INTEREST OF CREDITORS TEST .................................................................43

IX.    CONCLUSION.............................................................................................................45

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Debtors' Joint Plan of Reorganization<br>under Chapter 11 of the Bankruptcy Code |
| Exhibit B | Feasibility Analysis |
| Exhibit C | Best Interest of Creditors Analysis |

45674/0002-6330587v6

# I.    INTRODUCTION

## A.    Purpose of Disclosure Statement

This Disclosure Statement is being furnished by Gemcraft Homes, Inc. ("GHI"), DLM, LLC ("DLM"), Gemcraft Homes Group, Inc. ("GHG"), Gemcraft Homes Forest Hill, LLC ("GHFH"), Gemcraft Chesapeake, LLC ("Chesapeake"), Harkins Property, LLC ("Harkins"), Preserve at Jefferson Creek, LLC ("Preserve"), and S&M Properties, LLC ("S&M"), the debtors and debtors in possession (together, "Gemcraft", or the "Debtors"), as proponents of the Debtors' Joint Plan of Reorganization dated as of April 16, 2010 (including all exhibits thereto and as may be amended from time to time, the "Plan", a copy of which is attached hereto as **Exhibit A**), pursuant to section 1125 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code"). This Disclosure Statement is provided in connection with the solicitation of votes for the acceptance or rejection of the Plan, as it may be amended, altered, modified or supplemented from time to time in accordance with its terms, the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

The Bankruptcy Code requires that the party proposing a chapter 11 plan prepare and file with the United States Bankruptcy Court for the District of Maryland (the "Bankruptcy Court") a document called a "disclosure statement." This Disclosure Statement summarizes the Plan's contents and provides information relating to the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan. This Disclosure Statement also discusses the events leading to the Debtors' filing of the chapter 11 cases and describes the main events that have occurred in the Debtors' chapter 11 cases. This Disclosure Statement also describes the chapter 11 voting procedures and the confirmation process, and also outlines risk factors associated with the Plan.

The Bankruptcy Code requires a disclosure statement to contain information of a kind, and in sufficient detail, to enable parties who are affected by the Plan to vote intelligently for or against the Plan or object to the Plan, as the case may be. The Plan was filed in the Bankruptcy Court on April 16, 2010. The Bankruptcy Court approved this Disclosure Statement by Order dated _____, 2010 (the "Disclosure Statement Order"). In approving this Disclosure Statement, the Bankruptcy Court found that it contains "adequate information" to enable a hypothetical reasonable investor to make an informed decision to accept or reject the Plan.

For purposes of this Disclosure Statement, all capitalized terms not otherwise defined shall have the meaning ascribed to them in the Plan, except as expressly provided or unless the context clearly requires otherwise. Whenever the context requires, such meaning shall be equally applicable to both the singular and the plural form of such terms, and the masculine gender shall include the feminine and the feminine gender shall include the masculine. Any term used in initially capitalized form in this Disclosure Statement that is not defined herein but is used in the Bankruptcy Code shall have the same meaning ascribed to such term in the Bankruptcy Code.

All holders of Claims should carefully review both this Disclosure Statement and the Plan before voting to accept or reject the Plan.

**B.**     <u>Disclaimer</u>

NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS, SUPPLEMENTS TO THE PLAN AND THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME HEREAFTER.  ALL CREDITORS AND EQUITY INTEREST HOLDERS SHOULD READ CAREFULLY AND CONSIDER FULLY THE "RISK FACTORS" SECTION OF THIS DISCLOSURE STATEMENT BEFORE VOTING FOR OR AGAINST THE PLAN.  TO THE EXTENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS, OR ANY FUTURE ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, ESTOPPEL, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN FURTHERANCE OF SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE PLAN AND RELATED SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS IN THEIR VARIOUS FILINGS IN THIS CHAPTER 11 CASE AND FROM OTHER PARTIES' FILINGS, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  ANY VALUE GIVEN AS TO ASSETS OF THE DEBTORS IS BASED UPON AN ESTIMATION OF SUCH VALUE.  THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION THIS DISCLOSURE STATEMENT CONTAINS, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION, ALTHOUGH DILIGENT EFFORTS HAVE BEEN MADE TO PRESENT ACCURATE AND COMPLETE INFORMATION.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED BY THE DEBTORS, AND NOT BY THEIR COUNSEL, AND IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY

45674/0002-6330587v6

NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS. YOU ARE URGED TO CONSULT YOUR OWN COUNSEL AND FINANCIAL AND TAX ADVISORS ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

The Order approving this Disclosure Statement Order sets forth the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan. For those who are entitled to vote, a ballot ("Ballot") is also enclosed. Voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement and Plan, the Order approving this Disclosure Statement, and the instructions accompanying the Ballot in their entireties before voting on the Plan. CONSULTATION WITH COUNSEL IS ALSO RECOMMENDED.

## II.    GENERAL INFORMATION ON CONFIRMATION PROCEDURE AND VOTING

### A.    Plan Confirmation Process

The requirements for confirmation of a plan are set forth in detail in section 1129 of the Bankruptcy Code. The following summarizes some of the pertinent requirements:

**1.    Acceptance by Impaired Classes.** Without invoking the "cramdown" provision of the Bankruptcy Code, described immediately below, each impaired class must accept the Plan. Under all circumstances where there is an impaired class, at least one impaired class must vote in favor of a plan.

**2.    "Cramdown" Provisions.** If an impaired class of Claims or Equity Interests either is deemed to have rejected the Plan or votes to reject the Plan, the Plan may still be confirmed under the Bankruptcy Code's "cramdown" provision so long as the Plan is fair and equitable and does not discriminate unfairly against the non-accepting classes.

**3.    Feasibility.** A court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor, unless otherwise contemplated by the Plan.

**4.    "Best Interests of Creditors" Test.** The Plan must be in the "best interests" of each Debtor's creditors. To satisfy this requirement, each holder of a Claim or Equity Interest must accept the Plan or receive or retain property that has a value not less than the amount such holder would receive if the Debtor's property were liquidated under chapter 7 of the Bankruptcy Code.

3

**5.**     **Confirmation Hearing.**  To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of the Bankruptcy Code (the "Confirmation Hearing").  The Bankruptcy Court has scheduled the Confirmation Hearing for _____, 2010 at _____ (Prevailing Eastern Time).

**6.**     **Objections to Confirmation.**  Any party in interest may object to confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection.  The Bankruptcy Court has set _____, 2010 at _____ (Prevailing Eastern Time) as the deadline for filing and serving objections.  Objections to confirmation must be filed with the Bankruptcy Court at the following address:

> U.S. Bankruptcy Court for the
> District of Maryland
> 101 West Lombard Street
> Baltimore, Maryland 21201

with a copy served upon counsel to the Plan Proponents:

> Irving E. Walker, Esquire
> Gary H. Leibowitz, Esquire
> Cole, Schotz, Meisel, Forman & Leonard, P.A.
> 300 East Lombard Street, Suite 2000
> Baltimore, Maryland 21202

**B.**     **Voting on the Plan**

**1.**     **Solicitation Package.**  Each person entitled to vote to accept or reject the Plan is being provided with (1) this Disclosure Statement; (2) the Plan; (3) notice of the Confirmation Hearing and objection deadline; (4) an appropriate Ballot to be used in voting to accept or reject the Plan; and (5) a pre-addressed return envelope.  Any person who receives this Disclosure Statement but does not receive a Ballot, and who believes that he is entitled to vote to accept or reject the Plan or who believes he received an incorrect Ballot, should contact the Balloting Agent at the address or telephone number set forth in paragraph II.D of this Disclosure Statement.

**2.**     **Who May Vote.**  Only the holders of impaired Claims who will retain or receive property under the Plan may vote.  A class of claims or equity interests is impaired under a plan unless the plan leaves unaltered the legal, equitable or contractual rights of the holders of such interests.  Holders of impaired Claims or Equity Interests that retain no rights or property on account of their interests are deemed to have rejected the Plan and are not entitled to vote.  Holders of unimpaired Claims or Equity Interests are not entitled to vote and are deemed to have accepted the Plan.

Claims in Class 2.4 (Integrity Bank), 2.10 (Regions Bank), 2.11 (Slavie Federal Savings and Loan), Class 7 (Convenience Claims), and Class 8 (General Unsecured Claims) are impaired under the Plan, and the holders of such Claims are the only parties entitled to vote to accept or reject the Plan.  Administrative Claims are not classified for voting purposes and the holders of

4

such Claims are unimpaired and not entitled to vote. Claims in Class 1 (Post-Petition Secured Lender Claims), Class 2 (Pre-Petition Secured Bank Lenders Claims), Class 3 (Property Tax Authorities), Class 4 (Secured Claims Other than Lenders and Secured Mechanic's Lien Claims), Class 5 (Secured Mechanic's Lien Claims), and Class 6 (Priority Claims) are not impaired and the holders of such Claims are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. Claims in Class 9 (Debtors' Intercompany Claims) and Class 10 (Old Equity Interests) are impaired but will receive no property on account of their respective Claims and Equity Interests under the Plan (with one exception described below which is immaterial), and the holders of such Claims and Equity Interests are deemed to have rejected the Plan.

3. **Eligibility.** If you are the holder of a Claim in Classes 7 or 8, you are included in the creditors entitled to vote to accept or reject the Plan, and a Ballot is enclosed for the purpose of voting. If a holder of a Claim holds more than one Claim in any one class, all Claims of such holder in such class shall be aggregated and deemed to be one Claim for purposes of determining the number and amount of Claims voting on the Plan in such class. To vote on the Plan, you must have (i) timely filed a proof of Claim that is not the subject of a pending objection, (ii) a Claim that is identified on the Debtors' Schedules of Assets and Liabilities that is not listed as disputed, unliquidated or contingent, or (iii) had your claim estimated by the Bankruptcy Court for the sole purpose of voting.

4. **Procedure/Voting Deadlines.** For your vote to count, you must complete, date, sign and properly mail the enclosed Ballot (please note that envelopes have been included with the Ballot) to The Garden City Group, Inc. (the "Balloting Agent") at the following address:

<u>Mailing Address</u>:

The Garden City Group, Inc.
Agent for Gemcraft Homes, Inc.
P.O. Box 9564
Dublin, OH 43017-4864

<u>for FedEx and hand delivery, use</u>:

The Garden City Group, Inc.
Agent for Gemcraft Homes, Inc.
5151 Blazer Parkway, Suite A
Dublin, Ohio 43017

Original ballots must be received by hand delivery, mail or overnight delivery on or before _____ p.m., _____, 2010 (Prevailing Eastern Time). Except as otherwise provided, you may not change your vote once the Balloting Agent receives your Ballot.

Any Ballot that is timely received, that contains sufficient information to permit the identification of the claimant and that is cast as an acceptance or rejection of the Plan will be counted and will be deemed to be cast as an acceptance or rejection, as the case may be, of the Plan.

45674/0002-6330587v6

The following Ballots will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

      (a)     any Ballot received after the Voting Deadline, unless the Plan Proponents have granted an extension of the Voting Deadline with respect to such Ballot;

      (b)     any Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

      (c)     any Ballot cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept or reject the Plan;

      (d)     any Ballot cast for a claim designated as unliquidated, contingent or disputed or as zero or unknown in amount and for which no Rule 3018(a) Motion has been filed by the Rule 3018(a) Motion deadline;

      (e)     any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Plan or that indicates both acceptance and rejection of the Plan;

      (f)     any unsigned Ballot; or

      (g)     any Ballot that is electronically submitted.

**C.**     **Acceptance of the Plan**

As the holder of an Allowed Claim in a voting class, your acceptance of the Plan is very important.  At least one voting class must vote to accept the Plan.  If any voting class votes to accept the Plan, the Debtors will attempt to invoke the "cramdown" provisions of the Bankruptcy Code with respect to the holders of any Claims in a class that votes to reject the Plan.  For a Class to accept the Plan by vote, a majority (i.e., more than fifty percent (50%)) of claimants that vote, who possess at least two thirds of the dollar amounts of the claims of that class for which valid votes are submitted, must vote to accept the Plan.

**D.**     **Additional Information**

Any questions regarding (1) voting procedures, (2) the Solicitation Package, (3) the amount of a Claim, or (4) a request for an additional copy of the Plan, Disclosure Statement or any Exhibits to such documents may be directed to:

The Garden City Group, Inc.
Agent for Gemcraft Homes, Inc.
P.O. Box 9564
Dublin, OH 43017-4864
(Phone) 312-499-6900

6

### III.  GENERAL INFORMATION CONCERNING THE DEBTORS

#### A.  Founding and Background

Gemcraft is a corporation formed under the laws of the State of Maryland with its principal place of business located at 2205A Commerce Road, Forest Hill, Maryland 21050. Gemcraft's primary business consists of developing real property and building single and multi-family homes in Maryland, Pennsylvania, Delaware, Virginia, and West Virginia. Gemcraft's management is led by the company's four owners: William "Bill" R. Luther, Jr. (CEO), Sharon Babcock (President of Sales & Marketing), Brian Fromme (President of Operations ), and Vickie Luther (President of Administration) (collectively, the "Owners").

Established in 1993, Gemcraft experienced record growth and became one of the largest independent homebuilders in the Mid-Atlantic region, #61 in the nation according to the May, 2008 issue of *Builder* magazine. As of the commencement of these bankruptcy Cases, Gemcraft was building residential homes in over 40 communities located in five states and 17 counties at a volume of over 300 homes per year. As a production builder, Gemcraft targets first-time homebuyers and first-time "move up" buyers, as well as soon-to-retire buyers for its retirement communities. Gemcraft was named the Maryland builder of the year by the Maryland Homebuilders' Association in 2001. In 2007, Gemcraft was the recipient of three Parade of Homes awards for Best Home and Best Bath & Kitchen, and two Pyramid awards for Best Single Family and Best Multi-Family Home. Gemcraft followed that success in 2008 by winning four more Parade of Homes awards.

The Gemcraft divisional centers are responsible for selling, building and servicing the homes and are located in Forest Hill and Hagerstown, Maryland; and Magnolia, Delaware. Additionally, the Owners control a land development company – DLM (described below) -- which develops finished lots for Gemcraft, as well as for other builders. Approximately 80% of Gemcraft's lots have come from DLM or affiliated land companies, which have been responsible for all aspects of land development, including but not limited to acquiring the land, securing the necessary approvals for the project, and overseeing onsite construction to finalize the development process. In addition, Gemcraft is involved in certain joint ventures, which are profitable service companies, such as a mortgage company, title company, and commercial real estate holdings.

Gemcraft has come a long way from its small beginnings in 1993 when it delivered just one home in its first year of operation with only $8,000 in start-up capital. From 1993 through December 31, 2009, Gemcraft had 6,603 sales, 6470 settlements and total revenue of $1,719,102,351. Gemcraft believes its success is attributable to offering customers affordable, personalized homes in desired areas, combined with impeccable after-sale customer service, and ownership's dedication to hands-on, systematic, day-to-day operations.

#### B.  Debtors' Business Structure

The Debtors are organized into four interrelated components. The management company (GHG), the homebuilding company (GHI), the land development companies (DLM, GHFH,

Harkins Property, and S&M) and the project entities (Chesapeake, and Preserve), which operate as follows:

GHG:  The management company for all Gemcraft companies.  All of the Debtors' employees are employed by an unrelated third party (Alpha Staff, Inc.), which contracts with GHG (except in West Virginia).  All companies pay GHG a management fee.  GHG maintains the systems which support the homebuilding and land development operations.

GHI:  The homebuilding company responsible for selling and building homes.  The company contracts with most homebuyers, the exception being contracts written with condominium townhouse limited liability companies.  All subcontractors and suppliers involved in constructing the homes (vertical construction) contract with GHI.  The company also contracts with third party developers to purchase finished lots for the construction of homes.  The company maintains the Debtors' bank accounts, cash management system and deposit escrow accounts.  GHI is funded primarily through borrowing base loans with M&T Bank and Regions Bank.

DLM, GHFH,  Harkins, and S&M:  Organized in 2000 as Forest Hill Land Development, LLC, DLM grew from managing one development job to controlling over 20,000 lots at its peak.  Operating through entities that include GHFH, Harkins, and S&M, DLM grew to be one of the largest residential developers on the East Coast.  The company focuses on raw ground in growth areas that it can take through the entire development process.  The marketing and finance departments of DLM analyze all potential properties to determine the long term marketability and profitability of the site.  The project management team manages all aspects of the entitlement process, including engineering, public hearings and financing.  The field supervision team produces finished lots ready for the homebuilder to sell, build and deliver to new homebuyers.  DLM sells lots to Gemcraft, Lennar, Ryan, K-Hovnanian and other national and local builders.  DLM, GHFH and Harkins maintain bank accounts that are often funded by other Debtor companies.  The cash management system for the land development companies is completely reliant on the homebuilding side of Gemcraft to pay its bills.

Chesapeake:  The owner of lots and construction at Eagle Point in Rehoboth, Delaware

Preserve:   The owner of lots and construction at Jefferson Creek in Bethany Beach, Delaware.

Gemcraft's business in the "North Division" (geographic area consisting of southern Pennsylvania, central and eastern Maryland and Northern Delaware) is conducted out of the Forest Hill corporate headquarters.  Gemcraft's business in the "South Division" (geographic area consisting of southern Delaware and southern Maryland) is conducted out of a temporary office in one of the community sales models.  Gemcraft's business in the "Western Division" (geographic area consisting of south central Pennsylvania, western Maryland, and eastern West Virginia) is conducted out of the Hagerstown Maryland office. Gemcraft's business in the "Tidewater Division" (geographic area consisting of the Richmond Virginia metro area) is conducted out of the Forest Hill corporate headquarters.  DLM's business is conducted out of the corporate headquarters in Forest Hill, Maryland.

8

**C.**     **Prepetition Capital Structure**

The Debtors' growth has been very dependent on loans from banks to finance the acquisition of land as well as the construction of homes.  In 2005, the Debtors relied on approximately 27 different lenders, including Regions Bank, Manufacturers & Traders Trust Company ("M&T Bank"),  PNC Bank, BB&T Bank, Wachovia Bank, and The Columbia Bank (collectively, with all of the Debtors' other lenders, the "Lenders"), and they had the ability to borrow up to $400 million in the aggregate.  The overwhelming majority of the Debtors' loans were guaranteed by the Owners of Gemcraft.

As of November 1, 2009, Gemcraft and other Debtors (except for DLM) owed their Lenders a total of approximately $99,000,000 under the various loan agreements, DLM owed its Lenders a total of approximately $32,000,000, and other affiliated non-Debtors owed approximately $32,000,000.

**D.**     **Events Leading to Bankruptcy**

As is now well documented, after the U.S. housing market peaked in 2005, the market collapsed towards the end of 2006.  Home foreclosures skyrocketed in 2006-2007, further contributing to the crisis in the subprime, mortgage, and credit markets.  The downturn worsened in 2008.

Homebuilders all over the country suffered major losses.  A number of them filed for relief in bankruptcy, and many others ceased operating and closed their doors.  According to the National Association of Homebuilders (the "NAH"), single-family home starts fell in October 2008 to a level that was down by 71% from its peak in January 2006.  The NAH also reported that sales of new homes continued to trend downward falling by 40% on a year-over-year basis. New-home sales were down by 69% in 2008 from their cyclical peak in July 2005.  On December 30, 2008, the Case-Shiller home price index reported its largest price drop in its history.

The Debtors were not immune to these adverse market forces.  Beginning in 2006, as home values declined, interest rates rose, and defaults on home loans increased dramatically, Gemcraft's annual home sales decreased from 770 in 2006, to 501 in 2008.  Gemcraft's gross profits on home sales decreased concurrently from the high 20% range to the single digits.  The value of DLM's land holdings plummeted, in the Debtors' estimate, by hundreds of millions of dollars. With decreasing sales and profitability, Gemcraft's ability to meet its obligations to its subcontractors suffered, and its Lenders continued to demand interest and paydowns on outstanding loans.

To address their liquidity crisis, the Debtors reduced their staff from over 400 employees to approximately 80 as of the Petition Date, closed 6 of their 7 offices, cut salaries and benefits, and reduced overhead and direct costs.  The Debtors also retained outside financial advisors to assist in reviewing the situation, to provide financial advice, assist in implementing recommended changes, and to help to obtain financing to address immediate liquidity needs.

The Debtors reduced sales, projected to be 350 this year, coupled with the decreased value of land holdings, rendered the Debtors unable to service their debts to their Lenders and to remain profitable companies under their current financial structure.  In these circumstances, the Debtors had no choice but to seek relief under chapter 11 of the United States Bankruptcy Code to restructure their business and financial affairs and to reduce their overall indebtedness to ensure their ability to continue as going concerns.

## IV.    THE BANKRUPTCY CASES

### A.    The Chapter 11 Cases

**1.    The Bankruptcy Filing.**  On November 9, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court.  On November 10, 2009, the Bankruptcy Court notified the parties in interest that the meeting of creditors would take place on December 16, 2009, that the last day to file proofs of claim (for all creditors, except governmental units) was March 16, 2010 (the "Bar Date"), and that the last day to file proofs of claim for governmental units is May 10, 2010.

**2.    Continuation of the Business**.  After the Petition Date, the Debtors continued to operate their businesses as debtors in possession under the Bankruptcy Code.  Pursuant to the Bankruptcy Code, the Debtors are required to comply with certain statutory reporting requirements, including the filing of monthly operating reports.

**3.    Professionals Retained in the Chapter 11 Cases.**

(a)    **Debtors' Professionals**

The Debtors retained certain attorneys and advisors to assist them in their reorganization under Chapter 11.  In connection with the commencement of the Chapter 11 Case, the Debtors sought and obtained Bankruptcy Court approval for the retention of Cole, Schotz, Meisel, Forman & Leonard, P.A. as their bankruptcy counsel.  The Debtors also retained (i) FTI Consulting, Inc. to provide financial advisory services; and (ii) Kramon & Graham, P.A. as their Special Counsel for business, real estate and certain litigation matters.

(b)    **The Appointment of the Official Committee of Unsecured Creditors**

On November 17, 2009, the United States Trustee for the District of Maryland (the "U.S. Trustee") appointed the Committee, pursuant to section 1102(a) of the Bankruptcy Code.  The Committee is composed of the following members (i) 84 Lumber; (ii) L&L Carpet Discounters, Inc. d/b/a The L&L Company; (iii) D&S Drywall, Inc.; (iv) Bollinger Construction, Inc.; (v) L&E Bustamente Concrete Co., Inc.; (vi) Hall Mechanical Associates, Inc.; and (vii) Reico.  The Committee retained Tydings & Rosenberg LLP as counsel, and Invotex Group as its financial advisor.

45674/0002-6330587v6

(c)     **The Appointment of the Noticing, Claims and Balloting Agent**

By Order entered November 13, 2009, the Court appointed The Garden City Group ("GCG") to serve as the noticing, claims and Balloting Agent (or "Claims Agent", as the context requires ) for the Debtors.

**4.    Significant Events During the Chapter 11 Case.**

At the outset of this Case, the Debtors sought and received authority with respect to various matters designed to assist in the administration of the Chapter 11 Case and to maximize the value of the Debtors' estates.  Material events since the commencement of the Chapter 11 Cases include:

(a)     **Debtor-in-Possession Financing**

**a.     Gemcraft Capital, LLC DIP Loan**

On the Petition Date, the Debtors filed a motion for Court approval of a debtor in possession credit agreement with Gemcraft Capital, LLC (the "GC DIP Loan Agreement").  The Court approved the GC DIP Loan Agreement pursuant to Final Order entered on December 15, 2009 (the "Final GC DIP Order").  Under the terms of the GC DIP Loan Agreement, the Debtors obtained an unsecured credit facility up to a maximum amount of  $5,000,000.   The proceeds obtained from the GC DIP Loan Agreement were used to fund ordinary business expenses and are also available to pay the expenses incurred by the Debtors in connection with the Chapter 11 Case, including professional fees and expenses of the Debtors and the Committee.

**b.     Regions Bank DIP Loan**

On November 9, 2009, the Debtors filed a motion for Court approval of a debtor in possession credit agreement with Regions Bank (the "Regions DIP Loan Agreement").  The Court approved the Regions DIP Loan Agreement pursuant to Final Order entered on December 15, 2009 (the "Final Regions DIP Order").  Under the terms of the Regions DIP Loan Agreement, the Debtors obtained a credit facility with a maximum amount of $25,000,000.

The proceeds obtained from the Regions DIP Loan Agreement were used to fund: (a) the orderly operation of the Debtors' homebuilding businesses, (b) the management and preservation of the Debtors' assets within developments financed by Regions Bank, and (c) the maintenance of the Debtors' business relationships with customers, subcontractors, vendors and contract parties relating to the developments financed by Regions Bank.  As security for the repayment of the money loaned under the Regions DIP Loan Agreement, Regions Bank obtained first-priority security interests on all of the Debtors' properties on which Regions had prepetition liens, subject only to a carve-out for the payment of professional and U.S. Trustee fees (the "Carve-Out") and other priority liens (as that term is defined in the Regions DIP Loan Agreement), including liens on certain properties that was unencumbered as of the Petition Date, which also serve as collateral for the M&T DIP Loan discussed below.

11

### c.    M&T DIP Loan

On November 19, 2009, the Debtors filed a motion for Court approval of a debtor in possession credit agreement with M&T Bank (as amended, the "M&T DIP Loan Agreement"). The Court approved the M&T DIP Loan Agreement pursuant to Final Order entered on December 15, 2009 (the "M&T DIP Order").  Under the terms of the M&T DIP Loan Agreement, the Debtors obtained a credit facility with a maximum amount of $7,000,000.

The proceeds obtained from the M&T DIP Loan Agreement were used to fund: (a) the orderly operation of the Debtors' homebuilding businesses, (b) the management and preservation of the Debtors' assets within developments financed by M&T, and (c) the maintenance of the Debtors' business relationships with customers, subcontractors, vendors and contract parties relating to the developments financed by M&T.  As security for the repayment of the money loaned under the M&T DIP Loan Agreement, M&T Bank obtained first-priority security interests on all of the Debtors' properties on which M&T had prepetition liens, and other priority liens (as that term is defined in the M&T DIP Loan Agreement), including liens on certain properties unencumbered as of the Petition Date, which also serve as collateral for the Regions DIP Loan.

Together, these three facilities have provided the funding necessary for the Debtors to pursue a successful reorganization.

### (b)    Operational and Customer Issues

The Debtors filed numerous motions in the early weeks of these chapter 11 Cases, seeking authorization and approval of:  (i) payment of prepetition taxes and related obligations; (ii) payment of prepetition wages, salaries, benefits and related obligations; (iii) continuation of the Debtors' existing cash management systems; (iv) utility deposit procedures and provisions for adequate assurance of future payment with respect to dozens of utility providers; (v) the Debtors' ability to honor prepetition contracts for the sale of homes and to enter into contracts for the sale of homes postpetition; (vi) the Debtors' ability to continue to honor existing home warranties; and (vii) the Debtors' ability to purchase and sell lots.  Final orders were timely entered on all of these motions.

### (c)    Extension of the Exclusive Right to File and Confirm a Plan

Pursuant to Bankruptcy Code section 1121, the Debtors are afforded initial periods of 120 days and 180 days from the Petition Date during which they have exclusive rights, respectively, to file and to solicit acceptances of a plan or plans of reorganization (collectively, the "Exclusive Periods").  By motion filed with the Bankruptcy Court on or about February 9, 2010, the Debtors requested a relatively short extension of the Exclusive Periods to May 8, 2010 and July 7, 2010 respectively.  On March 4, 2010 the Bankruptcy Court granted the motion and entered an Order extending the Exclusive Periods [Docket No. 417].

45674/0002-6330587v6

(d)    **Mechanic's Lien Holders**

Both prior and subsequent to the Petition Date, a number of the Debtors' subcontractors filed Mechanics' Liens against the properties for which they supplied work and/or materials, and against the homeowners in some cases.  After extensive negotiations between the Debtors, M&T Bank, Regions Bank, and certain Mechanics' Lien holders, related to the "first-day" motions filed by the Debtors, the Final Regions DIP Order and Final M&T DIP Order incorporated provisions which permitted Mechanics' Lien holders to challenge the extent, validity and priority of Regions Bank's and M&T Bank's first priority liens on their prepetition collateral.  The Final Regions DIP Order and Final M&T DIP Order required that any challenge be filed by February 16, 2010, the sixtieth (60th) day from entry of the Final Regions DIP Order, or February 28, 2010, the seventy-fifth (75th) day from entry of the Final M&T DIP Order, and that the failure to make a timely challenge to the Lenders' liens would forever bar the creditor from making such a challenge in the future.  Four Mechanics' Lien holders filed adversary proceedings to challenge Regions Bank and/or M&T Bank's liens (Hall Mechanical & Associates, Inc. (Adv. No. 10-00085), Benfield Electric Company, Inc. (Adv. No. 10-00100), Environmental Materials, LLC (Adv. No. 10-00120), and American Residential Services, LLC (Adv. No. 10-00121)).  One mechanic's lien creditor, 84 Lumber, has been granted an extension of time to file such a challenge, as 84 Lumber and the Debtors have engaged in extensive negotiations to reach an agreement to resolve 84 Lumber's mechanic's lien claims.

For Lenders other than Regions Bank and M&T Bank, there has not been any determination as to whether any Mechanic's Lien claimant is subordinate to or senior to the liens held by the Lenders for loans provided for the development of the properties involved.  For many of the Mechanics' Lien Claims in the case, the Debtors dispute the alleged perfection of the Liens under applicable state and/or local law.  But even if properly perfected, the Debtors believe that the Lenders' Liens, with some limited exceptions, are senior in priority to the Mechanics' Liens, and after deducting the senior Liens of the Lenders from the current market value of the Debtors' properties, there is no equity in the properties to secure the Mechanics' Lien claims.  Accordingly, the Debtors believe the Mechanics' Liens generally will be subject to avoidance under the Bankruptcy Code.  In any event, as discussed below, Mechanics' Lien claimants who timely filed challenges to the seniority of the Regions and/or M&T Bank Liens will have the opportunity to attempt to establish the validity, priority and extent of their Liens with respect to the Regions and M&T Bank collateral, all Mechanics' Liens claimants will have the same opportunity with respect to properties of the Debtors that are not subject to the liens of Regions or M&T Bank and are subject to Liens held by other Lenders.  To the extent that any such Mechanics' Lien Claims are determined to be Secured Mechanics' Lien Claims, such claims will be paid in full under the Plan.

**V.        THE PLAN PROPONENTS' PLAN OF REORGANIZATION**

**A.    Classes of Claims and Equity Interests**

All Claims and Equity Interests, except Administrative Claims and Priority Tax Claims, are placed in the following Classes.  In accordance with section 1123(a)(1) of the Bankruptcy

13

Code, Administrative Claims and Priority Tax Claims, as described in Section III(A) of the Plan, have not been classified and thus are excluded from the following Classes.  A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such other Classes.

The Plan constitutes a separate plan of reorganization for each of the Debtors and does not seek substantive consolidation of the Debtors' Estates.  Each such separate plan shall have an identical set of classifications for Claims against and Equity Interests in the applicable Debtor, and the Plan treatment of similarly classified claims shall be the same for each of the Debtors.  If there is no Allowed Claim in any particular Class for a particular Debtor, then that Class shall be deemed to be eliminated.  Accordingly, the Debtors propose to classify Claims in the Estates as follows:

**Class 1 (Post-Petition Date Secured Lenders)**.  Lenders that made DIP Loans to the Debtors after the Petition Date, as follows:

**Class 1.1**        The Claims of Regions Bank with respect to loans made to the Debtors after the Petition Date.

**Class 1.2**        The Claims of M&T Bank with respect to loans made to the Debtors after the Petition Date.

**Class 1.3**        The Claims of Gemcraft Capital, LLC with respect to loans made to the Debtors after the Petition Date.

**Class 1.4**        The Claims of one or more Lenders, other than those identified in Classes 1.1, 1.2, and 1.3, with respect to any loans made by any such other Lenders to the Debtors after the Petition Date.

**Class 2 (Pre-Petition Date Secured Lenders)**.  The Secured Claims of Lenders on account of loans made to one or more of the Debtors prior to the Petition Date, that are secured by Liens on Real Property owned by a Debtor, as follows:

**Class 2.1  (The Columbia Bank)**.  The Claims of Columbia Bank to the extent secured by a Lien on Property owned by a Debtor.

**Class 2.2 (Fifth Third Bank)**.  The Claims of Fifth Third Bank to the extent secured by a Lien on Property owned by a Debtor.

**Class 2.3 (First Horizon Bank)**.The Claims of First Horizon Bank to the extent secured by a Lien on Property owned by a Debtor.

**Class 2.4 (Integrity Bank)**.  The Claims of Integrity Bank to the extent secured by a Lien on Property owned by a Debtor.

**Class 2.5 (M&T Bank).**  The Claims of M&T Bank, excluding M&T Bank's Class 1 Claims, to the extent secured by a Lien on Property owned by a Debtor.

**Class 2.6 (Orrstown Bank).**  The Claims of Orrstown Bank to the extent secured by a Lien on Property owned by a Debtor.

**Class 2.7 (Patapsco Bank).**The Claims of Patapsco Bank to the extent secured by a Lien on Property owned by a Debtor.

**Class 2.8 (Peoples Bank).**  The Claims of Peoples Bank to the extent secured by a Lien on Property owned by a Debtor.

**Class 2.9 (PNC).**  The Claims of PNC to the extent secured by a Lien on Property owned by a Debtor.

**Class 2.10 (Regions Bank).**  The Claims of Regions Bank, excluding Regions Bank's Class 1 Claims, to the extent secured by a Lien on Property owned by a Debtor.

**Class 2.11 (Slavie Federal Savings Bank).**The Claims of Slavie Federal Savings Bank to the extent secured by a Lien on Property owned by a Debtor.

**Class 2.12 (Stonebridge Bank).**  The Claims of Stonebridge Bank to the extent secured by a Lien on Property owned by a Debtor.

**Class 2.13 (Wachovia Bank, N.A.).**  The Claims of Wachovia Bank, N.A. to the extent secured by a Lien on Property owned by a Debtor.

**Class 3 (Property Tax Authorities).**  The Claims of Property Tax Authorities, including such claims that qualify as priority claims pursuant to section 507(a)(8) of the Bankruptcy Code.

**Class 4 (Secured Claims Other Than Lenders and Secured Mechanic's Lien Claims).**  The Claims of Creditors other than Lenders, Class 3 and Class 5 Claims to the extent secured by a Lien on Property owned by a Debtor.

**Class 5 (Secured Mechanic's Lien Claims).**  The Claims of Creditors holding Mechanic's Lien Claims to the extent determined by a Final Order of the Bankruptcy Court to be Secured Claims within the meaning of section 506(a) of the Bankruptcy Code.

**Class 6 (Priority Claims).**  Unsecured Claims against the Debtor that are entitled to priority under section 507(a) of the Bankruptcy Code, other than Administrative Claims and Claims of Property Tax Authorities.

**Class 7 (Convenience Claims)**.  General Unsecured Claims that qualify as Convenience Claims.

45674/0002-6330587v6

**Class 8 (General Unsecured Claims).**  General Unsecured Claims, excluding Convenience Claims, and including Mechanic's Lien Claims that do not qualify as Allowed Class 5 Claims.

**Class 9 (Intercompany Claims).**  Claims by and between any Debtor against one or more of the other Debtors.

**Class 10 (Equity Interests).**  Equity Interests of the Debtors.

**B.**     **Treatment of Claims and Equity Interests**

   **1.**     **Unclassified Claims**

      (a)     **Administrative Claims**

      **a.**     **Payment of Administrative Claims**

Except as specified in this Section III(A)(1) of the Plan, and subject to the Bar Date provisions herein, unless otherwise agreed by the holder of an Administrative Claim and the Debtors or unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim either (i) as soon as reasonably practicable after the Effective Date or (ii) if the Administrative Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Administrative Claim becomes an Allowed Administrative Claim.

      **b.**     **U.S. Trustee Fees**

On and after the Effective Date, Administrative Claims for U.S. Trustee Fees shall be paid in Cash equal to the amount of such Administrative Claims until the closing of the Bankruptcy Case pursuant to section 350(a) of the Bankruptcy Code.

      **c.**     **Ordinary Course Liabilities**

Allowed Administrative Claims based on liabilities incurred by the Debtors in the ordinary course of their businesses after the Effective Date shall be paid by the Debtors pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without further action by the holders of such Administrative Claims or further approval by the Bankruptcy Court.

      **d.**     **Bar Dates for Administrative Claims**

         i.     **General Bar Date Provisions**

Except as otherwise provided in Section III.A(1)(d)(ii) of the Plan, the Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims arising after the Effective Date must be Filed and served pursuant to the

16

procedures specified in the Confirmation Order and the notice of occurrence of the Effective Date, no later than thirty (30) days after the Effective Date.  Holders of such Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Claims against the Debtors or their respective property, and such Administrative Claims shall be deemed discharged as of the Effective Date.  Any party in interest may object to any Administrative Claim.  Any objections to the allowance of Administrative Claims must be Filed and served on the requesting party no later than (i) thirty (30) days after the Administrative Claim is filed (the "Administrative Claim Objection Deadline").  The Administrative Claim Objection Deadline may be further extended by an order of the Bankruptcy Court.  If no objection to the applicable Administrative Claim is filed on or before the Administrative Claim Objection Deadline for such Administrative Claim, such Administrative Claim shall be deemed Allowed as of that date.

### ii.    Bar Dates for Certain Administrative Claims

#### 1.    Professional Fee Claims

Professionals or other entities asserting a Professional Fee Claim for services rendered before the Effective Date must, unless previously Filed, File and serve on the Plan Notice Parties and such other entities who requested notice pursuant to Bankruptcy Rule 2002, an application for final allowance of such Professional Fee Claim no later than thirty (30) days after the Effective Date; provided, however, that any Professional who receives compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order).  Any party in interest may object to a Professional Fee Claim.  Any objections to the allowance of a Professional Fee Claim must be Filed and served on the requesting party no later than thirty (30) days after such Professional Fee Claim is Filed.

#### 2.    Ordinary Course Liabilities

Except as otherwise provided in the Confirmation Order, holders of Administrative Claims arising from liabilities incurred by the Debtor in the ordinary course of its business after the Effective Date, including U.S. Trustee Fees, shall not be required to File or serve any request for payment of such Administrative Claims.  Such Administrative Claims shall be satisfied pursuant to Section III(A)(1)(c).

### C.    Classified Claims and Equity Interests

#### 1.    Class 1 Claims (Post-Petition Date Secured Lenders)

##### 1.1    Class 1.1 (Regions Bank DIP Loan):  Except to the extent that Regions Bank has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, the Class 1.1 Claim, on account of the Regions Bank DIP Loan, shall be Allowed and

17

paid in full in accordance with the terms of the Regions Bank DIP Loan Agreement, as it may be amended; provided, however, that the maturity date of the Regions Bank DIP Loan shall be extended through the 90th day after the Effective Date.  As security for the Debtors' obligations to Regions Bank for the Regions Bank DIP Loan, Regions Bank shall retain all of its rights and remedies under the Regions Bank DIP Loan Agreement, including a first priority senior Lien on the Regions Bank Collateral (as defined in the Regions Bank DIP Loan Agreement).  Because the Plan leaves unaltered Regions Bank's rights under the Regions Bank DIP Loan Agreement, Class 1.1 is unimpaired within the meaning of section 1124 of the Bankruptcy Code and Regions Bank, as holder of a Class 1.1 Claim, shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

  **1.2  Class 1.2 (M&T Bank DIP Loan):**  Except to the extent that M&T Bank has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, the Class 1.2 Claim, on account of the M&T Bank DIP Loan, shall be Allowed and paid in full in accordance with the terms of the M&T Bank DIP Loan Agreement, as it may be amended; provided, however, that the maturity date of the M&T Bank DIP Loan shall be extended through the 90th day after the Effective Date.  As security for the Debtors' obligations to M&T Bank for the DIP Loan, M&T Bank shall retain all of its rights and remedies under the M&T Bank DIP Loan Agreement, including a first priority senior Lien on the M&T Bank Collateral (as defined in the M&T Bank DIP Loan Agreement).  Because the Plan leaves unaltered M&T Bank's rights under the M&T Bank DIP Loan Agreement, Class 1.1 is unimpaired within the meaning of section 1124 of the Bankruptcy Code, and M&T Bank, as holder of a Class 1.2 Claim, shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

  **1.3  Class 1.3 (Gemcraft Capital, LLC DIP Loan):**  Except to the extent that Gemcraft Capital, LLC has been paid by the Debtors prior to the Effective Date or agrees to a less favorable treatment, the Class 1.3 Claim shall be Allowed and paid in full as follows:

   (a)  On the Effective Date and subject to and conditioned upon the issuance of 100 % of the New Equity of each of the Debtors to Gemcraft Capital, LLC as set forth in section IV(C) of the Plan, at the election of Gemcraft Capital, LLC in its sole discretion, a portion of the Class 1.3 Allowed Claim may be deemed to be repaid and reduced in an amount up to the New Equity Purchase Price.

   (b)  The unpaid balance of the Class 1.3 Claim, after deduction of any portion applied on account of the New Equity Purchase Price, if applicable, shall be repaid in full, over time, pursuant to the terms and conditions of the Gemcraft Capital, LLC amended note, which shall be included in the Plan Supplement.

   (c)  Class 1.3 is impaired within the meaning of section 1124 of the Bankruptcy Code, and Gemcraft Capital, LLC, as holder of a Class 1.3 Claim, shall be deemed to be impaired within the meaning of section 1124 of the Bankruptcy Code, and shall be entitled to vote to accept or reject the Plan pursuant to section 1126(a) of the Bankruptcy Code.

  **1.4  Class 1.4 (Other Lenders' DIP Loans):**  Except to the extent that any other Lender that made a DIP Loan has been paid by the Debtors prior to the Effective Date or

agrees to a less favorable treatment, each such other Lender, on account of the Lender's DIP Loan, shall be Allowed and paid in full in accordance with the terms of the Lender's DIP loan agreement, as it may be amended.  As security for the Debtors' obligations to each such Lender each such DIP Loan, each such Lender shall retain all of its rights and remedies under the Lender's DIP Loan agreement, including a first priority senior Lien on the Lender's Collateral. Because the Plan leaves unaltered such Lender's rights under the Lender's DIP Loan agreement, Class 1.4 is unimpaired within the meaning of section 1124 of the Bankruptcy Code, and each such Lender, as holder of a Class 1.4 Claim, shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

**2.      Class 2 (Pre-Petition Secured Bank Lenders):**

**2.1 (The Columbia Bank).**  The Secured Claims of The Columbia Bank shall be treated as follows:

(a)      In the event that the Debtors and The Columbia Bank enter into a written agreement mutually acceptable to The Columbia Bank and the Debtors, such agreement shall be incorporated into the Plan as part of the Plan Supplement, and The Columbia Bank's Secured Claims shall be treated as set forth in that Agreement.

(b)      In the absence of a mutually acceptable agreement between The Columbia Bank and the Debtors, the Debtors shall surrender to The Columbia Bank possession and control of the Collateral subject to The Columbia Bank's duly perfected Liens, which shall continue to be subject to any other Liens held by any other parties on such Collateral (in the order of priority to which such other Liens are entitled under applicable non-bankruptcy law).  In addition, The Columbia Bank shall retain its Liens on such Collateral and shall be entitled to enforce its non-bankruptcy rights and remedies as a holder of such Liens under applicable non-bankruptcy law, and the automatic stay of section 362(a) of the Bankruptcy Code shall no longer apply to such Collateral as of the Confirmation Date.  To the extent that The Columbia Bank's Claims are not Secured Claims, they shall be treated as Class 8 Claims.

(c)      In either case, the Secured Claims of The Columbia Bank shall be deemed unimpaired within the meaning of section 1124 of the Bankruptcy Code, and Columbia Bank, as holder of a Class 2.1 Claim, shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

**2.2 (Fifth Third Bank).**  The Secured Claims of Fifth Third Bank shall be

treated as follows:

(a)      In the event that the Debtors and Fifth Third Bank enter into a written agreement mutually acceptable to Fifth Third Bank and the Debtors, such agreement shall be incorporated into the Plan as part of the Plan Supplement, and Fifth Third Bank's Secured Claims shall be treated as set forth in that Agreement.

(b)     In the absence of a mutually acceptable agreement between Fifth Third Bank and the Debtors, the Debtors shall surrender to Fifth Third Bank possession and control of the Collateral subject to Fifth Third Bank's duly perfected Liens, which shall continue to be subject to any other Liens held by any other parties on such Collateral (in the order of priority to which such other Liens are entitled under applicable non-bankruptcy law).  In addition, Fifth Third Bank shall retain its Liens on such Collateral and shall be entitled to enforce its non-bankruptcy rights and remedies against its Collateral as a holder of such Liens under applicable non-bankruptcy law, and the automatic stay of section 362(a) of the Bankruptcy Code shall no longer apply to such Collateral as of the Confirmation Date.  To the extent that Fifth Third Bank's Claims are not Secured Claims, they shall be treated as Class 8 Claims.

(c)     In either case, the Secured Claims of Fifth Third Bank shall be deemed unimpaired within the meaning of section 1124 of the Bankruptcy Code, and as holder of a Class 2.2 Claim, shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

**2.3     (First Horizon Bank).**  The Secured Claims of First Horizon Bank shall be treated as follows:

(a)     In the event that the Debtors and First Horizon Bank enter into a written agreement mutually acceptable to First Horizon Bank and the Debtors, such agreement shall be incorporated into the Plan as part of the Plan Supplement, and First Horizon Bank's Secured Claims shall be treated as set forth in that Agreement.

(b)     In the absence of a mutually acceptable agreement between First Horizon Bank and the Debtors, the Debtors shall surrender to First Horizon Bank possession and control of the Collateral subject to First Horizon Bank's duly perfected Liens, which shall continue to be subject to any other Liens held by any other parties on such Collateral (in the order of priority to which such other Liens are entitled under applicable non-bankruptcy law).  In addition, First Horizon shall retain its Liens on such Collateral and shall be entitled to enforce its non-bankruptcy rights and remedies against its Collateral as a holder of such Liens under applicable non-bankruptcy law, and the automatic stay of section 362(a) of the Bankruptcy Code shall no longer apply to such Collateral as of the Confirmation Date.  To the extent that Horizon Bank's Claims are not Secured Claims, they shall be treated as Class 8 Claims.

(c)     In either case, the Secured Claims of First Horizon Bank shall be deemed unimpaired within the meaning of section 1124 of the Bankruptcy Code, and as holder of a Class 2.3 Claim, First Horizon Bank shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

**2.4     (Integrity Bank).**  The Secured Claims of Integrity Bank shall be treated as follows:

(a)     The  Debtors and Integrity Bank have entered into a written Agreement dated March 12, 2010, which the Court approved by an Order entered on April 7, 2010 [Docket

No. 507].  That agreement is hereby incorporated into the Plan as if fully set forth herein, and Integrity Bank's Secured Claims shall be treated as set forth in that Agreement.

(b)  The Secured Claims of Integrity Bank shall be deemed to be impaired within the meaning of section 1124 of the Bankruptcy Code, and Integrity Bank shall be entitled to vote to accept or reject the Plan pursuant to section 1126(a) of the Bankruptcy Code.

2.5  **(M&T Bank).**  The Secured Claims of M&T Bank, excluding M&T Bank's Class 1.2 Claims, shall be treated as follows:

(a)  In the event that the Debtors and M&T Bank enter into a written agreement mutually acceptable to M&T Bank and the Debtors, such agreement shall be incorporated into the Plan as part of the Plan Supplement, and M&T Bank's Secured Claims shall be treated as set forth in that Agreement.

(b)  In the absence of a mutually acceptable agreement between M&T Bank and the Debtors, the Debtors shall surrender to M&T Bank possession and control of the Collateral subject to M&T Bank's duly perfected Liens, which shall continue to be subject to any other Liens held by any other parties on such Collateral (in the order of priority to which such other Liens are entitled under applicable non-bankruptcy law).  In addition, M&T Bank shall retain its Liens on such Collateral and shall be entitled to enforce its non-bankruptcy rights and remedies against its Collateral as a holder of such Liens under applicable non-bankruptcy law, and the automatic stay of section 362(a) of the Bankruptcy Code shall no longer apply to such Collateral as of the Confirmation Date.  To the extent that M&T Bank's Claims are not Secured Claims, they shall be treated as Class 8 Claims.

(c)  In either case, the Secured Claims of M&T Bank shall be deemed unimpaired within the meaning of section 1124 of the Bankruptcy Code, and as holder of a Class 2.5 Claim, M&T Bank shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.6  **(Orrstown Bank).**  The Secured Claims of Orrstown Bank shall be treated as follows:

(a)  In the event that the Debtors and Orrstown Bank enter into a written agreement mutually acceptable to Orrstown Bank and the Debtors, such agreement shall be incorporated into the Plan as part of the Plan Supplement, and Orrstown Bank's Secured Claims shall be treated as set forth in that Agreement.

(b)  In the absence of a mutually acceptable agreement between Orrstown Bank and the Debtors, the Debtors shall surrender to Orrstown Bank possession and control of the Collateral subject to Orrstown Bank's duly perfected Liens, which shall continue to be subject to any other Liens held by any other parties on such Collateral (in the order of priority to which such other Liens are entitled under applicable non-bankruptcy law).  In addition, Orrstown Bank shall retain its Liens on such Collateral and shall be entitled to enforce its non-bankruptcy rights and remedies against its Collateral as a holder of such Liens under applicable non-bankruptcy law, and the automatic stay of section 362(a) of the Bankruptcy Code shall no longer

21

apply to such Collateral as of the Confirmation Date. To the extent that Orrstown Bank's Claims are not Secured Claims, they shall be treated as Class 8 Claims.

(c)     In either case, the Secured Claims of Orrstown Bank shall be deemed unimpaired within the meaning of section 1124 of the Bankruptcy Code, and as holder of a Class 2.6 Claim, Orrstown Bank shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.7     **(Patapsco Bank).** The Secured Claims of Patapsco Bank shall be treated as follows:

(a)     In the event that the Debtors and Patapsco Bank enter into a written agreement mutually acceptable to Patapsco Bank and the Debtors, such agreement shall be incorporated into the Plan as part of the Plan Supplement, and Patapsco Bank's Secured Claims shall be treated as set forth in that Agreement.

(b)     In the absence of a mutually acceptable agreement between Patapsco Bank and the Debtors, the Debtors shall surrender to Patapsco Bank possession and control of the Collateral subject to Patapsco Bank's duly perfected Liens, which shall continue to be subject to any other Liens held by any other parties on such Collateral (in the order of priority to which such other Liens are entitled under applicable non-bankruptcy law). In addition, Patapsco Bank shall retain its Liens on such Collateral and shall be entitled to enforce its non-bankruptcy rights and remedies against its Collateral as a holder of such Liens under applicable non-bankruptcy law, and the automatic stay of section 362(a) of the Bankruptcy Code shall no longer apply to such Collateral as of the Confirmation Date. To the extent that Patapsco Bank's Claims are not Secured Claims, they shall be treated as Class 8 Claims.

(c)     In either case, the Secured Claims of Patapsco Bank shall be deemed unimpaired within the meaning of section 1124 of the Bankruptcy Code, and as holder of a Class 2.7 Claim, Patapsco Bank shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.8     **(Peoples Bank).** The Secured Claims of Peoples Bank shall be treated as follows:

(a)     In the event that the Debtors and Peoples Bank enter into a written agreement mutually acceptable to Peoples Bank and the Debtors, such agreement shall be incorporated into the Plan as part of the Plan Supplement, and Peoples Bank's Secured Claims shall be treated as set forth in that Agreement.

(b)     In the absence of a mutually acceptable agreement between Peoples Bank and the Debtors, the Debtors shall surrender to Peoples Bank possession and control of the Collateral subject to Peoples Bank's duly perfected Liens, which shall continue to be subject to any other Liens held by any other parties on such Collateral (in the order of priority to which such other Liens are entitled under applicable non-bankruptcy law). In addition, Peoples Bank shall retain its Liens on such Collateral and shall be entitled to enforce its non-bankruptcy rights and remedies against its Collateral as a holder of such Liens under applicable non-bankruptcy

law, and the automatic stay of section 362(a) of the Bankruptcy Code shall no longer apply to such Collateral as of the Confirmation Date.  To the extent that Peoples Bank's Claims are not Secured Claims, they shall be treated as Class 8 Claims.

(c)     In either case, the Secured Claims of Peoples Bank shall be deemed unimpaired within the meaning of section 1124 of the Bankruptcy Code, and as holder of a Class 2.8 Claim, Peoples Bank shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.9     **(PNC).**  The Secured Claims of PNC shall be treated as follows:

(a)     In the event that the Debtors and PNC enter into a written agreement mutually acceptable to PNC and the Debtors, such agreement shall be incorporated into the Plan as part of the Plan Supplement, and PNC's Secured Claims shall be treated as set forth in that Agreement.

(b)     In the absence of a mutually acceptable agreement between PNC and the Debtors, the Debtors shall surrender to PNC possession and control of the Collateral subject to PNC's duly perfected Liens, which shall continue to be subject to any other Liens held by any other parties on such Collateral (in the order of priority to which such other Liens are entitled under applicable non-bankruptcy law).  In addition, PNC shall retain its Liens on such Collateral and shall be entitled to enforce its non-bankruptcy rights and remedies as a holder of such Liens under applicable non-bankruptcy law, and the automatic stay of section 362(a) of the Bankruptcy Code no longer apply to such Collateral as of the Confirmation Date.  To the extent that PNC's Claims are not Secured Claims, they shall be treated as Class 8 Claims.

(c)     In either case, the Secured Claims of PNC shall be deemed unimpaired within the meaning of section 1124 of the Bankruptcy Code, and as holder of a Class 2.9 Claim, PNC shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

2.10     **(Regions Bank).**  The Secured Claims of Regions Bank, excluding its Class 1.1 Claims, shall be an Allowed Secured Claim and shall be treated and paid as follows:

(a)     Regions Bank's Secured Claim shall be amended and restated pursuant to loan agreements to be finalized and mutually approved by Regions Bank and the Debtors.  The amended and restated Regions Bank loan agreements shall be filed as part of the Plan Supplement prior to the Confirmation Date.

(b)     Under the amended and restated Regions Bank loan agreements, Regions Bank shall provide the Debtors with a $25 million line of credit (the "A Loan") for use after the Effective Date for the construction of homes and acquisition of real property.  In addition, the Regions Bank post-Confirmation Date credit facility shall be used to pay off the unpaid balance of the Regions Bank Class 1.1 Claim as of the maturity date of such loan.  Any vertical construction remaining as of the maturity date of the post-Petition Date loan shall be moved into the collateral base for the Regions Bank A Loan.  For the A Loan, the borrower shall

23

be Gemcraft Homes Group, Inc., and the guarantors shall be Gemcraft Homes, Inc., Gemcraft Homes Forest Hill, LLC, Gemcraft Chesapeake, LLC, DLM, LLC, Tull Gardens, LLC, St. Helen's LLC, Harkins Property, LLC, and The Preserve at Jefferson Creek, LLC.  Payments on the A Loan shall be made upon closing of the sale of homes funded under the A Loan, with the net proceeds first applied to the A Loan funding for the home, and then to pay the release price for payment on account of the Class 2.10 Claim, with such proceeds applied first to accrued and unpaid interest on the Class 2.10 Claim, with any balance of such release price to be applied to principal.  The interest rate shall be LIBOR plus 300 basis points, with a minimum rate of 3.5 %.

(c)     The unpaid balance of the Class 2.10 Claim (the "B Loan") shall be paid upon the third (3rd) anniversary of the Effective Date, or such later date to which Regions Bank may agree, subject to Paragraph III(2.10)(e) below.  The amended and restated Regions Bank Class 2.10 Claim shall be secured by a duly perfected Lien on all of Regions Bank's current Collateral as well as any and all real property acquired by any of the Debtors after the Effective Date with the proceeds of the Regions Bank loan.  The real property of the Debtors subject to Regions Bank's Liens, without any other Lien from any other Lender, shall be transferred and assigned by the Debtors owning such property to a new limited liability company that will be organized and formed for the purpose of holding title to the real property constituting the Regions Bank Collateral, to be called "Gemcraft RB Holding, LLC."  Regions Bank will advance funds to Gemcraft RB Holding, LLC, outside of the A Loan, to pay for the Holding Expenses related to such entity's ownership and preservation of the Regions Bank Collateral prior to its sale.  In addition, as of the Effective Date, the unpaid balance of the Regions Bank Class 1.1 Claim attributable to loans made by Regions Bank after the Petition Date and before the Confirmation Date for land development shall be deemed paid off and added and included as part of the B Loan.  In the event that the Regions Bank Collateral is completely liquidated and the Debtors' obligations to Regions Bank as of the Effective Date are paid in full with respect to all principal, interest and other charges, except for a total of no more than  $3,000,000, Regions Bank will agree to release the remaining balance of its Class 2.10 Claims.

(d)     The Class 2.10 Claim of Regions Bank shall be deemed to be impaired within the meaning of section 1124 of the Bankruptcy Code, and Regions Bank shall be entitled to vote to accept or reject the Plan pursuant to section 1126(a) of the Bankruptcy Code.

**2.11     (Slavie Federal Savings Bank).**  The Secured Claims of Slavie Federal Savings Bank shall be treated as follows:

(a)     The Debtors and Slavie Federal Savings Bank entered into a Consent Order Modifying Automatic Stay, entered on March 26, 2010 [Docket No. 473], the terms of which are incorporated by reference.  The terms of this Consent Order, and the parties' rights and obligations thereunder, shall continue in full force and effect and shall bind the Debtors and Slavie Federal Savings Bank as if fully set forth herein.

(b)     Slavie Federal Savings Bank shall retain its Liens on its Collateral as set forth in the parties' Consent Order.

(c)     The Secured Claims of Slavie Federal Savings Bank shall be deemed impaired within the meaning of section 1124 of the Bankruptcy Code, and Slavie Federal Savings Bank shall be entitled to vote to accept or reject the Plan pursuant to section 1126(a) of the Bankruptcy Code.

**2.12    (Stonebridge Bank).**  The Secured Claims of Stonebridge Bank shall be treated as follows:

(a)     In the event that the Debtors and Stonebridge Bank enter into a written agreement mutually acceptable to Stonebridge Bank and the Debtors, such agreement shall be incorporated into the Plan as part of the Plan Supplement, and Stonebridge Bank's Secured Claims shall be treated as set forth in that Agreement.

(b)     In the absence of a mutually acceptable agreement between Stonebridge Bank and the Debtors, the Debtors shall surrender to Stonebridge Bank possession and control of the Collateral subject to Stonebridge Bank's duly perfected Liens, which shall continue to be subject to any other Liens held by any other parties on such Collateral (in the order of priority to which such other Liens are entitled under applicable non-bankruptcy law).  In addition, Stonebridge Bank shall retain its Liens on such Collateral and shall be entitled to enforce its non-bankruptcy rights and remedies against its Collateral as a holder of such Liens under applicable non-bankruptcy law, and the automatic stay of section 362(a) of the Bankruptcy Code shall no longer apply to such Collateral as of the Confirmation Date.  To the extent that Stonebridge Bank's Claims are not Secured Claims, they shall be treated as Class 8 Claims.

(c)     In either case, the Secured Claims of Stonebridge Bank shall be deemed unimpaired within the meaning of section 1124 of the Bankruptcy Code, and as holder of a Class 2.12 Claim, Stonebridge Bank shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

**2.13    (Wachovia Bank, N.A.).**  The Secured Claims of Wachovia Bank, N.A. shall be treated as follows:

(a)     In the event that the Debtors and Wachovia Bank, N.A. enter into a written agreement mutually acceptable to Stonebridge Bank and the Debtors, such agreement shall be incorporated into the Plan as part of the Plan Supplement, and Wachovia Bank, N.A.'s Secured Claims shall be treated as set forth in that Agreement.

(b)     In the absence of a mutually acceptable agreement between Wachovia Bank, N.A. and the Debtors, the Debtors shall surrender to Wachovia Bank, N.A. possession and control of the Collateral subject to Wachovia Bank, N.A.'s duly perfected Liens, which shall continue to be subject to any other Liens held by any other parties on such Collateral (in the order of priority to which such other Liens are entitled under applicable non-bankruptcy law).  In addition, Wachovia Bank, N.A. shall retain its Liens on such Collateral and shall be entitled to enforce its non-bankruptcy rights and remedies against its Collateral as a holder of such Liens under applicable non-bankruptcy law, and the automatic stay of section 362(a) of the Bankruptcy

Code shall no longer apply to such Collateral as of the Confirmation Date. To the extent that Wachovia Bank, N.A.'s Claims are not Secured Claims, they shall be treated as Class 8 Claims.

(c)        In either case, the Secured Claims of Wachovia Bank, N.A. shall be deemed unimpaired within the meaning of section 1124 of the Bankruptcy Code, and as holder of a Class 2.13 Claim, Wachovia Bank, N.A. shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

**3.        Class 3 (Property Tax Authorities).**  The Allowed Claims of Property Tax Authorities, excluding such Claims that are determined to be Administrative Claims, shall be treated as follows:

(a)        Except as set forth in Paragraph III(B)(3)(b) below or to the extent that a holder of an Allowed Class 3 Claim agrees to a less favorable treatment, the holder of an Allowed Class 3 Claim shall be paid in full through regular installment payments of cash, over a period ending five (5) years after the Petition Date, having a total value, as of the Effective Date, equal to the Allowed amount of such Claim, as required by section 1129(a)(9)(C) and (D) of the Bankruptcy Code.

(b)        Notwithstanding the foregoing, in the event that a Class 3 Claim is secured by a Lien on real property surrendered to a holder of a Class 2 Secured Claim, either before the Confirmation Date or pursuant to the Plan, such Class 3 Claim shall retain a Lien on such real property until paid in full with all interest and other charges due under applicable non-bankruptcy law, and shall be entitled to enforce all of the holder's rights and remedies against such real property as provided under applicable non-bankruptcy law.

(c)        Class 3 is not impaired under the Plan, and pursuant to section 1126(f) of the Bankruptcy Code, the holders of Class 3 Claims are not entitled to vote on the Plan and shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

**4.        Class 4 Claims (Secured Claims Other Than Lenders and Secured Mechanics' Lien Claims).**

Except to the extent that a holder of an Allowed Class 4 Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Class 4 Claim shall receive one of the following treatments, as the Debtors may determine in their sole and absolute discretion:  (a) the Debtors' payment of Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (b) the Debtors' surrender of the Collateral securing such Class 4 Secured Claim, in full and complete satisfaction of such Allowed Class 4 Secured Claim.  Such payment or surrender of Collateral shall occur as soon as reasonably practicable upon or after the Distribution Date, or, if the Class 4 Claim is not Allowed as of the Distribution Date, thirty (30) days after the date on which such Class 4 Claim becomes an Allowed Class 4 Secured Claim.  Class 4 is not impaired under the

26

Plan, and the holders of Class 4 Claims are not entitled to vote on the Plan and shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

     5.     **Class 5 Claims (Secured Mechanic's Lien Claims).**

     (a)     Unless the Debtors agree in writing otherwise, all Mechanic's Lien Claims shall be treated as Class 8 General Unsecured Claims under the Plan unless and until such time that the Bankruptcy Court enters a Final Order determining any such Mechanic's Lien Claim to qualify as a Secured Claim pursuant to section 506(a) of the Bankruptcy Code.

     (b)     In the event a Mechanic's Lien Claim is determined to be a Secured Mechanic's Lien Claim by a Final Order, and except to the extent that the Debtors and the holder of an Allowed Class 5 Claim agree otherwise, each holder of an Allowed Class 5 Claim shall be paid in full, in one of the following ways, as selected by the Debtors in their respective discretion:  (a) in Cash within thirty (30) days after the date on which such Class 5 Claim becomes an Allowed Class 5 Claim; (b) the holder of an Allowed Class 5 Claim shall retain its Lien on the property on which the holder's Lien attaches, and shall be paid in full (i) upon the closing of the sale of any such property to which the holder's lien attaches, or (ii) if the property subject to the Lien is funds escrowed pursuant to a Bankruptcy Court Order from the prior sale of real property, from the escrow funds; or, (c) in the event that the Debtors, before or under the Plan, surrender real property to the Lender with a senior Lien on such property, the holder of the Class 5 Claim against such property shall retain its Lien on the property in the order of priority to which such Lien is entitled under applicable law, and shall be entitled to exercise all of such holder's rights and remedies under applicable non-bankruptcy law to enforce its Secured Mechanic's Lien Claim with respect to any such property.

     (c)     Class 5 is not impaired under the Plan, and the holders of Class 5 Claims are not entitled to vote on the Plan, and shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

     6.     **Class 6 Claims (Priority Claims)**

Except to the extent that a holder of an Allowed Class 6 Claim agrees to a less favorable treatment, as soon as reasonably practicable upon or after the Distribution Date, or, if the Class 6 Claim is not Allowed as of the Distribution Date, thirty (30) days after the date on which such Class 6 Claim becomes an Allowed Class 6 Claim or otherwise becomes due and payable, each holder of an Allowed Class 6 Claim shall receive Cash equal to the amount of such Allowed Claim without post-Petition Date interest.  Class 6 is  not impaired under the Plan, and the holders of Class 6 Claims shall be deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

     7.     **Class 7 Claims (Convenience Claims).**

Each holder of an Allowed Convenience Claim shall receive, in full satisfaction of such Claim, Cash in an amount equal to ten percent (10% ) of the amount of its Allowed Class 7 Claim, on or as soon as reasonably practicable after (i) the Distribution Date, or (ii) the first Business Day after the date thirty (30) days after the date such Claim becomes an Allowed

Claim.  Class 7 is impaired under the Plan and holders of Class 7 Claims shall be entitled to vote to accept or reject the Plan pursuant to section 1126(a) of the Bankruptcy Code.

### 8.      Class 8 Claims (General Unsecured Claims)

On the Distribution Date, the Debtors shall pay to the Class 8 Disbursing Agent the Class 8 Payment.  Each holder of an Allowed Class 8 Claim shall receive its Pro Rata share of the Class 8 Distributable Cash on each Class 8 Distribution Date.  Class 8 is impaired under the Plan, and holders of Class 8 Claims shall be entitled to vote to accept or reject the Plan pursuant to section 1126(a) of the Bankruptcy Code.

### 9.      Class 9 Claims (Debtors' Intercompany Claims)

Except as the Debtors may otherwise determine, Class 9 Claims shall be discharged and released as of the Effective Date.  Class 9 Claims shall receive no distributions under the Plan. Class 9 is impaired under the Plan, and because holder of Class 9 Claims are not entitled to receive or retain any property under the Plan on account of such Claims, holders of Class 9 Claims shall be deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

### 10.      Class 10 Equity Interests (Old Equity Interests)

On the Effective Date the Equity Interests in the Debtors will be deemed canceled and extinguished, except that DLM, LLC shall retain its Equity Interest in Harkins Property, LLC. On the Effective Date, General Capital, LLC shall pay the New Equity Purchase Price (subject to Paragraph III (B)(1.3)(a), to the Debtors and shall purchase all of the equity and ownership interests of each of the Debtors; except that DLM, LLC shall continue to hold the Equity Interests of the King Property, LLC.  As of the Effective Date, Gemcraft Capital, LLC shall be the sole holder of equity or ownership interests (limited liability company interests and common stock, as applicable) of each of the Debtors, in exchange for payment of the New Equity Purchase Price; provided, however, that DLM, LLC shall retain its Equity Interest in Harkins Property, LLC.

## D.      Means for Implementation of Plan

### 1.      Continuation of the Business.

Upon confirmation of the Plan, the Reorganized Debtors will continue their respective legal existence and will be re-vested with title to all property and property rights of their respective estates (including Causes of Action), except to the extent that the Plan expressly provides otherwise.

### 2.      Management and Operations.

The Reorganized Debtors shall be authorized to operate their businesses and to use, sell, lease or otherwise dispose of property free of any restrictions contained in the Bankruptcy Code or Bankruptcy Rules, but subject to the provisions of the Plan.

28

3.      **New Equity Ownership of Reorganized Debtors**.

On the Effective Date the Equity Interests in the Debtors will be deemed canceled and extinguished, except that Gemcraft Homes Forest Hill, LLC shall retain its Equity Interest in Harkins Property, LLC.  On the Effective Date, Gemcraft Capital, LLC shall pay the New Equity Purchase Price (subject to Paragraph III (B)(1.3)(a), to the Debtors and shall purchase all of the equity and ownership interests of each of the Debtors (except as noted above).  Gemcraft Capital, LLC thus shall be, as of the Effective Date, the sole holder of equity or ownership interests -- limited liability company interests and common stock, as applicable -- with the one exception noted above.

4.      **Avoidance Actions.**

(a)      The Debtors' Estates shall retain all Avoidance Actions.  The Plan Administration Committee shall be vested with all rights, powers, and authority of the Debtors' Estates with respect to all Avoidance Actions.  Any such actions shall be brought on behalf of the Debtors' Estates, with all net proceeds recovered, after payment of all expenses incurred by the Plan Administration Committee, to be distributed Pro Rata to the holders of Allowed Class 8 Claims, as and when the Plan Administration Committee deems appropriate, in its discretion, taking into account the amount available to distribute, the costs of distribution, and the need to retain funds reasonably anticipated to be needed for the expenses of administration of the Plan after the Effective Date.

(b)      The Plan Administration Committee shall have the sole and exclusive right to commence, prosecute, pursue, settle, compromise, receive the proceeds and recoveries from, and/or abandon any and all Avoidance Actions, without any requirement of Bankruptcy Court approval.  All funds received by the Plan Administration Committee shall be held by the Disbursing Agent for the benefit of holders of Class 8 Allowed Claims.

(c)      The Plan Administration Committee shall be entitled to employ counsel and other professionals to assist in pursuing Avoidance Actions and to assist the Plan Administration Committee in fulfilling its obligations under the Plan, and shall be entitled to pay such professionals from funds received pursuant to Paragraph IV(C)(2) of the Plan and any funds recovered from the Avoidance Actions.

5.      **Corporate Actions**.

On the Effective Date, or as soon thereafter as is practicable, (i) each of the Debtors' articles of incorporation and bylaws, or if applicable operating agreement, shall be amended as necessary to comply with the provisions of section 1123(a)(6) of the Bankruptcy Code and otherwise in a manner not inconsistent with the Plan, and (ii) the Debtors shall execute and deliver all documents, instruments and agreements that are necessary to implement the Plan.

6.      **Plan Supplement**

The Plan Supplement shall be considered to be an integral part of the Plan, and entry of the Confirmation Order shall constitute (a) approval of the Plan Supplement and all agreements

and other documents included therein, and (b) authorization of the Debtors to take any and all actions necessary or desirable, in the Debtors' business judgment, to implement and consummate all such agreements and other documents.

### 7.    Plan Funding.

(a)    The Plan shall be funded by the Debtors' cash on hand as of the Effective Date, by advances from Gemcraft Capital, LLC, and by payment of the New Equity Purchase Price, and by the Debtors' future revenues from the operation of their businesses.  In addition distributions to holders of Class 8 Allowed Claims shall share Pro Rata in net recoveries from Avoidance Actions.

(b)    On the Effective Date, the Debtors shall pay the Class 8 Payment to the Disbursing Agent.

### 8.    Effect of Confirmation of the Plan.

(a)    **Discharge of Claims**

Except to the extent provided otherwise in the Plan, all Claims against the Debtor shall be deemed fully satisfied, discharged, waived and released in exchange for the treatment of such Claims under the Plan, to the fullest extent provided under section 1141 of the Bankruptcy Code.

(b)    **Comprehensive Settlement of Claims and Controversies**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims or controversies relating to the rights that a holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtor, the Estates and their respective creditors, and is fair, equitable and reasonable.

### 9.    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The Reorganized Debtors or their respective designees shall be authorized to (1) execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan and (2) certify or attest to any of the foregoing actions.  Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp tax, real estate transfer tax, sales and use tax or similar tax:  (1) any sale transaction; (2) the transfer of any Property to a subsidiary or affiliate of any of the Debtors; and/or (3) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the

45674/0002-6330587v6

Plan, including any merger agreements or agreements of consolidation, disposition, liquidation or dissolution executed in connection with any transaction pursuant to the Plan.

**E.     Treatment of Executory Contracts and Unexpired Leases**

**1.     Executory Contracts and Unexpired Leases to Be Rejected**

On the Effective Date, except to the extent that the Debtors either previously assumed or rejected an Executory Contract or Unexpired Lease pursuant to an order of the Bankruptcy Court, or has filed a motion to assume and assign or reject an Executory Contract or Unexpired Lease prior to the Effective Date, each Executory Contract and Unexpired Lease entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be assumed pursuant to section 365 of the Bankruptcy Code. Each such contract and lease will be assumed only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The Confirmation Order will constitute an order of the Bankruptcy Court approving such assumptions and rejections pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

**2.     Bar Date for Rejection Claims**

Notwithstanding anything in the Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan gives rise to a Claim by the other party or parties to such contract or lease, such rejection Claim will be forever barred and will not be enforceable against the Estate unless a proof of Claim is Filed and served on the Plan Notice Parties no later than thirty (30) days after the Effective Date.

**F.     Provisions Governing Distributions**

**1.     Method of Distributions to Holders of Allowed Claims**

The Class 8 Disbursing Agent, will make all distributions of Cash required under the Plan to holders of Allowed Class 8 Claims from the Class 8 Distributable Cash on each applicable Class 8 Distribution Date. The Debtors will make all distributions required under the Plan, other than the distributions on account of Allowed Class 8 Claims.

2.      **Compensation**

The Class 8 Disbursing Agent providing services pursuant to the Plan, and any professionals employed by the Class 8 Disbursing Agent to assist the Class 8 Disbursing Agent in carrying out its duties hereunder, shall be paid reasonable compensation for its services rendered and expenses incurred after the Effective Date from the funds to be provided by the Debtors pursuant to paragraph IV(C)(2) of the Plan and the proceeds of any recoveries from Avoidance Actions, without further Bankruptcy Court approval.

3.      **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

(a)      **Delivery of Distributions to Holders of Allowed Claims**

Distributions to holders of Allowed Claims will be made by the Debtors or the Class 8 Disbursing Agent, as applicable, (a) at the addresses set forth on the respective proofs of Claim, requests for payment of Administrative Claim or similar document Filed by holders of such Claims; (b) at the addresses set forth in any written certification of address change delivered to the Debtors and the Class 8 Disbursing Agent after the date of Filing of any related proof of Claim, requests for payment of Administrative Claim or similar document; or (c) at the addresses reflected in the Debtors' Schedules if no proof of Claim has been Filed and the Debtors and Class 8 Disbursing Agent have not received a written notice of a change of address.

(b)      **Undeliverable Distributions Held by Class 8 Disbursing Agent**

Distributions returned to the Debtors or Class 8 Disbursing Agent or otherwise undeliverable may either be redistributed to holders of Allowed Class 8 Claims on a Pro Rata basis, or, if such amount is too small (taking into account the cost of such distributions relative to the amount available for distribution), in the Class 8 Disbursing Agent's sole judgment and discretion, to redistribute, such funds shall be returned to the Debtors.

4.      **Distribution Record Date**

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of any Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.  The Disbursing Agent will have no obligation to recognize the transfer or sale of any Claim that occurs after the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders who are holders of such Claims as of the close of business on the Distribution Record Date.

5.      **Setoffs**

Except with respect to claims of the Debtors released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Debtors and the Disbursing Agent, as may be applicable, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, may set off against any Allowed Claim

and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim) the Claims, rights and Causes of Action of any nature that the Debtors may hold against the holder of such Allowed Claim prior to the Effective Date; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim hereunder will constitute a waiver or release of any claims, rights and Causes of Action that the Debtors may possess against such a Claim holder, which are expressly preserved.

## G.    **Procedures for Resolving Disputed Claims**

### 1.    **Treatment of Disputed Claims**

#### (a)    **Estimation of Claims.**

The Debtors and the Class 8 Disbursing Agent, as applicable, may, at any time, request the Bankruptcy Court to estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors have previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to such Claim.  In the event the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors and/or the Class 8 Disbursing Agent, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.  On and after the Confirmation Date, Claims which have been estimated may be compromised, settled, withdrawn or otherwise resolved, without further order of the Bankruptcy Court.

### 2.    **Prosecution of Objections to Claims**

#### (a)    **Objections to Claims**

i.    The Plan Administration Committee shall have the sole and exclusive authority to object to Class 8 Claims, and the Reorganized Debtors shall have the sole and exclusive authority to object to all other Claims (except Administrative Claims and Professional Fee Claims).

ii.    All objections to Claims must be Filed and served on the holders of such Claims by the Claims Objection Bar Date.  If an objection has not been Filed to a proof of Claim or a scheduled Claim by the Claims Objection Bar Date, the Claim to which the proof of Claim or scheduled Claim relates shall be treated as an Allowed Claim if such Claim has not been allowed earlier.

45674/0002-6330587v6

### 3. Treatment of Disputed Claims

#### (a) No Partial Distributions Pending Allowance

No payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. The Class 8 Disbursing Agent shall establish reserves to ensure that Disputed Claims, to the extent they may become Allowed Class 8 Claims, will receive their proper Pro Rata Share of the Class 8 Distributable Cash.

#### (b) Distributions on Account of Disputed Claims Once Allowed

In the event a Disputed Claim becomes an Allowed Claim, distributions on account of such previously Disputed Claim shall be made in accordance with Article VI of the Plan.

### H. Conditions Precedent to the Effective Date and Consummation of the Plan

The Effective Date shall not occur, and the Plan shall not be consummated, unless and until the Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Debtors, which shall be a Final Order unless the Debtors waive this condition.

### I. Cramdown

The Debtors request Confirmation under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that does not accept or is deemed not to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

### J. Injunction and Subordination Rights

### 1. Injunction

Except as provided in the Plan or the Confirmation Order and other than with respect to a right of recoupment or setoff, as of the Effective Date, all entities that held, currently hold or may hold (i) a Claim or other debt or liability subject to the Plan or (ii) an Equity Interest or other right of an equity security holder, will be permanently enjoined from taking any of the following actions in respect of any such Claims, debts, liabilities, Equity Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Debtors, the Committee or its members, the Class 8 Disbursing Agent or any Professional, other than to enforce any rights under the Plan; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Class 8 Disbursing Agent, the Committee or its members, or any Professional other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtors or their respective property; (d) asserting a right of subrogation of any kind against any debt, liability or obligation due to the Debtors; and (e) commencing or continuing any action, in any manner or in any jurisdiction that does not comply with or is inconsistent with the provisions of the Plan.

34

## 2.    Automatic Stay

Except as provided herein or otherwise determined by order of the Bankruptcy Court, the automatic stay imposed by operation of section 362 of the Bankruptcy Code shall remain in full force and effect until the earlier of the time the Bankruptcy Case is closed or dismissed.

## K.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such exclusive jurisdiction over the Bankruptcy Case after the Effective Date as is legally permissible, including, but not limited to, jurisdiction to:

1.    allow, disallow, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the amount, allowance, priority or classification of Claims or Equity Interests;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

3.    resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtors may be liable;

4.    ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date or brought thereafter;

6.    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, this Disclosure Statement, and the Confirmation Order;

7.    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, any Agreement or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan, including, but not limited to any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

8.    modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any

35

Bankruptcy Court order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

9.      issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan and the Confirmation Order;

10.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

11.      determine any other matters that may arise in connection with or relate to the Plan, the Confirmation Order, or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan and the Confirmation Order;

12.      determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for taxes;

13.      enter a final decree closing the Bankruptcy Case; and

14.      hear any other matter not inconsistent with the Bankruptcy Code.

## L.      **Miscellaneous Provisions**

### 1.      **Dissolution of the Committee**

On the Effective Date, the Committee shall dissolve, and the members thereof shall be released and discharged from all duties and obligations arising from or related to their membership.  The Professionals retained by the Committee and the respective members thereof shall not be entitled to assert any Fee Claims for any services rendered or expenses incurred on behalf of the Committee after the Effective Date, except for fees for time spent and expenses incurred:  (a) in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served after the Effective Date pursuant to Section III(A)(1)(d)(ii)(A) of the Plan; or (B) in connection with any appeal pending as of the Effective Date, including any appeal of the Confirmation Order.

### 2.      **Authority of Plan Administration Committee**

(a)      Prior to the Confirmation Date, the Committee shall select the individuals to serve on the Plan Administration Committee, which shall have the sole and exclusive authority, standing, power and responsibility to prosecute objections to Class 8 Claims and Avoidance Actions.  The Plan Administration Committee shall come into existence and commence its authority and responsibilities under the Plan on the Effective Date.

45674/0002-6330587v6

(b)    The Plan Administration Committee shall have the power and authority to engage professionals, including Tydings & Rosenberg, LLP as counsel, to assist it in the performance of its duties.  All fees and expenses incurred by the Plan Administration Committee shall be paid solely from the Cash made available for distributions to holders of the Class 8 Claims.  After all distributions to holders of Class 8 Claims have been made and all objections to Claims and Avoidance Actions have been resolved or concluded, the Plan Administration Committee shall cease to exist and all members shall be discharged from further duties and responsibilities.

### 3.    Exculpation

From and after the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any entity for any act taken or omitted to be taken in connection with, related to or arising out of the Bankruptcy Case, the Debtor, its Estate, or the consideration, formulation, preparation, dissemination, implementation, Confirmation, consummation or administration of the Plan, this Disclosure Statement, the Sale, or any transaction proposed in connection with the Bankruptcy Case or any contract, instrument, release or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection therewith; provided, however, that the foregoing provisions of Section XII(B)(1) of the Plan shall have no effect on: (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan or (b) the liability of any entity that would otherwise result from any such act, omission or occurrence to the extent that such act, omission or occurrence is determined in a Final Order to have constituted gross negligence or willful misconduct.

Notwithstanding any other provision of the Plan, no holder of a Claim or Equity Interest, no other party in interest, none of their respective agents, employees, Representatives, financial advisors, attorneys or affiliates, and no successors or assigns of the foregoing, shall have any right of action against any Exculpated Party for any act or omission in connection with, relating to or arising out of the Bankruptcy Case, the Debtor, its Estate, or the consideration, formulation, preparation, dissemination, implementation, Confirmation, consummation or administration of the Plan, this Disclosure Statement, or any transaction or document created or entered into, or any other act taken or omitted to be taken, in connection therewith, except for:  (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan or (b) the liability of any entity that would otherwise result from any such act, omission or occurrence to the extent that such act, omission or occurrence is determined in a Final Order to have constituted gross negligence or willful misconduct.

### 4.    Modification of the Plan

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan before the Effective Date.

37

## 5.    Revocation of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date. If the Debtors revoke or withdraw the Plan, or if Confirmation does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall:  (1) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor; (2) prejudice in any manner the rights of the Debtors or any other party in interest; or (3) constitute an admission of any sort by the Debtors or any other party in interest.

## 6.    Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

## 7.    Notices

(a)    Except as otherwise set forth in the Plan, all notices, requests or other communications required or permitted to be made in accordance with the Plan shall be in writing and shall be deemed given five (5) Business Days after first-class mailing, one (1) Business Day after sending by overnight courier, or upon receipt of facsimile transmission and addressed to:

| | |
|---|---|
| Cole, Schotz, Meisel, Forman & Leonard, P.A. | Tydings & Rosenberg LLP |
| Irving E. Walker, Esquire | Alan M. Grochal, Esquire |
| Gary H. Leibowitz, Esquire | Maria Ellena Chavez-Ruark, Esquire |
| 300 East Lombard Street, Suite 2000 | 100 East Pratt Street, 26th Floor |
| Baltimore, MD 21202 | Baltimore, MD 21202 |

(b)    **Limitation on Notice**

The Debtors shall give the following notice with regard to the following matters, which notice shall be deemed to be good and sufficient notice of such matters with no requirement for any additional or further notice:

i.    **Notice of Entry of Confirmation Order.**  Notice of the entry of the Confirmation Order shall be sufficient if mailed to all known holders of Claims and Equity Interests (which have not become Disallowed as of the date of mailing).  Such notice shall be mailed within five (5) Business Days of the date that the Confirmation Order becomes a Final Order.

ii.    **Post-Confirmation Date Service.**  From and after the date the Confirmation Order becomes a Final Order, notices of appearances and demands for service of process filed with the Bankruptcy Court prior to such date shall no longer be effective.  No further notices (other than notice of entry of the Confirmation Order) shall be required to be sent

38

to any entities or persons, except for any creditor who files a renewed request for service of pleadings and whose Claim has not been fully satisfied.

          iii.    **General Notice To Creditors.**  All notices and requests to creditors of any Class shall be sent to them at the addresses set forth on the proofs of Claim or, if no proof of Claim was filed, to their last known address as reflected in the records of the Debtors.  Any Creditor may designate in writing any other address for purposes of this Section, which designation shall be effective upon receipt by the Debtors or the Reorganized Debtors or the Disbursing Agent (as the case may be) after the Effective Date.

    **8.**    **Miscellaneous Provisions**

        (a)    **Binding Effect of Plan.**  The provisions of the Plan shall be binding upon and inure to the benefit of the Plan Proponents, any holder of a Claim or Equity Interest treated herein and each of their respective heirs, executors, administrators, representatives, predecessors, successors, assigns, agents, officers and directors and, to the fullest extent permitted under the Bankruptcy Code and other applicable law, each other Person affected by the Plan.

        (b)    **Severability**.  In the event the Bankruptcy Court determines, prior to the Confirmation Date, that any provision of the Plan is not permissible on its face or impermissible as applied to any Claim or Equity Interest, such provision shall be unenforceable as to all holders of Claims or Equity Interest or to the specific holder of such Claim or Equity Interest, as the case may be, as to which such provision is impermissible.  Unless the Bankruptcy Court determines otherwise, such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan or the Plan Proponents' obligation to proceed with confirmation or consummation of the Plan if any such ruling occurs.

        (c)    **Deletion of Class**.  Any class of Claims that does not contain as an element of an Allowed Claim or Claim temporarily allowed under Bankruptcy Rule 3018(b) as of the date of the commencement of the confirmation hearing shall be deemed deleted from the Plan for purposes of voting to accept or reject the Plan for the purposes of determining acceptance or rejection of the Plan by such class under Section 1129(a)(8) of the Bankruptcy Code.

        (d)    **Governing Law**.  Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other federal laws are applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the construction, implementation and enforcement of the Plan and all rights and obligations arising under the Plan shall be governed by, and construed and enforced in

accordance with, the laws of the State of Maryland, without giving effect to conflicts of law principles which would apply the law of a jurisdiction other than the State of Maryland or the United States of America.

(e) **Payment of Statutory Fees**.  All fees payable pursuant to Section 1930 of Title 28, of the United States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be paid on the Effective Date.  Any statutory U. S. Trustee's fees accruing after the Confirmation Date shall constitute Administrative Expense Claims and be paid in accordance with the Plan.

(f) **Interest**.  All holders of Allowed Unsecured Claims hereby waive any and all interest, late charges, penalties, attorneys' fees, court costs, and any other such charges of any kind arising from or related to such unsecured Claims not expressly provided for in the Plan.

(g) **Filing of Additional Documents**.  On or before the Effective Date, the Plan Proponents may file with the Bankruptcy Court such agreements and other documents which may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  In addition, the Court, to the extent necessary, shall direct any party to execute all appropriate documents and instruments to implement or further the provisions of the Plan.

(h) **Compliance**.  The Plan is not proposed principally for the purpose of avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933.  The provisions of Code § 1145 and 1146 shall apply hereto to the fullest extent permitted by law.

(i) **Reservation under Section 1129(b)**.  If all impaired classes do not vote in favor of the Plan, the Plan Proponents shall seek confirmation of the Plan in accordance with Section 1129(b) of the Bankruptcy Code either under the terms provided herein or upon such terms as may exist if the Plan is modified in accordance with Section 1127(a) of the Bankruptcy Code and the Plan.

(j) **Reservation of Rights**.  If the Plan is not confirmed by Final Order, or if the Plan is confirmed and the Effective Date does not occur, the rights of the Plan Proponents and all other parties in interest in the Chapter 11 Case, are and will be reserved in full.  Any concessions, settlements or statements reflected therein are made for the purposes of the Plan only and, if the Effective Date does not occur, no party in interest in the chapter 11 Case, shall be bound nor deemed prejudiced by any concession, settlement or statement.

(k)　　**Headings**.  The article and section headings used in the Plan are inserted for convenience and reference only and neither constitutes a part of the Plan nor in any manner effect the terms, provisions or interpretation of the Plan.

(l)　　**Entire Agreement**.　The Plan sets forth the entire agreement and undertakings relating to the subject matter hereof and supersedes all prior discussions and documents.  The Plan Proponents shall not be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for in the Plan and as may hereafter agreed to by the parties in writing.

(m)　　**Plan Controls**. To the extent any documents are inconsistent with the Plan, the language of the Plan controls.

## VI.　　CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

Each holder of a Claim or Equity Interest should consult its own tax advisor to determine what effect, if any, the treatment afforded its respective Claim or Equity Interest by the Plan may have under federal tax law, state and local tax laws and the laws of any applicable foreign jurisdictions.

No statement in this Disclosure Statement should be construed as legal or tax advice. Neither the Plan Proponents nor their professionals assume any responsibility or liability for the tax consequences the holder of a Claim or Equity Interest may incur as a result of the treatment afforded its Claim or Equity Interest under the Plan.

The principal income tax consequence for a creditor relates to its ability to deduct a portion of its Claim in the event the creditor does not receive full payment of its Allowed Claim. Section 166 of the Internal Revenue Code of 1986, as amended ("IRC") (relating to the deductibility of bad debts) generally provides that:

(a)　　a totally worthless business bad debt is deductible only in the tax year in which it becomes worthless;

(b)　　a partially worthless business bad debt is deductible in an amount not in excess of the part charged off on the taxpayer's within the taxable year; and

(c)　　in the case of a taxpayer other than a corporation, a nonbusiness bad debt which becomes completely worthless during that taxable year is deductible as a short-term capital loss and is subject to the limitations imposed on the deductibility of such losses.

41

For purposes of IRC section 166, a "nonbusiness debt" means a debt other than:  (a) one created or acquired in connection with the taxpayer-creditor's trade or business or (b) the loss from the worthlessness of which was incurred during the operation of the taxpayer-creditor's trade or business.

Pursuant to Treas. Reg. section 1.166-2(c), a bankruptcy filing is generally an indication of the worthlessness of at least a part of an unsecured and unperfected debt.  In bankruptcy cases, a debt may become worthless before settlement in some instances, and in others, only when a settlement has been reached.  In either case, the mere fact that bankruptcy proceedings are terminated in a later year, thereby confirming the conclusion that the debt is worthless, does not authorize the shifting of the deduction under IRC section 166 to such later year.  Pursuant to Treas. Reg. section 1.166-1(2)(ii), only the difference between the amount received in distribution of assets of a debtor and the amount of the claim may be deducted under IRC section 166 as a bad debt.

Generally, a taxpayer is entitled to a bad debt deduction with respect to accounts receivable only if the taxpayer has recognized as income the accounts receivable in the year in which the bad debt deduction is claimed or a prior taxable year.  Thus, bad debt deductions for worthless or partially worthless accounts receivable are normally available only to accrual method taxpayers.  Likewise, worthless debts arising from unpaid wages, salaries, fees, rents and similar items of taxable income are not allowed as a bad debt deduction unless such items have been reported as income in the year for which the deduction as a bad debt is claimed or for a prior taxable year.

Business bad debts deductible under IRC section 166 generally may be deducted using either the specific charge-off method or, if certain requirements are met, the nonaccrual-experience method.  Under the specific charge-off method, specific business bad debts that become either partially or totally worthless during the tax year may be deducted in the manner permitted by IRC section 166.

If a deduction is taken for a bad debt which is recovered in whole or part in a latter tax year, the taxpayer may have to include in gross income the amount recovered, except, under limited circumstances, the amount of the deduction that did not reduce taxes in the year deducted.

## VII.    <u>FEASIBILITY OF THE PLAN</u>

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless contemplated by the Plan.

The Debtors have analyzed their ability to meet their obligations under the Plan.  Based on the analysis set forth in **<u>Exhibit B</u>** to this Disclosure Statement and the operational, business and other assumptions set forth therein, the Debtors believe that they will have the financial capability to satisfy their obligations following the Effective Date pursuant to the Plan, including the payment of all cash distributions contemplated by the Plan.  **<u>Exhibit B</u>** includes the following

information:  (i) Estimated Cash Requirements to Make Payments Due at Confirmation, which includes the sources of the required cash (**Exhibit B-1**); (ii) a Pro Forma Balance Sheet upon Emergence (**Exhibit B-2**); and (iii) a Projected Income Statement, which presents the Debtors' projected operating revenues and expenses for the years 2010 and 2011 (**Exhibit B-3**).  As reflected in these exhibits, confirmation of the Plan will result in a reduction of the Debtors' bank loans and other  liabilities by approximately $85 million.  With this significant improvement to the Debtors' balance sheets and dramatic reduction of debt service obligations, the Debtors reasonably project that they will have more than enough cash upon confirmation of the Plan to meet all of its immediate payment obligations under the Plan, as well as the obligations to be paid over time in accordance with the terms set forth in the Plan.

The information in **Exhibit B** reflects that the Debtors' ability to meet their obligations under the Plan, while based on a sound foundation, will require Gemcraft Capital, LLC to continue to make advances to the Debtors during the Plan period, to supplement revenues from the Debt.  With all of the identified and available funding sources, the Debtors will ask the Bankruptcy Court, at the Confirmation Hearing, to find as a fact that the Plan is feasible, and that confirmation of the Plan is not likely to be followed by the liquidation, or need for further financial reorganization, of the Debtors.

## VIII.   BEST INTERESTS OF CREDITORS TEST

Section 1129(a)(7) requires that the Bankruptcy Court find, as a condition to confirmation, that each holder of a Claim or Interest in each impaired class: (1) has accepted the Plan or (2) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount such person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code (the "Best Interests of Creditors" test).  To make these findings, the Bankruptcy Court must: (a) estimate the cash proceeds that a chapter 7 would generate if each chapter 11 case were converted to a chapter 7 case and the assets of each such estate were liquidated; (b) determine the distribution that each non-accepting holder of a Claim or Interest would receive from the liquidation  proceeds under the priority scheme dictated in chapter 7; and (c) compare each holder's liquidation distribution to the distribution under the Plan that such holder would receive if the Plan were confirmed and consummated.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7), the Debtors, through their financial advisors and valuation consultants, FTI Consulting, Inc., with information from the Debtors' real estate valuation experts, The Great American Group, have prepared a "Best Interest of Creditors Analysis", which is attached hereto as **Exhibit C**.  **Exhibit C** compares the proceeds to be realized if the Debtors were to be liquidated in hypothetical cases under chapter 7 of the Bankruptcy Code to the results to be realized under the Plan.  As demonstrated by **Exhibit C**, under the Plan, each holder of an Allowed Claim will receive or retain under the Plan, on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. The Plan therefore meets the "best interest" test.

43

The Debtors are mindful that for holders of general unsecured Claims that do not qualify as Convenience Class Claims, the distributions under the Plan amount to only a very small fraction of the amounts owed. That is an unfortunate consequence of the limited cash available to pay such pre-bankruptcy Claims. Nevertheless, confirmation of the Plan will ensure that the Debtors have the ability to pay in full, when due, all of their post-Petition Date obligations to their vendors and other creditors, and also will enable the Debtors to continue to be a very good customer for those vendors that continue to supply goods and/or services to the Debtors after the Effective Date. The Debtors believe this is the best they can do in the circumstances, while retaining sufficient cash resources from their lending sources to face the challenges anticipated in the next few years in the homebuilding industry and continue as one of the leading independent builders in the mid-Atlantic region.

Under chapter 7 liquidation, certain factors would reduce the recoveries by unsecured creditors from the assets of the Debtors' Estate. First, in chapter 7 the Debtors would be unable to obtain credit to fund payments due to vendors for their post-Petition Date goods and services. These obligations are now being paid on a timely basis, and the Debtors will continue to make timely payments to such creditors while continuing to operate under chapter 11 and under the Plan upon confirmation. Second, the Debtors in a chapter 7 would be forced to abruptly cease construction of homes now being constructed for the Debtors' customers, which would significantly reduce the value of such homes and prevent the Debtors from realizing the benefit of the sales proceeds upon closing of the sales of completed homes. Third, in chapter 7, a trustee would be appointed, and the trustee would be entitled to be paid trustee commissions, in addition to the expenses the trustee would incur in employing professionals to assist the trustee in liquidating the Debtors' assets and completing the administration of the Estates.

With these factors in mind, there should be no doubt that the outcome of a hypothetical chapter 7 case would be disastrous not only for the Debtors but also for creditors and other parties in interest, including the Debtors' customers. The Debtors, for these reasons, believe that the Plan is in the best interests of creditors.

45674/0002-6330587v6

## IX.    <u>CONCLUSION</u>

It is important that you exercise your right to vote on the Plan.  It is the Debtors' belief and recommendation that the Plan fairly and equitably provides for the treatment of all Claims against the Debtors, and that the confirmation of the Plan is in the best interest of creditors. Confirmation of the Plan paves the way for the Debtors to emerge from bankruptcy and to continue developing land and constructing homes with the assistance of its many subcontractors and suppliers.  THE DEBTORS RECOMMEND THAT CREDITORS IN CLASSES 7 AND 8, as well as other creditors entitled to vote, VOTE TO ACCEPT THE PLAN.

Dated:  April 16, 2010

**Gemcraft Homes, Inc.**
**DLM, LLC**
**Gemcraft Homes Group, Inc.**
**Gemcraft Homes Forest Hill, LLC**
**Gemcraft Chesapeake, LLC**
**Harkins Property, LLC**
**Preserve at Jefferson Creek, LLC**
**S&M Properties, LLC**

By:   /s/ William R. Luther, Jr.
       William R. Luther, Jr.

45